# No. 23-30755

In the
United States Court of Appeals
for the Fifth Circuit

Anika Warner, as guardian of minor child, Y. J.,
*Plaintiff - Appellee*

v.

Talos ERT, L.L.C.,
Defendant – Appellant
_____

Vantrece Jackson,
Plaintiff - Appellee

v.

Talos ERT, L.L.C.,
Defendant - Appellant

On appeal from
the United States District Court for the Western District of Louisiana
No. 2:18-CV-1435

## Brief of Appellant, Talos ERT, L.L.C.

submitted by:

**Adams and Reese LLP**
Martin A. Stern, La. Bar # 17154
Raymond P. Ward, La. Bar # 20404
701 Poydras Street, Suite 4500
New Orleans, LA 70139
(504) 581-3234
(504) 566-0210 fax
martin.stern@arlaw.com
ray.ward@arlaw.com

**King & Jurgens, LLC**
George B. Jurgens III, La. Bar # 7602
Jedd S. Malish, La. Bar # 23846
201 St. Charles Ave., 45th Floor
New Orleans, LA 70170
(504) 582-3800
(504) 582-1233 fax
gjurgens@kingjurgens.com
jmalish@kingjurgens.com

# Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Vantrece Jackson | Zachary P. McFarlane of Zehl & Associates, P.C. Houston, TX |
| Vantrece Jackson | Ilijana Todorovic of Dupre Law Firm New Orleans, LA |
| Vantrece Jackson | Andy J. Dupre of Dupre Law Firm, L.L.C. New Orleans, LA |
| Vantrece Jackson | Justin C. Warner of Zehl & Associates, P.C. Houston, TX |
| Anika Warner | Michael K. Cox of Cox, Cox, Filo, Camel & Wilson, L.L.C. Lake Charles, LA |
| Anika Warner | Jonathan Kyle Findley of Arnold & Itkin, L.L.P. Houston, TX |
| Anika Warner | Ilijana Todorovic of Dupre Law Firm New Orleans, LA |
| Anika Warner | Andy Dupre of Dupre Law Firm, L.L.C. New Orleans, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| Talos ERT, L.L.C. | Martin A. Stern of Adams and Reese, L.L.P. New Orleans, LA |
| Talos ERT, L.L.C. | Raymond P. Ward of Adams and Reese, L.L.P. New Orleans, LA |
| Talos ERT, L.L.C. | George B. Jurgens of King & Jurgens, L.L.C. New Orleans, LA |
| Talos ERT, L.L.C. | Jedd S. Malish of King & Jurgens, L.L.C. New Orleans, LA |

s/ *Raymond P. Ward*
Attorney of record for Talos ERT, L.L.C.

## Statement Regarding Oral Argument

Appellant, Talos ERT, L.L.C, requests oral argument. This is a significant wrongful-death case arising under the Outer Continental Shelf Lands Act. The jury awarded $20 million and $6 million in non-pecuniary damages to the survivors of a worker against the owner of an offshore oil platform. The worker died in an accident there when his co-worker dropped a steel pipe on his head. Both were employed by an independent contractor who, under its contract, had "the authority and right to direct and control all of the details of the Work." The trial court committed numerous legal errors as to both liability and damages, including failing to apply the independent-contractor rule. And though the trial court granted a remittitur, it failed to apply this Court's maximum-recovery rule properly. The trial court also failed to rein in plaintiffs' counsel's repeated inflammatory appeals to passion and prejudice, including repeatedly branding the platform owner as a "convicted felon." As provided by Fed. R. App. P. 34, oral argument will provide the opportunity to discuss these errors and to answer any questions this Court may have.

# Table of Contents

Certificate of Interested Persons..............................................................................i

Statement Regarding Oral Argument..................................................................iii

Table of Contents ...................................................................................................... iv

Table of Authorities ................................................................................................vii

Introduction ................................................................................................................ 1

Jurisdictional Statement ......................................................................................... 4

Statement of the Issues ........................................................................................... 5

Statement of the Case.............................................................................................. 6

Summary of the Argument....................................................................................18

Argument....................................................................................................................22

    I.   The trial court should have granted Talos's motion for judgment
        as a matter of law...........................................................................................22

        A.  The de novo standard of review applies. ....................................23

        B.  The negligence of DLS, an independent contractor, cannot be
            imputed to Talos............................................................................24

            1.  DLS's work was not ultrahazardous.....................................25

            2.  DLS had operational control; Talos did not......................28

                a.  In its contracts with DLS, Talos did not retain
                   operational control..............................................................31

                b.  The only party who actually exercised operational
                   control was DLS, not Talos. ................................................32

        c.   Talos did not order DLS to do anything unsafe. ........................33

  C.  Talos was not independently negligent. .......................................................34

     1.   Under Louisiana law, Talos did not owe Jackson a duty to make its independent contractor, DLS, do its work safely. .........34

     2.   The testimony of plaintiffs' expert Ziegler failed to establish a duty under Louisiana law. ...................................................36

     3.   Talos did not assume a duty to police its independent contractor. ..............................................................................................42

  D.  Alternatively, the allocation of 88% fault to Talos is unreasonable. ..................................................................................................44

II.  On damages, the trial court committed multiple legal errors. .................46

  A.  The trial court's legal errors on damages require application of the de novo standard of review. .................................................................46

  B.  By using a verdict form with duplicative awards, the trial court violated this Court's precedents. ........................................................48

  C.  In applying this Court's maximum-recovery rule, the trial court failed to examine the facts of the cases it chose as benchmarks. ........................................................................................................53

     1.   The trial court correctly found the general-damage awards excessive. ...........................................................................................54

     2.   The trial court failed to consult factually similar cases, and it made an error in its calculation. ...................................................54

     3.   Factually similar cases show the excessiveness of the trial court's remitted awards. ..............................................................................59

          a.   Mrs. Jackson's general-damage award. .......................................59

  b. Y.J.'s general-damage award............................................................63

III. Inflammatory comments by plaintiffs' counsel permeated the
  trial, denying Talos a fair trial. ...............................................................68

  A. Under any standard of review, the inflammatory comments
   by plaintiffs' counsel require a new trial....................................69

  B. Counsel's inflammatory comments permeated the trial.....................69

   1. Branding Talos as a "convicted felon"...................................70

   2. Condemning Talos for seeking legal counsel. ..................................72

   3. Accusing Talos of witness intimidation...............................73

   4. Accusing Talos's counsel of misrepresentation.............................74

   5. Making conscience-of-the-community arguments.......................75

  C. The remedy is a new trial on all issues. ......................................76

Conclusion.............................................................................................................77

Certificate of Compliance....................................................................................79

# Table of Authorities

## Legislation

28 U.S.C. §1291 ................................................................................................... 4

28 U.S.C. §1331 ................................................................................................... 4

43 U.S.C. §1331 .................................................................................................. 24

43 U.S.C. §1333 .................................................................................... 4, 7, 24, 40

43 U.S.C. §1334 .................................................................................................. 36

La. Civ. Code art. 667 ....................................................................................... 25

1996 La. Sess. L. Serv. 1st Ex. Sess., Act No. 1 ............................................. 25

## Court Rules

Fed. R. App. P. 4 .................................................................................................. 4

Fed. R. App. P. 25 ................................................................................................ 7

Fed. R. App. P. 34 ................................................................................................ iii

Fed. R. Civ. P. 5.2 ................................................................................................ 7

Fed. R. Civ. P. 50 ........................................................................................... 4, 23

Fed. R. Evid. 404 ............................................................................................... 70

## Regulations

30 C.F.R. §250.1900 .......................................................................................... 36

30 C.F.R. §250.1914 ...............................................................37

**Cases**

*Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548 (5th Cir. 1987) .........22, 25, 29–31

*Alaniz v. Zamora-Quezada*, 591 F.3d 761 (5th Cir. 2009) ..........................69

*Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    787 F.3d 276 (5th Cir. 2015) ...........................................49

*Atlantic Coast Line R.R. Co. v. Anderson*, 267 F.2d 329 (5th Cir. 1959) ................45

*Bourg v. Texaco Oil Co.*, 578 F.2d 1117 (5th Cir. 1978) .......................40–41

*Boutwell v. Chevron USA, Inc.*, 864 F.2d 406 (5th Cir. 1989) ....................31

*Breaux v. Goodyear Tire & Rubber Co.*, 320 So.3d 1197
    (La. App. 4th Cir.), *writ denied*, 325 So.3d 363 (La. 2021) ................51

*Bujol v. Entergy Servs., Inc.*, 922 So.2d 1113 (La. 2004)................................42

*Caldarera v. E. Airlines, Inc.*, 705 F.2d 778 (5th Cir. 1983) .......................53

*Coleman v. BP Exploration & Prod., Inc.*, 19 F.4th 720
    (5th Cir. 2021) ...........................................22, 29–30, 33

*Coulter v. Texaco, Inc.*, 117 F.3d 909 (5th Cir. 1997)...........................29, 33

*Croce v. Bromley Corp.*, 623 F.2d 1084 (5th Cir. 1980) .......................49, 52

*Davis v. Dynamic Offshore Res., LLC*, 865 F.3d 235 (5th Cir. 2017) .......................33

*Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336 (5th Cir. 1990) .............................54

*Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187 (5th Cir. 1991) .......................29–30

*Dupre v. Chevron USA, Inc.*, 109 F.3d 230 (5th Cir. 1997) .........................41

*Echeverry v. Jazz Casino Co.*, 988 F.3d 221 (5th Cir. 2021)........................ 24, 29–33

*Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1975).............. 73, 76–77

*Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326 (5th Cir.), *amended*, 274 F.3d
    881 (5th Cir. 2001) ........................................................................................23

*Ellison v. Conoco, Inc.*, 950 F.2d 1196 (5th Cir. 1992).................................35

*Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229
    (D.D.C. 2006) ........................................................................................66–67

*FDIC v. Abraham*, 137 F.3d 264 (5th Cir. 1998) ............................................50

*Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003).........................30, 35, 41

*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996)........................45

*Goldman v. Bosco*, 120 F.3d 53 (5th Cir. 1997)................................................48

*Graham v. Amoco Oil Co.*, 21 F.3d 643 (5th Cir. 1994)................................36

*Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269 (5th Cir. 2000)..............53

*Hawkins v. Evans Cooperage Co.*, 766 F.2d 904 (5th Cir. 1985)...................... 22, 35

*Higgins v. Smith Int'l, Inc.*, 716 F.2d 278 (5th Cir. 1983), *disavowed in
    part on other grounds*, *Overman v. Fluor Constructors, Inc.*, 797 F.2d
    217 (5th Cir. 1986). ........................................................................................ 4–5

*Hill v. Shelter Mut. Ins. Co.*, 935 So.2d 691 (La. 2006) ................................51

*In re Deepwater Horizon*, 785 F.3d 986 (5th Cir. 2015) .............................48

*In re Quirk*, 705 So.2d 172 (La. 1997) ...........................................................52

*Keathley v. Buddy Ayers Constr., Inc.*, No. 3:21CV261, — F.Supp.3d —,
    2023 WL 8642706 (N.D. Miss. Dec. 14, 2023) ................................ 46, 49

*Kennedy-Fagan v. Estate of Graves*, 993 So.2d 255
(La. App. 1st Cir. 2008) ........................................................50

*Kent v. Gulf States Utils. Co.*, 418 So.2d 493 (La. 1982) ...............................................36

*LeJeune v. Shell Oil Co.*, 950 F.2d 267 (5th Cir. 1992)....................................................30

*Longoria v. Hunter Express, Ltd.*, 932 F.3d 360 (5th Cir. 2019) ........53–54, 59–60

*Maldonado v. Kiewit La. Co.*, 152 So.3d 909 (La. App. 1st Cir. 2014)..... 61–62, 64

*Malmay v. Sentry Ins. Co.*, 550 So.2d 366 (La. App. 3d Cir. 1989) ............59, 61, 63

*McDaniel v. R.J.'s Transp., LLC*, 310 So.3d 760 (La. App. 2d Cir. 2021) ......... 25, 29

*Moore v. M/V ANGELA*, 353 F.3d 376 (5th Cir. 2003) .......................... 54, 56, 59, 61

*Olsen v. Shell Oil Co.*, 561 F.2d 1178 (5th Cir. 1977)...............................................38–41

*Pete v. Boland Marine & Mfg. Co.*, No. 2023-C-170, — So.3d —, 2023 WL
6937381 (La. Oct. 20, 2023), *reh'g denied*, 2023 WL 8462168
(La. Dec. 7, 2023) .................................................................67

*Rachal v. Brouillette*, 111 So.3d 1137
(La. App. 3d Cir. 2013) ......................................50–51, 56–58, 63, 66

*Robertson v. Arco Oil & Gas, Inc.*, 948 F.2d 132 (5th Cir. 1991) ..............................29

*Romero v. Mobil Exploration & Producing N. Am., Inc.*,
939 F.2d 307 (5th Cir. 1991) ................................................40–41

*Salinas v. O'Neill*, 286 F.3d 827 (5th Cir. 2002) ...............................................................56

*Scott v. Pyles*, 770 So.2d 492 (La. App. 1st Cir. 2000) .................................. 60, 64–66

*Sec. & Exch. Comm'n v. Novinger*, 40 F.4th 297 (5th Cir. 2022) ..............................47

*Sledge v. Continental Cas. Co.*, 639 So.2d 805 (La. App. 2d Cir. 1994)...........63–66

*State v Brown*, 347 So.3d 745 (La. 2022).........................................................................52

x

*Stauder v. Shell Oil Co.*, No. 2022-CA-0593, 2023 WL 2009251 (La. App. 4th Cir. Feb. 15, 2023), *vacated*, No. 2023-C-619, — So.3d —, 2024 WL 176992 (La. Jan. 17, 2024) ............................................................ 66–67

*Tex. v. Ala.-Coushatta Tribe of Tex.*, 918 F.3d 440 (5th Cir. 2019) ......................... 47

*Thompson v. Crawford*, 223 So.3d 1163 (La. App. 1st Cir.), *rev'd in part on other grounds*, 229 So.3d 451 (La. 2017) .......................................................... 50

*Transco Leasing Corp. v. United States*, 896 F.2d 1435 (5th Cir.), *amended on reh'g*, 905 F.2d 61 (5th Cir. 1990) ................................................................. 49, 52

*Vallien v. State ex rel. Dept. of Transp. & Dev.*, 812 So.2d 894 (La. App. 3d Cir. 2002) .......................................................................................................... 64

*Voces v. Energy Res. Tech. G.O.M., L.L.C.*, 704 F.App'x 345 (5th Cir. 2017) ........... 43

*Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233 (5th Cir. 1985) ....................................................................................... 68–69, 75, 77

*Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265 (5th Cir. 1998) ............... 68–69

*Zepherin v. Conoco Oil Co.*, 884 F.2d 212 (5th Cir. 1989) ....................................... 35

*Zimko v. American Cyanamid*, 905 So.2d 465 (La. App. 4th Cir. 2005) .......................................................... 55, 59, 62, 66

**Other Authorities**

Restatement (2d) Torts §414 cmt. c (1965) .................................................................. 29

U.S. Bureau of Labor Statistics CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Jan. 17, 2024) ...................................................................................................... 58

# Introduction

This wrongful-death case is remarkably similar to many in which this Court has affirmed summary judgment. This Court has repeatedly held that, when the owner of an offshore platform hires an independent contractor to do work on the platform, the owner is generally not responsible for injuries to the contractor's employees caused by the contractor's negligence. Nor does the owner have a tort duty to intervene to correct the contractor's unsafe work practices.

Here, the owner, Talos ERT, L.L.C., hired an independent contractor, DLS, L.L.C., to remove corroded pipe from Talos's platform, with DLS having the authority to direct and control all of the details of its work. The decedent, DLS employee Walter Jackson, was killed when his co-worker dropped a 130-pound section of cut pipe from a height of 40 feet, striking Jackson in the head. The accident occurred because the DLS crew disregarded multiple safety instructions from the DLS supervisor:

First, DLS instructed its crew to never work under a suspended load. Violating this instruction, Jackson's co-worker attempted to lower the 130-pound piece of pipe while Jackson was directly below.

Second, DLS instructed its crew to use a rope to gently lower the sections of cut pipe. Instead, they pushed or kicked pipe off the scaffold,

letting it free-fall until it hit the end of the rope. This practice repeatedly shock-loaded the rope, weakening its fibers until it finally broke.

Third, DLS instructed its crew not to cut and lower pipe at the same time. But they did exactly this, causing sparks and hot debris to rain down on Jackson. He apparently tried to get out of the way by moving into the landing zone, believing his co-workers would not lower anything while cutting was being done. This miscalculation proved fatal.

In short, everything DLS could do wrong, it did do wrong. As the independent contractor "with the authority and right to direct and control all of the details of the Work" under the contract, DLS was, as a matter of law, alone responsible.  ROA.13516. The case should have never gone to the jury.

But the trial court did let the case go to the jury. Making matters worse, the trial court allowed plaintiffs' counsel to make repeated inflammatory appeals to passion and prejudice. These comments, permeating the entire trial, including 21 references to Talos as a convicted felon, 12 comments inviting the jury to condemn Talos for seeking advice of legal counsel in investigating this accident, 14 accusations of witness intimidation, 9 accusations of misrepresentation by Talos's trial counsel, and repeated conscience-of-the-community arguments in both opening and closing.

The outcome was predictable. In a case where the jury was already sympathetic to the surviving widow and child, it allocated 88% fault to Talos and only 12% fault to DLS. Not stopping there, the jury awarded shocking general damages—$6.6 million to the widow and, to the surviving child, $20 million.

Besides being excessive, these awards were also duplicative. Contrary to this Court's precedents, the trial court gave the jury a verdict form inviting the jury to award duplicative awards for emotional loss.

Recognizing the excessiveness of the awards, the trial court granted a remittitur. But the trial court committed legal error here, too, failing to properly apply this Court's maximum-recovery rule. That rule requires a court to determine remittitur by consulting factually similar cases. But the trial court consulted only cases with the highest awards, without regard to whether the cases were factually similar.

The upshot is a case that should have been dismissed as a matter of law, but instead is riddled with reversible error.

# Jurisdictional Statement

Although the plaintiffs originally alleged diversity jurisdiction (*see* ROA.40; ROA.13550), the parties later recognized that the basis of jurisdiction is federal question, 28 U.S.C. §1331. *See* ROA.254. The accident sued on occurred on the Outer Continental Shelf; therefore, plaintiffs' claims are governed by federal law, specifically the Outer Continental Shelf Lands Act. *See* 43 U.S.C. §1333(a).

This Court has jurisdiction of the appeal under 28 U.S.C. §1291. This appeal is from a final judgment on a jury verdict, modified by the trial court's grant of a remittitur. *See* ROA.9361-62 (final judgment); ROA.10730-41 (order granting remittitur). The judgment became appealable when the plaintiffs failed to opt for a new trial, thus accepting the remittitur. *See Higgins v. Smith Int'l, Inc.*, 716 F.2d 278, 281-82 (5th Cir. 1983), *disavowed in part on other grounds*, *Overman v. Fluor Constructors, Inc.*, 797 F.2d 217, 219 (5th Cir. 1986).

The appeal is timely under Fed. R. App. P. 4(a), particularly Rule 4(a)(4)(A). The trial court entered final judgment on February 10, 2023. ROA.9361-62. Twenty-eight days later (March 10, 2023), defendant and appellant, Talos, filed a timely motion for judgment as a matter of law or for new trial or remittitur under Fed. R. Civ. P. 50. ROA.9412. The trial court disposed of Talos's motion on September 28, 2023, denying JMOL and new

trial but granting remittitur and giving plaintiffs 15 days to request a new trial in lieu of the remittitur. ROA.10730-41. Under *Higgins*, this order became appealable 15 days later (October 13, 2023), when the plaintiffs tacitly accepted the remittitur by failing to request a new trial. Talos filed its notice of appeal on October 24, 2023—26 days after the order disposing of Talos's Rule 50 motion and 11 days after the plaintiffs tacitly accepted the remittitur. *See* ROA.10742 (notice of appeal).

## Statement of the Issues

1. A principal generally is not liable for the negligence of its independent contractor. Did the plaintiffs prove any exception to this rule?

   a. Did the plaintiffs prove that the work being done by the independent contractor, DLS, was ultrahazardous?

   b. Did plaintiffs prove that the principal, Talos, had operational control over DLS's work, or expressly or impliedly authorized DLS's negligent conduct?

2. A principal generally has no duty to ensure that its independent contractor performs its work safely, and this Court's precedents hold that regulations promulgated under the Outer Continental Shelf Lands Act do not create such a duty to an independent contractor's employees.

a. Did the testimony of plaintiffs' expert, based on regulations promulgated under the Lands Act, establish a duty owed by Talos to DLS's employees?

b. Did plaintiffs prove that Talos assumed a duty to DLS's employees to ensure their safety?

3. Alternatively, did the trial court err in denying new trial after the jury imposed 88% fault on Talos and only 12% on DLS, whose negligence directly caused the accident?

4. Did the trial court err in using a verdict form inviting duplicative awards for emotional wrongful-death damages?

5. Alternatively, in applying this Court's maximum-recovery rule, did the trial court err in failing to use as benchmarks cases that were factually similar to this case, and even then, erring in its calculation?

6. Did the jury's verdict result from passion and prejudice inflamed by plaintiffs' counsel's incendiary comments throughout the trial?

## Statement of the Case

This wrongful-death case arises from a workplace accident on an oil-and-gas platform on the Outer Continental Shelf. The platform was owned and

operated by Talos. The decedent, Jackson, was killed while working there for Talos's independent contractor, DLS.

The plaintiffs are Jackson's surviving son, Y.J.[1] (through his mother, Anika Warner) and Jackson's surviving spouse, Vantrece Jackson. Under the Outer Continental Shelf Lands Act, the case is governed by federal law, which adopts as surrogate federal law the tort law of the adjacent state, in this case Louisiana. *See* 43 U.S.C. §1333(a)(2)(A).

The accident occurred while the DLS crew was removing out-of-service firewater piping from beneath the platform's cellar deck. Two DLS employees were working on scaffolding hanging from the cellar deck, while Jackson and another DLS employee were stationed about 40 feet below on the +10 deck (so named because it is 10 feet above sea level). ROA.11383. According to the procedure devised by DLS supervisor Stephen DeLue, the DLS employees on the scaffold were to cut the pipe into manageable sections and then use a rope to gently lower the sections to the +10 deck. ROA.11305; ROA.11384-85. Once the pipe section reached the +10 deck, a DLS employee stationed there was to

---

[1] Since Y.J. is a minor, his initials are used to comply with Fed. R. Civ. P. 5.2(a) and Fed. R. App. P. 25(a)(5).

disconnect it from the rope and carry it to another area for eventual removal from the platform.

To ensure safety of the DLS employees on the +10 deck, the DLS employees on the scaffold were never to cut pipe and lower sections at the same time. ROA. 11387-88; ROA.11498. For further protection, the DLS employees on the +10 deck were to stay out of the barricaded landing zone whenever sections were being lowered. ROA.11305; ROA.11311; ROA.11345-46; ROA.11401.

Jackson and another DLS employee were stationed on the +10 deck. ROA.11383; ROA.11385. The accident occurred when DLS employees on the scaffold were simultaneously cutting and lowering a section of pipe while Jackson was directly below—violating two of DeLue's instructions. *See* ROA.11845 (DLS employee was cutting "when the pipe fell"); ROA.11853; ROA.11857. The cutting caused sparks and hot debris to rain down on Jackson. To avoid the falling hot debris, Jackson apparently entered the barricaded landing area. ROA.11227-28; ROA.11458-59. At the same time, a DLS employee violated another of DeLue's instructions by pushing or kicking off the scaffold a section of 6-inch pipe that was over four feet long[2] and

---

[2] ROA.12100-01 (pipe's length was 51½ inches, or 4 feet, 3½ inches).

weighed nearly 130 pounds.[3] ROA.11811; ROA.11814-16; ROA.11846. When the falling pipe hit the end of the rope, the rope broke and the pipe fell 40 feet, striking Jackson on the head.

Prior events leading up to the accident are undisputed. Because the supports holding the old firewater piping were corroded, Talos had decided to remove the piping and supports threatening walkways and stairs. ROA.12549. In early February 2018, Talos project engineer Larry Robinson contacted Stephen DeLue, a DLS supervisor, for this project. DLS held itself out as an expert in offshore marine construction. ROA.11219, ROA.11359, ROA.11499-500. DeLue himself had 23 years' experience in offshore construction. ROA.11359.

Talos already had two contracts with DLS to govern any work done for Talos: a Master Service Agreement with general rights and obligations, and a Bridging Agreement addressing safety issues. The Master Service Agreement stated that DLS was "an independent contractor, with the authority and right to direct and control all of the details of the Work, [Talos] being interested only in the result obtained," and that DLS's employees "at all times shall be under the direct and sole supervision and control of [DLS] ...." ROA.13516 ¶5.

---

[3] ROA.12126.

The Master Service Agreement further placed on DLS "sole responsibility for the safety of [DLS employees] as well as their performance in accordance with appropriate safety practices ...." ROA.13516 ¶4.

The Bridging Agreement required DLS to conduct its work "in accordance with the requirements of [DLS's] safe work policies ...." ROA.13460. It required DLS to use Talos's Job Safety Analysis (JSA) form, but allowed DLS to use its own form if it met Talos's minimum criteria. ROA.13461-62. The Bridging Agreement further obligated DLS, "[a]s a minimum requirement," to "follow the safe work practices communicated by Talos" before beginning any work at a Talos facility. ROA.13462.

For the pipe-removal project, Robinson sent DeLue a corrosion-mitigation task list (ROA.12549) and asked DeLue to scope the job. ROA.11360. DeLue visited the platform to do so, to see the piping for himself, and to prepare a job plan. *See* ROA.11365-66, ROA.13467. As DeLue described it, "I had to ... work on the job plan for correcting the corrosion issues" and "make it safe for these guys to work." ROA.11365.

On returning to shore, DeLue told Robinson that DLS could do the work safely. ROA.11366. Rather than remove only the piping and supports threatening walkways and stairs, DeLue recommended removal of all out-of-

service firewater piping and supports. ROA.11363, ROA.11368-69; ROA.12428 (Ex. D6). Robinson agreed with DeLue's recommendation. ROA.11370.

In planning the job, DeLue determined the personnel needed. *See* ROA.13469; ROA.11371-72. He also chose the equipment to use, putting that information on a job equipment list. *See* ROA.13470-71; ROA.11372-73. The equipment form had options for "air tuggers," air-powered hoists equipped with wire rope, which DeLue could have chosen to lower the cut sections of pipe. ROA.11376; ROA.11378. But DeLue chose instead to use ½-inch manila rope. ROA.11378. He testified that he had worked on projects like this before and had always used that kind of rope for the task. ROA.11373, ROA.11379. His boss, Joseph Tortomase, a 42-year veteran in offshore marine construction, confirmed that use of a rope for a job like this is common in the industry. ROA.11476-77. DeLue submitted his equipment list to Robinson before the work started, and Robinson approved it. ROA.11375.

DeLue also prepared another document breaking the job down into 26 steps. ROA.13472. According to DeLue, this was "[p]retty much" his final work plan for doing this job. ROA.11379; *see also* ROA.11380. In sum, DeLue chose the personnel, chose the equipment, and formulated the plan for the job.

The accident occurred on February 17, 2018, the second day of the pipe removal. The day began with a Job Safety Analysis meeting and completion of

a JSA form. ROA.11381; ROA.11406; *see also* ROA.12544-48 (JSA form).

According to Talos's Safety and Environmental Management System (SEMS) plan, "The immediate supervisor of the crew performing the job onsite must conduct the JSA, sign the JSA and ensure that all personnel participating in the job understand and sign the JSA." ROA.12566. Talos's person in charge of the facility (PIC) must then approve and sign the form. ROA.12566.

As the immediate supervisor of the DLS crew (ROA.11396), DeLue was responsible for conducting the JSA meeting. DeLue also filled out the Talos-supplied JSA form, signed it, and had each member of the DLS crew sign it. ROA.11298; ROA.11404-05; ROA.11398; ROA.11400.

Talos's PIC, Jeremy Bourque, also signed the JSA form. Above his signature was language stating that he visited the job location to review the JSA with all involved before work began. ROA.12544. At trial, DeLue did not know whether Bourque had walked the job site that morning, but he testified that he and Bourque "had walked that job down previously." ROA.11304.

During the JSA meeting, DeLue gave his crew instructions for doing the job safely. ROA.11782. The DLS welder, John Menser, was to cut a hole in the pipe near the end of the section about to be cut. The workers were then to put a shackle through the hole, run a strap through the shackle, and tie the rope to the strap. ROA.11385. *See also* ROA.13497 (photograph of pipe with attached

12

rigging). After this rigging was attached, the pipe section was cut. After it was cut, they were to use the rope to gently lower it to the +10 deck. ROA.11138; ROA.11305. Jackson and a co-worker were stationed on the +10 deck.

DeLue specifically instructed the workers on the scaffold not to cut and lower pipe at the same time. ROA.11387. Why? "Because … I didn't want any cutting going on when a man was below." ROA.11387. "I didn't want fire falling on anything down below. Don't work underneath a man overhead." ROA.11388. Thus, while a pipe section was being lowered, there should have been no fire or hot debris falling down to the +10 deck. ROA.11388:8-11.

DeLue gave further instructions intended to prevent injury from falling objects. There was an out-of-service area on the +10 deck with a pre-existing barricade. ROA.11311-12; ROA.11404; ROA.11072-73. Since the area was already barricaded, they decided to use it as the landing zone for the pipe. ROA.11311. Several times, DeLue told the DLS workers not to cross that barricade until the pipe reached the +10 deck. ROA.11345-46; ROA.11401. DeLue described this as "a common rigging practice. You do not work under a suspended load under any circumstances." ROA.11351. Bourque attended the JSA meeting, so he was aware of and approved these precautions. ROA.11303; ROA.11312; ROA.11410.

DeLue further instructed the workers on the scaffold to gently lower the cut pipe section to the +10 deck. ROA.11138. They were not to kick or push sections of pipe off the scaffold and let them drop to remove slack from the rope. ROA.11139.

Finally, to ensure that the job was carried out safely, DeLue was supposed to supervise. That was his job with DLS and his specific task for this project. ROA.11394-96. His DLS job description required him to "[s]upervise the safe execution of a project" and to "[e]nsure safety as a top priority for all personnel ...." ROA.11396-97.

The accident occurred because the DLS crew disregarded DeLue's safety instructions, and DeLue himself was not present to enforce his own instructions. The DLS welder, Menser, testified that when the accident occurred, he was cutting pipe with a welding torch at the same time that his co-worker was apparently attempting to lower the piece of pipe that killed Jackson. ROA.11853. A post-accident investigation conducted by DLS's Joseph Tortomase confirmed that this is exactly what happened. ROA.11480. This was contrary to DeLue's instructions to not cut and lower and the same time. ROA.11498. In its post-accident investigation, DLS concluded that this failure may have contributed to the accident: with sparks falling to the +10 deck where Jackson was located, he may have felt the need to move, and he may

14

have assumed that because pipe was being cut, his co-workers would not simultaneously attempt to lower anything. ROA.13480; ROA.11490.

Also contrary to DeLue's instructions, the DLS workers on the scaffold were not gently lowering the pipe sections. Instead, they would wrap a section of the rope around the scaffold rail to act as a brake, and then push or kick the pipe over the side, allowing it to free-fall until it hit the end of the rope. ROA.11811, ROA.11814-16.

Plaintiffs' expert Edward Ziegler testified that this conduct not only violated DeLue's instruction, but also was dangerous because it could shock-load the rope. ROA.11140:2-13; ROA.11156:22-ROA.11157:5. Defense expert Thomas Shelton defined shock-loading as "a sudden application of a load to material or to some kind of support device." ROA.12111. "Repeated shock loading of the rope," he explained, "gradually deteriorates the strand structure inside of the rope." ROA.12111. This deterioration "shows up in a shredding and tearing of the individual fibers within the rope." ROA.12111-12. Tortomase and Shelton agreed that the rope would have worked fine if the DLS crew had followed DeLue's instructions. ROA.11251, ROA.11255 (Tortomase); ROA.12126 (Shelton). But the broken ends of the rope recovered from the accident scene showed evidence of shock-loading. ROA.12112-13.

Most tragically, Jackson was directly below when the rope broke and the pipe fell, in violation of DeLue's instructions and DLS policy to never work under a suspended load. Immediately after the accident, his feet were found on the barricade itself, and his head about two and a half feet into the landing zone. ROA.11346-48.

The DLS worker attempting to lower the pipe, Byron Davis, was supposed to make sure that the landing zone was clear before attempting to lower the pipe. ROA.11860. He failed to do so, as Jackson was found directly below after the pipe fell.

Perhaps none of these failures would have happened if DeLue had been there to supervise and enforce his own instructions. But he was not. He admitted that, when the accident occurred, he was elsewhere. DLS employee Menser testified that, when the accident occurred, DeLue was in the galley and "wasn't out there supervising. He wasn't out there doing his job, if you ask me." ROA.11850. When asked what difference DeLue's presence would have made, he testified, "If he'd been doing his job and supervising, maybe this wouldn't have happened…. Can't do nothing in the galley, can you?" ROA.11854.

Two wrongful-death suits were filed in the trial court, one by Jackson's surviving child, Y.J., through his mother, Anika Warner, and the other by

Jackson's surviving spouse, Vantrece Jackson. Both suits named as defendants Talos and Diverse Safety & Scaffolding, LLC, the contractor who built the scaffold. ROA.40; ROA.13550. After the suits were consolidated (ROA.13653), Diverse was dismissed by summary judgment, leaving Talos as the only defendant. ROA.6374-90.

In pretrial proceedings, Talos moved for summary judgment. Talos argued that, under this Court's precedents, it could not be held liable for its independent contractor's negligence and it owed no duty to Jackson to ensure that its independent contractor did its work safely. ROA.741-92. Based on the same law, Talos moved for judgment as a matter of law at trial at the close of evidence. ROA.12234-35. The trial court denied both motions. ROA.6392-98; ROA.11236.

The case went to the jury, which rendered a stunningly disproportionate verdict on both liability and damages. On liability, the jury assigned only 12% fault to DLS, whose negligence directly caused Jackson's death, and assigned 88% fault to Talos. The jury's determination of damages was even more disproportionate: for general (non-pecuniary) damages, the jury assessed totals of $6.6 million for Mrs. Jackson and $20 million for Y.J. ROA.10754. After adding pecuniary damages and subtracting 12% for DLS's

negligence, the trial court rendered judgment against Talos for $6,677,378.40 in Mrs. Jackson's favor and $17,705,600 in Y.J.'s favor. ROA.9361-62.

Talos brought a timely renewed motion for judgment as a matter of law and alternative motion for new trial or remittitur. ROA.9412-13. The trial court denied JMOL and new trial but granted a remittitur, reducing both plaintiffs' awards for general damages. ROA.10730-41. After reduction for DLS's 12% fault, the trial court awarded $4,360,708.59 to Y.J. and $5,104,226.22 to Mrs. Jackson, and gave both plaintiffs 15 days to request a new trial in lieu of accepting these reduced awards. ROA.10741. Neither plaintiff did so. After the 15-day period expired, Talos appealed.

## Summary of the Argument

The trial court committed legal error in failing to grant judgment as a matter of law. This Court has regularly affirmed summary judgment on these grounds in remarkably similar circumstances, where an independent contractor's employee is injured through his employer's negligence while working on an offshore platform. As this Court has explained, the platform owner is not responsible for the independent contractor's negligence unless the employee was engaged in an ultrahazardous activity or the owner

retained operational control over the contractor's work or approved unsafe work practices.

Plaintiffs proved none of these exceptions. First, the work was not ultrahazardous because the job—removing corroded pipe—could have been performed safely. In fact, the accident would not have occurred without the multiple violations of the DLS supervisor's safety instructions. These violations include: (1) cutting and lowering pipe simultaneously, (2) repeatedly kicking or pushing sections of pipe off the scaffold, shock-loading the rope until it failed, and (3) lowering a section of pipe while Jackson was directly below. Had DLS avoided any of these negligent acts, Jackson would be alive today.

Second, the owner, Talos, neither retained operational control over DLS's work nor approved any unsafe work practices. According to this Court's precedents, the single most important evidence of operational control is the parties' contract. Here, the contract states that DLS "shall be deemed an independent contractor, with the authority and right to direct and control all of the details of the Work, Company [Talos] being interested only in the results obtained ...." ROA.13516 ¶5. There is no evidence that Talos took operational control away from DLS, or that Talos approved DLS's negligent acts that caused the accident.

Nor did plaintiffs prove any independent negligence by Talos. Under Louisiana law, the first element of a negligence case is existence of a legal duty. Plaintiffs failed to prove any such duty. Under Louisiana's no-duty rule, repeatedly recognized by this Court, a principal has no duty to ensure that its independent contractor does its work safely. While plaintiffs' liability expert testified that Talos failed to comply with regulations promulgated under the Lands Act, this Court has repeatedly held that those regulations do not create tort duties under Louisiana law. Nor did plaintiffs establish the essential elements under Louisiana law for assumption of a duty by Talos to protect DLS's workers from their own negligence.

On these grounds the trial court should have granted judgment as a matter of law. At a bare minimum, the trial court should have granted a new trial when the jury assigned only 12% fault to DLS and 88% fault to Talos.

Inflamed by improper appeals to passion and prejudice, the jury also awarded excessive emotional damages of $20 million and $6.6 million on the wrongful death claims brought by Jackson's son and wife respectively. These awards were not only excessive; they were also duplicative because the trial court violated this Court's precedents by asking the jury to make multiple awards for each plaintiff's emotional loss.

On Talos's post-trial motion, the trial court sought to remedy the excessive, but not duplicative, nature of the awards. But here, too, in granting remittiturs, the trial court committed legal error. In determining the remittiturs, the trial court should have looked to the highest awards in factually similar cases. But instead, the trial court simply looked to cases with the highest awards. Period.  The resulting awards are, therefore, still excessive.

Finally, the trial court did not address the root cause of the jury's inexplicable fault and damage determinations: plaintiffs' counsel's repeated improper appeals to passion and prejudice, which the trial court failed to rein in during trial. Specifically, plaintiffs' counsel repeatedly referred to Talos as a convicted felon, condemned Talos for seeking legal counsel, accused Talos of witness intimidation, accused Talos's counsel of misrepresentation, and made improper conscience-of-the-community arguments.

The remedy for the failure to grant judgment as a matter of law is to reverse and render judgment in Talos's favor, mooting all other errors. Alternatively, the remedy for all other errors is a new trial. An additional remedy for the excessive general-damage awards is to offer the plaintiffs a remittitur in lieu of a new trial on damages.

# Argument

**I.     The trial court should have granted Talos's motion for judgment as a matter of law.**

Because DLS was an independent contractor, two rules should have prevented the claims against Talos from going to the jury. One—the independent-contractor rule—is that a principal generally is not liable for the negligence of its independent contractor committed in the course of performing its contractual duties. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549 (5th Cir. 1987); *Coleman v. BP Exploration & Prod., Inc.*, 19 F.4th 720, 729 (5th Cir. 2021). The second—the no-duty rule—is that a principal has no duty to ensure that its independent contractor performs its work safely, or to discover and remedy hazards created by its independent contractor. *Hawkins v. Evans Cooperage Co.*, 766 F.2d 904, 908 (5th Cir. 1985). In case after case, this Court has applied these rules to affirm summary judgment in favor of platform owners in the same situation as Talos here.

Before trial, Talos moved for summary judgment, relying on these same rules and several of this Court's decisions affirming summary judgment in similar cases. ROA.741-92. During trial at the close of evidence, Talos raised the same argument in a motion for judgment as a matter of law. ROA.12234-35. After judgment on the verdict, Talos made the same argument in its

renewed its motion for JMOL. ROA.9412 et seq. The trial court denied all of these motions. ROA.6392-98; ROA.12236; ROA.10730-33.

In denying JMOL, the trial court committed reversible error. Under the independent-contractor rule, Talos is not responsible for DLS's negligence. And under the no-duty rule, Talos has no duty to intervene in and correct DLS's unsafe work practices.

### A.  The de novo standard of review applies.

This Court reviews de novo the trial court's ruling on a motion for judgment as a matter of law, applying the same legal standard as the trial court. *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 336 (5th Cir.), *amended*, 274 F.3d 881 (5th Cir. 2001). Under Fed. R. Civ. P. 50, a trial court in a jury trial may grant judgment as a matter of law against a party if that party has been fully heard on the issue and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue. In deciding a Rule 50 motion, the court reviews all of the evidence and draws all reasonable inferences in favor of the nonmoving party and may not make any credibility determinations. *Ellis*, 258 F.3d at 337.

When the jury is presented with more than one theory of negligence and the verdict is not clear which theory persuaded the jury, a new trial is

necessary if the evidence is insufficient on at least one theory but not on all. *Echeverry v. Jazz Casino Co.*, 988 F.3d 221, 228 (5th Cir. 2021).

Here, the parties stipulated that DLS was an independent contractor for Talos. ROA.12291. The jury was instructed that it could find Talos at fault for DLS's negligence under either of two theories: (1) that the activity DLS was hired to do was ultrahazardous, or (2) that Talos expressly or impliedly authorized DLS to do an unsafe work practice. ROA.12290-92. The jury was also instructed that it could find Talos independently negligent, and that it could do so under a theory of assumed duty. ROA.12290, ROA.12292-93. A holding of insufficient evidence on at least one but less than all theories requires a new trial. *Echeverry*, 988 F.3d at 228. A holding of insufficient evidence on all theories requires reversal.

## B. The negligence of DLS, an independent contractor, cannot be imputed to Talos.

This case is governed by the Outer Continental Shelf Lands Act, 43 U.S.C. §§1331 et seq. The Lands Act adopts as surrogate federal law the laws of the adjacent state—in this case, Louisiana—"[t]o the extent that they are applicable and not inconsistent with" federal law. 43 U.S.C. §1333(a)(2)(a).

Under Louisiana law, a principal is generally not liable for the offenses committed by an independent contractor in the course of performing its

contractual duties. *Ainsworth*, 829 F.2d at 549. This general rule is subject to two exceptions. The first exception applies when the liability arises from an ultrahazardous activity. *Id*. The second applies when the principal retains operational control over the contractor's work or expressly or impliedly approves unsafe work practices causing an injury. *McDaniel v. R.J.'s Transp., LLC*, 310 So.3d 760, 765 (La. App. 2d Cir. 2021). Neither exception applies here.

### 1. *DLS's work was not ultrahazardous.*

The issue of ultrahazardous activity never should have been submitted to the jury. In 1996, the Louisiana legislature amended La. Civ. Code art. 667 to "strictly limit[]" ultrahazardous activity "to pile driving or blasting with explosives." *See* 1996 La. Sess. L. Serv. 1st Ex. Sess., Act No. 1, §1 (amending La. Civ. Code art. 667). DLS's work did not involve either of these activities.

Nor, for that matter, was DLS's work ultrahazardous under pre-1996 law. Before 1996, activity needed three things to be ultrahazardous: (1) it must relate to land or some other immovable; (2) it must cause the injury, and the defendant must be engaged directly in the injury-producing activity; and (3) it must not require substandard conduct to cause injury. *Ainsworth*, 829 F.2d at 550.

This Court need not consider the first two elements because the third is dispositive: DLS could have done this job safely. Absent a combination of multiple negligent acts and omissions by DLS, the accident would not have occurred.

First, DLS employees repeatedly shock-loaded the manila rope by pushing or kicking the pipe off the scaffold and letting it free-fall until the rope suddenly caught it. ROA.11814-15; ROA.11846. Defense expert Thomas Shelton testified that the rope would have worked fine if it had not been shock-loaded. He conducted a test on an exemplar of ½-inch manila rope, the closest thing he could find to the rope used by DLS on this job. It failed at 1,181 pounds, nine times the 130-pound weight of the pipe that struck Jackson. ROA.12125-26. Had the DLS crew followed DeLue's instructions by gently lowering the pipe instead of repeatedly shock-loading the rope, the rope would have held up. According to Shelton, "The strength of this rope is more than sufficient to handle lifting, gently lifting the rope where you're not using acceleration to increase the load." ROA.12126.

DLS's supervisor, DeLue, agreed that the manila rope was up to the task; that's why he chose it. DeLue explained that the offshore construction industry routinely uses manila rope for a job like this. ROA.11374. He selected ½-inch manila rope, the same kind he had used on prior jobs. ROA.11379.

DeLue's boss, Tortomase, confirmed that companies like DLS have been safely doing this for decades. ROA.11477. Absent the DLS employees' shock-loading the rope, it would not have failed.

Second, even with the rope's failure, no one would have been hurt if not for the simultaneous cutting and lowering of pipe. DeLue specifically told his crew ***not*** to cut and lower at the same time. He "didn't want any cutting going on when a man was below." ROA.11387.

DeLue's boss, Tortomase, confirmed that DeLue's instructions prohibited the DLS crew from cutting and lowering pipe at the same time. ROA.11480-81. "Safety protocols would have been burning and then lowering after burning is complete." ROA.11492. By cutting and lowering pipe at the same time, the DLS crew violated DeLue's instructions and created a hazard. ROA.11490; ROA.11492. Plaintiffs' expert Edward Ziegler agreed that a contributing cause of the accident was DLS's conducting simultaneous operations (cutting and lowering), but he suggested that even this could have been done safely with proper controls. *See* ROA.11057-59. But had the DLS crew followed DeLue's instructions, there would have been no simultaneous operations at all.

Finally, even with DLS's improperly shock-loading the rope and simultaneously cutting and lowering pipe, no injury would have occurred if

27

Jackson had not been in the barricaded landing zone as pipe was being lowered. When the rope broke and the pipe fell, Jackson was directly underneath.

That, too, violated DeLue's instructions and DLS's own safety policy. According to DeLue, "That's a common rigging practice. You do not work under a suspended load under any circumstances." ROA.11351. Following that industry standard, DeLue instructed the DLS crew on the +10 deck to stay on the north side of the barricade until the pipe being lowered reached the +10 deck south of the barricade. ROA.11351-53. Tortomase confirmed DLS's policy that no worker should do anything beneath a suspended load. ROA.11495-96. He described that policy as "common sense." ROA.11496. Lowering pipe while Jackson was directly below violated that DLS policy. ROA.11497.

In sum, the DLS crew could have done this job safely. There is no evidence to the contrary. If the DLS employees had not committed multiple violations of DeLue's instructions and DLS's safety policy, the accident would not have occurred. The job was not ultrahazardous.

### 2. DLS had operational control; Talos did not.

The second exception to the independent-contractor rule applies if the principal retains operational control over the contractor's work or expressly

or impliedly approves the unsafe work practices leading to the injury. *McDaniel*, 310 So.3d at 765. "[A]bsent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal ... cannot be liable under the operational control exception." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997).

To have operational control, a principal must retain "at least some degree of control over the manner in which the work was done." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991) (quoting Restatement (2d) Torts §414 cmt. c (1965)). Whether a principal retains operational control turns on the principal's control over the independent contractor and its employees, not on the principal's control over its own premises. *Echeverry*, 988 F.3d at 232.

According to this Court's precedents, the following prerogatives normally belonging to a principal do ***not*** constitute operational control:

- Ownership of a platform where an injury occurs. *Robertson v. Arco Oil & Gas, Inc.*, 948 F.2d 132, 133 (5th Cir. 1991).

- The presence of the principal's "company man." *Ainsworth*, 829 F.2d at 550; *Coleman*, 19 F.4th at 730.

- The principal's periodic inspection of the job site to ensure that the work is being performed according to specifications. *Ainsworth*, 829 F.2d at 550; *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003).

- Requiring the contractor to comply with the principal's safety standards. *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992); *Echeverry*, 988 F.3d at 232. "[S]afety rules generally do not establish operational control as a matter of public policy." *Coleman*, 19 F.4th at 730.

- Holding safety meetings with the contractor's employees. *Duplantis*, 948 F.2d at 193.

- Taking an active interest in the safety of the independent contractor's employees. *Duplantis*, 948 F.2d at 193; *LeJeune*, 950 F.2d at 270.

In *Coleman*, this Court summed up its own jurisprudence on what is and is not operational control. "Operational control," this Court explained, "requires evidence of 'direct supervision' by the principal 'over the step-by-step process of accomplishing the work." 19 F.4th at 730 (footnote omitted). "That standard is not met merely because the principal contractually retained general rights" such as "the right to 'order the work stopped or resumed,' 'inspect its progress,' 'receive reports,' or demand that an independent contractor develop and implement safety procedures." *Id*. (footnotes omitted).

### a. In its contracts with DLS, Talos did not retain operational control.

Determining whether a principal has operational control depends greatly on whether the right to control the work has been contractually reserved to the principal; the control actually exercised by the principal is less important. *Ainsworth*, 829 F.2d at 550-51; *Boutwell v. Chevron USA, Inc.*, 864 F.2d 406, 408 (5th Cir. 1989); *Echeverry*, 988 F.3d at 232. Here, the contract vests all operational control in DLS and none in Talos.

The contractual relationship between DLS and Talos is defined by two contracts: a Master Service Agreement (ROA.13515 et seq.) and a Bridging Agreement (ROA.13459 et seq.). The Master Service Agreement states that DLS "shall be deemed an independent contractor, with the authority and right to direct and control all of the details of the Work, [Talos] being interested only in the results obtained …." ROA.13516 ¶5. Talos had only the right to approve the work and the "general right of inspection …." *Id.* It further states that DLS's employees "shall be under the direct supervision and control of [DLS] …." *Id.* It further places on DLS the "sole responsibility for the safety of Contractor Group as well as their performance in accordance with appropriate safety practices …." *Id.*, ¶4.

In the Bridging Agreement, DLS promised that its work "will be conducted in accordance with the requirements of [DLS's] safe work policies …." ROA.13460. DLS also promised, as "a minimum requirement," to "follow the safe work practices communicated by Talos Energy to [DLS] prior to beginning of work …." ROA.13461. As *Echeverry* says, requiring a contractor to comply with the principal's safety rules is not operational control. 988 F.3d at 232. DLS also agreed to use Talos's Job Safety Analysis (JSA) form, but could use its own form "as long as it [met] the minimum criteria of Talos Energy JSA procedure and form." ROA.13461-62.

### b. *The only party who actually exercised operational control was DLS, not Talos.*

While the control actually exercised is less important than the control retained by the principal in the contract, the evidence also negates operational control by Talos. The only person who directly supervised the DLS crew was DeLue. The only other DLS crewmember who testified—John Menser—confirmed this fact. He testified that on this job, DeLue was his supervisor (ROA.11776), that all work orders came from DeLue (ROA.11777), and that DeLue told the DLS crew how to do the work (ROA.11782). In contrast, Menser got no work orders from Talos and, in fact, never even talked to anyone from Talos. ROA.11866, ROA.11777.

32

### c. *Talos did not order DLS to do anything unsafe.*

Nor did Talos expressly or impliedly authorize unsafe work practices by DLS. To meet this exception, the principle must authorize "the *particular manner* which will render the work unsafe." *Davis v. Dynamic Offshore Res., LLC*, 865 F.3d 235, 236 (5th Cir. 2017) (citation omitted; emphasis added by this Court). In other words, the principal must give "an express or implied order to the contractor to engage in an unsafe work practice leading to an injury …." *Coulter*, 117 F.3d at 912. Observing but failing to object to an independent contractor's unsafe work practice is insufficient. *Echeverry*, 988 F.3d at 233; *Coleman*, 19 F.4th at 731.

In determining whether a principal authorized an unsafe work practice, a court must focus on the specific thing that caused the injury, not the work's overall purpose. *Coleman*, 19 F.4th at 732. Here, Talos never instructed the DLS employees—directly or impliedly—to do anything unsafe. Talos did not tell the DLS employees to (1) simultaneously cut the pipe into sections and lower those sections to the +10 deck; (2) push or kick the pipe sections off the

scaffold, thus repeatedly shock-loading the rope;[4] or (3) enter the barricaded landing zone while pipe was being lowered directly overhead.

All these actions making the job unsafe were contrary to DeLue's instructions. When the accident occurred, DeLue was not there to enforce his own instructions. Menser testified to this fact, and DeLue admitted it. ROA.11849-50 (Menser); ROA.11310 (DeLue). According to Menser, DeLue "wasn't out there supervising. He wasn't out there doing his job, if you ask me." ROA.11849-50. Menser testified that when the accident occurred, DeLue was in the galley. ROA.11864. "If he'd been doing his job and supervising, maybe this wouldn't have happened… Can't do nothing in the galley, can you." ROA.11864. There is no evidence in this record that Talos expressly or impliedly ordered DeLue to neglect his supervisory duties.

### C. Talos was not independently negligent.

#### 1. *Under Louisiana law, Talos did not owe Jackson a duty to make its independent contractor, DLS, do its work safely.*

Besides trying to pin DLS's negligence on Talos, plaintiffs allege that Talos is guilty of its own negligence. To determine whether a party is

---

[4] Plaintiffs' expert Edward Ziegler agreed that the Talos PIC did not tell the DLS crew to shock-load the rope by pushing or kicking the pipe sections off the scaffold. *See* ROA.11139-40.

negligent under Louisiana law, courts conduct a duty-risk analysis. This analysis resolves into three inquiries:

1. Was the defendant's affirmative conduct a cause-in-fact of the resulting harm?

2. Did the defendant owe a duty to protect this plaintiff from this type of harm arising in this manner?

3. Did the defendant breach that duty?

*See Ellison v. Conoco, Inc.*, 950 F.2d 1196, 1203 (5th Cir. 1992). The second element—existence of a duty and whether a particular risk of harm is included within the scope of a particular duty—is a legal question to be resolved by the court. *Id.* at 1205.

Under Louisiana tort law as consistently interpreted by this Court, Talos owed no duty to Jackson to ensure that its independent contractor, DLS, did its work safely. When, as here, an independent contractor's activity is not ultrahazardous, the principal has no duty to ensure, through instruction or supervision, that the independent contractor performs its obligations in a reasonably safe manner. *Hawkins*, 766 F.2d at 908.

Similarly, a principal who does not exercise operational control has no duty to remedy hazards created by its independent contractor. *Zepherin v. Conoco Oil Co.*, 884 F.2d 212, 213 (5th Cir. 1989); *Fruge*, 337 F.3d at 564. Even when the principal could have prevented an accident by interjecting itself and

demanding that the contractor act safely, the principal is not liable for failing to do so. *Graham v. Amoco Oil Co.*, 21 F.3d 643, 647 (5th Cir. 1994); *Kent v. Gulf States Utils. Co.*, 418 So.2d 493, 500 (La. 1982).

Thus, under Louisiana law, Talos had no duty to remedy hazards created by DLS or to interject itself into DLS's work practices. Without having breached any legal duty, Talos cannot be held liable.

### 2. *The testimony of plaintiffs' expert Ziegler failed to establish a duty under Louisiana law.*

Attempting to create a legal duty where none exists, the plaintiffs offered the expert testimony of Edward Ziegler. Ziegler, who has a law degree,[5] was tendered as an expert "on specific rules and regulations that apply out in the Gulf of Mexico." ROA.11022. His work on the case included research of federal regulations promulgated by the Department of Interior's Bureau of Safety and Environmental Enforcement (BSEE) under the authority of the Lands Act—specifically 43 U.S.C. §1334(a)—and applicable to oil-and-gas platforms on the Outer Continental Shelf. ROA.11017. He also reviewed Talos documents required by BSEE regulations. These included Talos's SEMS Plan, required by 30 C.F.R. §250.1900, and the Bridging Agreement between

---

[5] ROA.11013; *see also* ROA.12550 (Ziegler's resume).

Talos and DLS, required by 30 C.F.R. §250.1914. While he denied giving legal opinions, he insisted that "you have to understand how the regulations are applied in order to analyze whether they do apply or not." ROA.11024.

The gist of his testimony was that, by failing to exercise operational control over its independent contractor (which Talos had no duty to do under Louisiana law), Talos failed to comply with the federal regulations and its federally required SEMS plan. This is how Ziegler himself summarized his own testimony, under direct examination by plaintiffs' counsel:

> Q. Okay, sir. Just to sum it up, when we began we were talking about the BSEE rules and regulations that applied to this platform because Talos was the owner and operator, right?
>
> A. Yes.
>
> Q. Okay. And we've talked about the responsibility to issue permits, right?
>
> A. Yes.
>
> Q. We talked about responsibilities for safety, right?
>
> A. Yes.
>
> Q. Okay. And these were all on Talos because of the federal regulations in place, right?
>
> A. Right. The federal regulations and, as the process was developed at Talos based on the SEMS bridging document, et cetera, that all went back to the requirement of DLS and

Talos to follow the Talos safe work practices and JSA process
for this work.

[ROA.11083.]

By attempting to draw Louisiana tort duties from the BSEE regulations, Ziegler's testimony clashes with a consistent line of this Court's precedents. This line began with *Olsen v. Shell Oil Co.*, 561 F.2d 1178 (5th Cir. 1977) and has continued through at least four additional decisions discussed below. *Olsen* and its progeny hold that regulations promulgated under authority of the Lands Act do not create tort duties because the Lands Act "does not provide specifically for a civil remedy for violations of the statute or regulations, and because we feel that this is not the type of situation in which a cause of action should be implied or created." *Olsen*, 561 F.2d at 1179-80.

In *Olsen*, this Court did not reach its decision capriciously. Rather, this Court conducted a lengthy, detailed analysis of the Lands Act and its legislative history, and reached the following conclusions:

1. The Lands Act was not primarily intended to protect offshore workers. Rather, its primary purpose "was to assert United States jurisdiction over the shelf, and to set up a system for the full development of its natural resources." *Id.* at 1188. While protecting workers was "no doubt

a legitimate concern of Congress," it was "at best a secondary concern …." *Id.*

2. Because the Lands Act already "provides extensive civil remedies," the *Olsen* court "fail[ed] to see how implying this additional remedy will significantly further the goals Congress was seeking to accomplish in passing the act." *Id.* at 1188-89. The Lands Act's legislative history further "indicates that the plight of the workers was considered, and that the remedies provided for by the statute were intended to be the sole solution for this plight." *Id.* at 1189.

3. It would not be "consistent with the underlying purpose of the legislative scheme to imply a remedy for the plaintiffs." *Id.* at 1189. Because the remedies provided by the Lands Act are adequate, the *Olsen* court found that it was not "necessarily consistent with the legislative goal of the Act (to fully develop the natural resources of the Shelf) to impose liability upon a lessee based upon violation of a departmental regulation when that lessee is admittedly free from fault." *Id.*

4. A cause of action for personal injury is "traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 1189. Indeed, the Lands Act itself adopts as surrogate federal law the

tort law of the adjacent state. *See* 43 U.S.C. §1333(a)(2)(A). "We think

that it is apparent," *Olsen* reasoned, that personal-injury claims "should

be controlled by state law." *Id.* at 1190.

Based on this considered analysis, this Court concluded in *Olsen* that the

platform owner could not be held liable in tort for breach of regulations

promulgated under the Lands Act. *Id.* at 1179-80.

*Olsen*'s holding and reasoning have been continued in at least four

decisions of this Court:

- In *Bourg v. Texaco Oil Co.*, 578 F.2d 1117 (5th Cir. 1978), this Court

    rejected the plaintiff's argument "that because of these regulations

    [promulgated under the Lands Act], a platform owner who is otherwise

    free of negligence and who hires an experienced independent

    contractor and assigns to that contractor some rather routine work

    should be legally responsible for the negligent work methods utilized by

    that contractor." *Id.* at 1121. This Court concluded "that it would be

    error to so interpret these regulations absent a clear indication from

    Congress that this was their intent." *Id*.

- In *Romero v. Mobil Exploration & Producing North America, Inc.*, 939 F.2d

    307 (5th Cir. 1991), this Court rejected an argument that a breach of

federal regulations promulgated by BSEE's predecessor, Mineral Management Service, could serve as the basis for a tort claim under Louisiana law. This Court concluded "that no Louisiana cause of action arises merely from the breach of MMS regulations ...." *Id.* at 309.

- In *Dupre v. Chevron USA, Inc.*, 109 F.3d 230 (5th Cir. 1997), this Court followed *Olsen*, *Bourg*, and *Romero* to hold that regulations adopted under the Lands Act "provide no basis for an implied cause of action against" a platform owner, "nor do those regulations create an independent duty under Louisiana law on the part of ... the platform owner and principal, to protect a contractor's employee from hazards created by the contractor." *Id.* at 231.

- In *Fruge*, 337 F.3d at 563, this Court repeated its holding in *Romero* "that a violation of the MMS regulations does not give rise to a private cause of action," and that these same regulations "do not create an independent duty under Louisiana negligence law."

In light of these precedents, Ziegler's opinion on Talos's compliance with BSEE regulations has no bearing on whether Talos violated a legal duty owed to Jackson under Louisiana tort law. Any other conclusion is directly contrary to this Court's precedents in *Olsen*, *Bourg*, *Romero*, *Dupre*, and *Fruge*.

### 3. Talos did not assume a duty to police its independent contractor.

As noted above, one legal theory included in the trial court's jury instructions was voluntary assumption of a duty. ROA.12292-93. This theory never should have gone to the jury because there is insufficient evidence to support it.

Under Louisiana law, assumption of duty may arise when the defendant undertakes a duty to render services to another, which the defendant should recognize as necessary for the protection of a third person. *Bujol v. Entergy Servs., Inc.*, 922 So.2d 1113, 1129 (La. 2004). But proof of this alone is not enough. In addition, a plaintiff asserting assumption of duty must prove one of the following three things:

    (a) the defendant's failure to exercise reasonable care increased the risk of such harm; or

    (b) the defendant has undertaken to perform a duty owed by the employer to the injured employee; or

    (c) harm is suffered because of reliance of the employer or the injured employee upon the undertaking.

*Id*. (reformatted). The plaintiffs here failed to prove any of these three things.

To prove increased risk of harm under (a), the plaintiff must prove "some change in conditions that increases the risk of harm to the plaintiff over the level of risk that existed before the defendant became involved." *Id.* at

1135. This means "some physical change to the environment or some other material alteration of circumstances." *Id*. The evidence here negates increased risk of harm. Everything that physically contributed to this accident was done by DLS. Indeed, the plaintiffs' theory against Talos is its alleged *failure* to make "some physical change" to Jackson's work environment.

Proof of an undertaking under (b) requires the plaintiff to prove that the defendant's undertaking "was intended to supplant, not just supplement," the employer's duty. *Id.* at 1136; *Voces v. Energy Res. Tech. G.O.M., L.L.C.*, 704 F.App'x 345, 355 (5th Cir. 2017). There is no evidence that any oversight by Talos's person in charge was intended to supplant, as opposed to supplement, the supervision that DLS's DeLue was supposed to provide. In other words, Talos never took over DeLue's responsibility to supervise this job.

As for (c), there is no evidence that anyone connected with DLS relied on Talos to supervise this project. DLS could not reasonably expect Talos to supervise the project when the parties' contract required DLS to "have sole responsibility for the safety of Contractor Group as well as their performance in accordance with appropriate safety practices" and for all DLS personnel to "be under the direct and sole supervision and control of [DLS] ...." ROA.13516 ¶¶4-5.

DLS's personnel also could not have relied on anything in Talos's Safe Work Practices manual because, before the accident, they never read it. While DeLue's boss, Tortomase, testified that DLS had a copy of Talos's manual, he never gave it to DeLue to read. ROA.11509. When asked whether DeLue had read the Talos manual, Tortomase candidly answered, "Probably not." ROA.11509:14-17. Tortomase further testified that he never trained DLS workers on Talos's manual (ROA.11512), and that he himself never read it before this accident (ROA.11564). DLS's personnel could not possibly rely on something that they never read.

To sum up: Louisiana law imposed no duty on Talos to supervise its independent contractor's work. Ziegler's testimony failed to establish any duty under Louisiana law because the BSEE regulations on which he relied cannot have created any such duty. Finally, the evidence not only fails to support, but actually negates, any notion that Talos assumed DLS's duty to supervise this project. Without any duty owed to Jackson, Talos cannot have been negligent.

### D. Alternatively, the allocation of 88% fault to Talos is unreasonable.

For reasons explained above, Talos is entitled to judgment in its favor as a matter of law. But if this Court concludes otherwise, the Court should at least

grant a new trial on liability. DLS unquestionably had the primary—if not sole—responsibility to do its work safely. Talos did nothing wrong. But even if it did, it merely failed to provide a second layer of oversight in addition to the supervision that DeLue should have provided. Yet the jury assigned 88% fault to Talos and only 12% DLS, the party whose fault directly caused this accident. Talos argued this in its motion for new trial (*see* ROA.9446), and the trial court erred by denying Talos's motion.

Talos acknowledges the daunting standard of review. Apportioning damages under a comparative-negligence rule is for the jury, subject to review if excessive as a matter of law. *Atlantic Coast Line R.R. Co. v. Anderson*, 267 F.2d 329, 333 (5th Cir. 1959). Under the Seventh Amendment's re-examination clause, this Court does not review the jury's verdict directly. Rather, in deciding a party's motion for new trial, the trial court determines whether the jury's verdict is within the confines of state law; this Court then reviews the trial court's denial of new trial under an abuse-of-discretion standard. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996).

Even under this standard, the trial court abused its discretion in failing to grant a new trial on liability. Through its corporate representative, Tortomase, DLS actually admitted that it was at least 50% at fault. Tortomase testified that, in his view, DLS has "equal responsibility" and an "equal share of

responsibility" with Talos. ROA.11246-47. When Tortomase said "equal," he meant 50–50. ROA.11473. When asked whether DLS has a great deal of responsibility for this accident, he admitted, "A great deal." ROA.11473.

Talos submits that DLS had more than "a great deal" of responsibility; the parties' contract gave DLS *sole* responsibility for safety and supervision on this job. But leaving that fact aside, when a party *admits* 50% fault but the factfinder assigns that same party only 12%, the fault allocation has to have resulted from something other than a rational view of the evidence. If Talos is not granted a judgment as a matter of law, it should at least be granted a new trial on liability.

## II.    On damages, the trial court committed multiple legal errors.

### A.    The trial court's legal errors on damages require application of the de novo standard of review.

The trial court committed multiple legal errors on damages. First, contrary to this Court's precedents (and over Talos's objection), the trial court used a verdict form with multiple blanks for emotional damages on each plaintiff's wrongful-death claim. The trial court was bound to follow this Court's precedents; it has "no power to change the Fifth Circuit's approach ...." *Keathley v. Buddy Ayers Constr., Inc.*, No. 3:21CV261 M-P, — F.Supp.3d —, 2023 WL 8642706, at *4 (N.D. Miss. Dec. 14, 2023). By failing to follow this Court's

precedents, the trial court committed legal error, warranting de novo review of the resulting judgment. *Sec. & Exch. Comm'n v. Novinger*, 40 F.4th 297, 302 (5th Cir. 2022) ("This court reviews de novo 'any questions of law underlying the district court's decision.'") (quoting *Tex. v. Ala.-Coushatta Tribe of Tex.*, 918 F.3d 440, 446–47 (5th Cir. 2019)).

Second, the trial court committed legal error in ruling on Talos's alternative motion for a remittitur. The trial court correctly found that the general damages awarded by the jury—$20 million and $6.6 million for wrongful death claims by a child and wife, respectively—were excessive. ROA.10730-41. But in ordering a remittitur of the awards, the trial court committed legal error in applying this Court's maximum-recovery rule. That rule requires the trial court to determine the remittitur by consulting factually similar cases. But here, the trial court simply chose cases with the highest awards. Period. And finally, even if the trial court had chosen the correct benchmark cases, it erred in calculating the remittitur.

Generally, this Court reviews a trial court's ruling on a motion for new trial for an abuse of discretion, but this Court reviews legal errors de novo.

*Goldman v. Bosco*, 120 F.3d 53, 54 (5th Cir. 1997).[6]  Here, the trial court's legal

error calls for de novo review. But even if this Court were to apply an abuse-

of-discretion standard, that standard is satisfied by the trial court's legal error

in misapplying the maximum-recovery rule. This is because "[a] decision

premised on an error of law constitutes an abuse of discretion." *In re*

*Deepwater Horizon*, 785 F.3d 986, 999 (5th Cir. 2015). Accordingly, the trial

court's legal error meets both the de novo and the abuse-of-discretion

standards of review.

### B.  By using a verdict form with duplicative awards, the trial court violated this Court's precedents.

For each plaintiff, and over Talos's objection,[7] the trial court used a

verdict form with separate blanks for loss of love, affection, and

companionship; past mental anguish; and future mental anguish.[8]  These were

in addition to the blanks for pecuniary damages (lost financial support and

loss of household services).

---

[6] Whatever the standard of review, the trial court's calculation error, discussed at p. 58 below, should be corrected.

[7] ROA.12232-33 ("We believe it's cumulative of loss of love and affection and shouldn't be broken out that way.")

[8] ROA.10752-55, Interrogatory Nos. 6 and 7.

When interpreting Louisiana law, this Court is bound by its own prior interpretation, so long as it has not been superseded by Louisiana case law or statute. *Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 787 F.3d 276, 281 (5th Cir. 2015). In *Croce v. Bromley Corp.*, 623 F.2d 1084, 1095 (5th Cir. 1980) and *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1451 (5th Cir.), *amended on reh'g*, 905 F.2d 61 (5th Cir. 1990), this Court interpreted Louisiana law to hold that the same approach employed by the trial court here is legal error. This is because in a wrongful-death case, the plaintiff's mental anguish *is* the loss of love, affection, and companionship. Providing separate blanks for mental anguish and loss of affection, therefore, invites the jury to award a double recovery. *Croce*, 623 F.2d at 1094 ("Louisiana law does not sanction such 'double recovery.'"). This Court reaffirmed *Croce* in *Transco*, stating, "Louisiana law does not permit separate awards for the loss of love and affection and for grief and mental anguish…" 896 F.2d at 1451.

Here, the trial court not only invited the jury to duplicate the awards of loss of affection with awards of mental anguish, but actually did so twice, with separate awards of past and future mental anguish.

The trial court was required to follow this Court's precedents. *Keathley*, 2023 WL 8642706 at *4. The trial court could do otherwise only in the rare

circumstance where there is "a clearly contrary subsequent holding of the [state's] highest court," a "subsequent statutory authority, squarely on point," or a series of "unanimous or near-unanimous holdings from several— preferably a majority—of the [state's] intermediate appellate courts ...." *FDIC v. Abraham*, 137 F.3d 264, 269 (5th Cir. 1998). None is present here. Neither the Louisiana Supreme Court nor the legislature has spoken on this issue, and there are no near-unanimous holdings from Louisiana's intermediate appellate courts.

On the contrary, Louisiana's First Circuit, like this Court, has held that there can be only one award of general damages in a wrongful-death action. As explained by that court, "There is one element of damages in wrongful death actions intended to compensate the victims for the loss of love, affection, and companionship, i.e., the emotional loss." *Kennedy-Fagan v. Estate of Graves*, 993 So.2d 255, 268 (La. App. 1st Cir. 2008). Thus, "It was legal error for the jury to make three separate awards for this one element of damage." *Id*.; *accord, Thompson v. Crawford*, 223 So.3d 1163, 1171 n.6 (La. App. 1st Cir.), *rev'd in part on other grounds*, 229 So.3d 451 (La. 2017) (following *Kennedy-Fagan*).

It is true that Louisiana's Third Circuit has allowed separate awards for mental anguish and loss of love and affection. *See Rachal v. Brouillette*, 111

So.3d 1137, 1142-43 (La. App. 3d Cir. 2013). But in permitting these duplicative awards, the majority did not cite, let alone distinguish, the strong precedent to the contrary. *Id*. Moreover, three judges dissented, agreeing with this Court that these awards are duplicative. *Id.* at 1146-47, 1149 (Amy, J., Gremillion, J., and Conery, J. concurring in part and dissenting in part).

In *Breaux v. Goodyear Tire & Rubber Co.*, 320 So.3d 1197, 1206 (La. App. 4th Cir.), *writ denied*, 325 So.3d 363 (La. 2021), Louisiana's Fourth Circuit followed *Rachal*, but again without acknowledging the strong precedent to the contrary. *Id.* at 1206. Indeed, the Fourth Circuit did not even discuss the issue apart from citing *Rachal*. In response to the defendants' writ application, the Louisiana Supreme Court denied review without reasons. *Breaux*, 325 So.3d 363. Justice Griffin concurred, *id*., citing *Rachal* and *Hill v. Shelter Mutual Insurance Co.*, 935 So.2d 691 (La. 2006),but *Hill* involved a summary judgment on an insurance-coverage question; it did not address the propriety of inviting multiple awards of emotional damages in a wrongful-death case.

Here, rather than following this Court's controlling precedents, the trial court instead relied mostly on the Louisiana Supreme Court's writ denial in *Breaux*. ROA.10734. In doing so, the trial court committed yet another legal error. According to the Louisiana Supreme Court, its own writ denial "does not constitute the court's considered opinion on the allegations made in a writ

application but is merely a decision not to exercise the extraordinary powers of supervisory jurisdiction in that case." *In re Quirk*, 705 So.2d 172, 181 n.17 (La. 1997). The Louisiana Supreme Court "has repeatedly held that [its own] writ denial … has no precedential value." *State v Brown*, 347 So.3d 745, 833 n.69 (La. 2022).

In light of *Croce* and *Transco*, the trial court's verdict form constitutes legal error. This error was amplified by the trial court's erroneously instructing the jury to consider mental anguish and loss of love and affection as separate elements of recovery.[9]

The resulting prejudice is evident in the jury's shocking awards. The jury awarded Y.J. $10 million for loss of love, affection, and companionship, *plus* $5 million for past mental anguish, *plus* $5 million for future mental anguish. The same jury awarded Mrs. Jackson $4 million for loss of love, affection, and companionship, *plus* $1.5 million for past mental anguish, *plus* $1.1 million for future mental anguish. All told, as a result of the duplicative

---

[9] ROA.9352. Talos volunteers that there was no separate objection to this jury instruction, but any such objection would only have repeated the objection Talos had already made to the same legal error in the verdict form. The trial court was thus advised of the problem and the need to correct it.

awards, the jury awarded the two plaintiffs a staggering total of $26.6 million in emotional damages.

When a jury's verdict results from an erroneous instruction, the remedy is a new trial. *Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 275-76 (5th Cir. 2000) (collecting cases). Thus, to remedy this error, this Court should vacate the trial court's judgment and remand for a new trial on general damages.

### C. In applying this Court's maximum-recovery rule, the trial court failed to examine the facts of the cases it chose as benchmarks.

The trial court next committed legal error in its treatment of Talos's alternative motion for remittitur by failing to properly apply this Court's maximum-recovery rule. The maximum-recovery rule "prescribes that [an excessive] verdict must be reduced to the maximum amount the jury could properly have awarded." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). In determining the maximum recovery, the court "looks to other published decisions from the relevant jurisdiction … involving comparable facts," and reduces the verdict to "150% of the highest inflation-adjusted recovery in an analogous published decision." *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019).

1. **The trial court correctly found the general-damage awards excessive.**

Although the trial court erred in other respects, it was correct in recognizing the excessiveness of the awards here. For emotional damages, the jury awarded Mrs. Jackson $6.6 million and Y.J. $20 million. These awards shock the conscience. As shown below, they are multiple times higher than the highest prior awards in factually similar cases. The trial court correctly found these awards excessive under Louisiana law. ROA.10739.

2. **The trial court failed to consult factually similar cases, and it made an error in its calculation.**

Having correctly concluded that the jury's awards were excessive, the trial court should then have reviewed general damage awards to a child and spouse in factually similar, published Louisiana wrongful-death cases, and then remitted the awards to 150% of those amounts. *Longoria*, 932 F.3d at 365. To pass the maximum-recovery rule, the verdict must be proportionate "to at least *one factually similar* case from the relevant jurisdiction." *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990) (emphasis by this Court). A court errs by relying on cases that are not factually similar. *See Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003) (finding cases relied on by trial court not factually similar).

Here, the trial court erred as a matter of law in its application of the maximum-recovery rule. The trial court did not look to factually similar cases, but rather simply chose the highest awards it could find. Indeed, as to Mrs. Jackson, the trial court did not even attempt to look to a factually similar case. We know this because the trial court cited only *Zimko v. American Cyanamid*, 905 So.2d 465 (La. App. 4th Cir. 2005), which contains almost no discussion of the facts bearing on the surviving wife's emotional loss. This is probably because the *Zimko* defendants chose not to appeal damages, presumably believing they had winning arguments on liability. *Id.* at 480 n.16 ("All seven of American Cyanamid's specific assignments of error allude to the sufficiency of the evidence to support a finding of liability ...."). The few facts that can be gleaned from *Zimko* distinguish it from this case: the decedent and his widow were married for 31 years before his diagnosis with mesothelioma, and the decedent died about eight months after diagnosis.[10] When, like *Zimko*, a case "d[oes] not discuss the propriety of the emotional injury component of the

---

[10] *See* 905 So.2d 471 (married in 1969); *id.* at 472 (diagnosed on September 21, 2000); *id.* at 473 (death on May 16, 2001). In addition, the wrongful-death award in *Zimko* included the decedent's medical expenses. *See id.* at 474 ($2.5 million wrongful-death award was "inclusive of medical bills.").

total award," it is unsuitable for use in applying the maximum-recovery rule. *Salinas v. O'Neill*, 286 F.3d 827, 831 n. 7 (5th Cir. 2002).

In looking to the highest award it could find rather than to awards in factually similar cases, the trial court committed legal error, calling for de novo review. Alternatively, as discussed above, legal error is itself an abuse of discretion.

The same is true as to Y.J. Here, too, the trial court cited only a single case, *Rachal*, 111 So.3d 1137, where an award of $2.5 million in general damages was affirmed. But *Rachal* is wholly unlike this case. The surviving son there lost not only his mother, but also his two sisters. All three decedents were run over by the defendant, who, high on drugs, crashed into them at 91 m.p.h., carrying two of them on the hood of his car for some distance before finally crashing into a culvert. *Id.* at 1145. The defendant was convicted of three counts of vehicular homicide and sentenced to five years in prison for each count. *Id.* at 1141. The jury was rightly outraged by this reprehensible conduct, awarding punitive damages. *Id*. That case cannot possibly be considered factually similar to this one. Indeed, in applying the maximum-recovery rule, this Court has distinguished cases involving the deaths of multiple family members. *See Moore*, 353 F.3d at 384-85.

While all of that is enough to distinguish *Rachal*, there is more. The plaintiff in *Rachal* spent most weekends with his mother before she died. *Id.* at 1150. In contrast, Y.J. saw his father perhaps once every other year. ROA.11641. Most pointedly, the plaintiff in *Rachal* also suffered severe psychiatric problems, including hallucinations and suicidal thoughts. *Id.* at 1143. Again, the same was not true for Y.J. ROA.11761.

Even considering the "profound effect" of the mother's death in *Rachal*, Judge (now Justice) Genovese concluded that the award of $2.5 million of general damages was excessive. *Id.* at 1148 (Genovese, J., concurring in part, dissenting in part). He explained, "This is more than threefold the highest amount ever awarded in this state for the wrongful death of a parent. Though I am fully cognizant and mindful of the heinous and horrific facts in this case, the law requires that such an award at least be somewhat in line with prior awards for the wrongful death of a parent." *Id*.

But whether or not the $2.5 million award was excessive in *Rachal*, that same award, adjusted for inflation, is grossly excessive here. There is simply no way that *Rachal*, with its punitive-damage award, violent deaths of multiple family members, closer relationship between child and parent, and the surviving child's severe psychiatric problems, can be considered factually similar to this case. By using its $2.5 million award, adjusted for inflation to

$3,303,567, as its benchmark, the trial court ensured that its judgment after remittitur would be too high.

Even if *Rachal* were a proper benchmark, the trial court still erred in calculating the maximum recovery. The trial court appropriately intended to use the U.S. Bureau of Labor Statistics' inflation calculator[11] to update the $2.5 million *Rachal* award to the date of final judgment (February 2023), then multiply by 150%, then reduce by 12% for DLS's fault.[12] But the trial court erred at the outset by using the wrong starting date: February 2012 instead of *Rachal*'s judgment date of March 2013. *See* ROA.10739; 111 So.3d at 1137. Using the correct starting date, the trial court should have arrived at a maximum recovery of $4,264,980. But by using the wrong starting date, the trial court arrived at $4,360,709, a difference of $95,729. ROA.10739. This separate error requires correction if not mooted by correcting the greater errors.

---

[11] Found at https://www.bls.gov/data/inflation_calculator.htm.

[12] Updating to the date of final judgment is appropriate, as the judgment awards legal interest from the date of judgment. Thus, any post-judgment inflation is compensated by the award of legal interest.

### 3. Factually similar cases show the excessiveness of the trial court's remitted awards.

When a trial court errs in applying the maximum-recovery rule, this Court has discretion either "to set [the] amount [of the remittitur] or remand for the district court to do so." *Longoria*, 932 F.3d at 368. Here, because the trial court has already failed to apply the maximum-recovery rule properly, the better approach would be for this Court to determine the remittitur. The cases discussed below will help with that endeavor.

### a. Mrs. Jackson's general-damage award.

In applying the maximum-recovery rule to Mrs. Jackson's award, the Court should consider the cases discussed below. Unlike *Zimko*, all of them have at least some similarity to Mrs. Jackson's claim:

- In *Malmay v. Sentry Ins. Co.*, 550 So.2d 366 (La. App. 3d Cir. 1989), the court found that the "Malmays enjoyed a strong healthy marriage and family life." *Id.* at 371. The surviving spouse had to see a therapist for counseling. The court of appeal found that the $300,000 award ($718,567 adjusted for inflation) to the surviving spouse "was in the high range," but not an abuse of discretion. *Id.*

- In *Moore*, 353 F.3d 376, this Court found that the surviving wife and the decedent had a truly loving relationship, but found the award of

$750,000 award for loss of love and affection to be "an abuse of the trier of fact's discretion." *Id.* at 384. This Court found that the highest award in a factually similar case was $300,000 ($651,303 adjusted for inflation). Applying the maximum-recovery rule, this Court remitted the award to 133% of $300,000, resulting in a $399,000 award. *Id.* at 385.[13]

- In *Scott v. Pyles*, 770 So.2d 492 (La. App. 1st Cir. 2000), the surviving spouse did not want to live after she learned of her husband's death. *Id.* at 504. In addition to a voluntary commitment to an inpatient grief program, she participated in an outpatient program for grief counseling through the hospital, and it was only afterwards, upon taking medication for depression, that she began to make progress. *Id*. Despite this extreme emotional loss, the appellate court found that the trial court abused its discretion in awarding $750,000 for wrongful death. *Id*. The appellate court reduced the award to $500,000 ($864,483 adjusted for inflation), "the highest amount a reasonable trier of fact can award in light of the evidence in this case …." *Id*.

---

[13] This Court explained in *Longoria*, 932 F.3d at 365, n.3, that in a bench trial, the award is remitted to 133%, as opposed to 150% in a jury trial.

- In *Maldonado v. Kiewit La. Co.*, 152 So.3d 909, 934 (La. App. 1st Cir. 2014), the jury awarded a total of $3.5 million in nonpecuniary damages to the decedent's surviving spouse. *See id.* at 934.[14] They met when the surviving spouse was 14 years old, they dated for 7 years, and they married when she was 23. *Id.* at 938. They had a loving relationship and the surviving spouse missed her husband very much. *Id.* Nevertheless, the court found that the highest amount jury could award was $750,000 ($948,424 adjusted for inflation), and it reduced the award to this amount.

Mrs. Jackson's claim is most factually similar to those in *Malmay* and *Moore*. Granted, any loss of a spouse is a great loss. But like these plaintiffs, Mrs. Jackson's loss was not extraordinary. Mr. and Mrs. Jackson were married for only three years when the accident occurred. ROA.11687. After Jackson's death, Mrs. Jackson received no medical treatment or counseling. ROA.11705. She testified that going to church helps her and that she is "some better but not all the way." ROA.11705. The highest factually similar award, therefore, is

---

[14] The verdict form had separate lines for past emotional pain and suffering ($500,000 awarded), future emotional pain and suffering ($1.5 million awarded), and loss of love and affection ($1.5 million awarded). 152 So.3d at 934. The defendants complained of the erroneous verdict form. *Id.* at 918. Perhaps because the court concluded that the general-damage awards were excessive (*see id.* at 938-39), it did not address the propriety of the verdict form.

$718,567, adjusted for inflation. Applying the maximum-recovery rule to award 150% of this amount, the award to Mrs. Jackson should have been $1,077,850.50, not the $5,800,257.00 awarded by the trial court.

Even if this Court were instead to use the appellate decisions in which the surviving spouse and decedent were married for much longer, and where the surviving spouse was required to undergo psychiatric treatment, the highest award would be $948,424, adjusted for inflation. *See Maldonado*, 152 So.3d at 934. Applying the maximum-recovery rule to this would yield a (still too high) general damage award of $1,422,636. By instead using the $2.5 million award (adjusted for inflation to $3,866,838) from *Zimko*, the trial court awarded general damages of $5,800,257, more than three times higher than what could conceivably be supported.

This Court, therefore, should remit the general damage award to Mrs. Jackson to $1,077,850, or, at the very most, to $1,422,636. Mrs. Jackson would recover this in addition to the separate awards of pecuniary, special damages, which total nearly $1 million. The resulting total would then be adjusted by the allocation of 88% fault to Talos.

### b. Y.J.'s general-damage award.

The story is the same for Y.J. All of the following cases are more factually similar to this case than *Rachal*:

- In *Malmay*, 550 So.2d 366, the decedent spent much of his time with his children. *Id.* at 371. One daughter had to see a therapist for counseling, and counseling was recommended for the entire family to help them cope with their grief. *Id.* The trial court awarded $200,000 each to the three surviving children, but the appellate court concluded that $150,000 ($359,283 adjusted for inflation) was the highest amount possible.

- In *Sledge v. Continental Cas. Co.*, 639 So.2d 805 (La. App. 2d Cir. 1994), the decedent's 11-year old daughter had a "very close relationship" with her father. *Id.* at 817. But the appellate court found no evidence "beyond the usual father-daughter relationship." *Id.* The court continued, "Nor, obviously, can we overlook the fact that she had not lived regularly with him since the age of four." *Id.* "Hence, in awarding $247,815 for loss of love and affection, the jury abused its discretion." *Id.* After surveying several quantum cases, the court found "that $150,000 [$304,905 adjusted for inflation] constitutes the highest possible sum appropriate

under these particular facts." *Id*. The court distinguished other cases that "involved extraordinary circumstances and/or intact families." *Id*.

- In *Vallien v. State ex rel. Dept. of Transp. & Dev.*, 812 So.2d 894 (La. App. 3d Cir. 2002), the three children were 15 years old, 12-13 years old, and 7 years old when their father died. *Id.* at 901. They had a very loving relationship with their father, and he was very involved in their lives. *Id*. The court of appeal affirmed three awards, the highest of which was $375,000 ($630,956 adjusted for inflation). *Id*.

- In *Maldonado*, 152 So.3d 909, the two children were 7 and 3 years old when their father died. *Id.* at 939. "They face[d] a future without their father's affection, care, assistance and advice." *Id*. Nevertheless, the court found that the jury abused its discretion in awarding each child $3 million in wrongful death damages. After reviewing cases, the court of appeal found that $450,000 ($569,054 adjusted for inflation) was the highest amount the jury could have reasonably awarded each child. *Id*.

- In *Scott*, 770 So.2d 492, the two children were 13 and 10 years old when their father died. *Id.* at 505. The older daughter enjoyed a "special bond" with her father and was "daddy's girl." *Id*. The younger daughter's relationship was not as close, but her loss was still devastating. *Id*. The trial court awarded them general damages of $750,000 and $500,000

respectively. The court of appeal found that the most that could possibly be awarded was $500,000 for the older daughter ($864,483 adjusted for inflation) and $400,000 for the younger ($691,586 adjusted for inflation). *Id*.

Of all these cases, the most factually similar is *Sledge* because of one critical fact: like the child there, Y.J. did not live with his father. Instead, Y.J. lived with his mother in Brooklyn, New York. ROA.11618-19. Y.J. was eight years old when his father died. Jackson had last been to New York when Y.J. was born in 2009. ROA.11636, 11639-40. Jackson never returned to New York to visit Y.J. ROA.11640. Y.J.'s mother did bring him on occasion to visit Jackson in Houston and New Orleans. She testified that she could not "recall what years it was or how many times," but she suggested it was probably "at least every other year depending on how old [Y.J.] was." ROA.11641.

Even assuming a close relationship between Y.J. and his father, it could not be considered "beyond the usual father-[child] relationship." *Sledge*, 639 So.2d at 817. And critically, Y.J. had not lived with his father since he was one month old. As in *Sledge*, "$150,000 [$304,905 adjusted for inflation] constitutes the highest possible sum appropriate under these particular facts." *Id.* at 817.

Even if this Court were instead to use the highest of the above awards, that would be the $500,000 ($864,483 adjusted for inflation) award in *Scott*, 770 So.2d at 505. That case is not nearly as similar as others discussed above, with the father and child living together and having a "special bond." *Id.*

This Court, therefore, should decrease the general damage award to Y.J. based on the award in *Sledge*, $304,905, adjusted for inflation. Applying the maximum-recovery rule to this amount, this Court should remit Y.J.'s general damages to $457,357.50. Alternatively, at the very most, this Court should remit Y.J.'s general damages based on the award in *Scott*, $864,483, adjusted for inflation. Applying the maximum recovery rule to this amount would yield a reduced award of $1,296,724.50.

Whatever the general damages awarded, Y.J. will also receive $120,000 of pecuniary, special damages for loss of past and future financial support. Finally, the resulting total should be adjusted according to Talos's 88% fault allocation.

Talos anticipates that, unable to support the trial court's use of *Zimko* and *Rachal* as factually analogous cases, plaintiffs may cite other cases that the trial court did not rely on: *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006), and *Stauder v. Shell Oil Co.*, No. 2022-CA-0593, 2023 WL 2009251 (La. App. 4th Cir. Feb. 15, 2023), *vacated*, No. 2023-C-619,

— So.3d —, 2024 WL 176992 (La. Jan. 17, 2024). But *Heiser* is not from Louisiana, the controlling jurisdiction. It also has no factual similarity to this case: it involved a default judgment entered against Iran for a terrorist bombing, killing U.S. military personnel in Saudi Arabia.

As for *Stauder*, that decision was just vacated by the Louisiana Supreme Court and remanded for reconsideration in light of *Pete v. Boland Marine & Mfg. Co.*, No. 2023-C-170, — So.3d —, 2023 WL 6937381 (La. Oct. 20, 2023), *reh'g denied*, 2023 WL 8462168 (La. Dec. 7, 2023). *See Stauder*, 2024 WL 176992. In *Pete*, the Louisiana Supreme Court changed the methodology for appellate review of general damages. Since the court of appeal in *Stauder* has not yet conducted a proper review of damages according to *Pete*, its now-vacated decision is an inappropriate benchmark for applying the maximum-recovery rule.

In sum, if this Court neither reverses nor grants a new trial on other grounds, then it should vacate the awards entered by the trial court and apply the maximum-recovery rule to remit Y.J.'s general damages to $457,357, or, at the very most, $864,483. Applying the same rule, this Court should remit Mrs. Jackson's general damages to $1,077,850, or, at the very most, to $1,422,636. As with any remittitur, the Court should provide each plaintiff the option to acquiesce or request a new trial on general damages. If they acquiesce, this

Court should award them these damages plus the pecuniary, special damages awarded by the trial court, adjusting the total awards to each according to the 88% fault allocation to Talos.

## III.    Inflammatory comments by plaintiffs' counsel permeated the trial, denying Talos a fair trial.

The jury's inexplicable allocation of fault and award of outrageously excessive damages raises the question: Why did the jury act in this way? This is the question this Court asks when struck with the size of a verdict. *See Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1240 (5th Cir. 1985). As recognized by this Court, the size of a jury's verdict can indicate that it was "influenced by … prejudicial statements." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278 (5th Cir. 1998).

Here, the record reflects exactly this. Plaintiffs' counsel made repeated incendiary comments throughout the entire trial. The verdict was based not on the evidence, but rather on passion and prejudice.

Talos objected to some of these comments the first time they were made, but the trial court overruled Talos's objections. *See* ROA.10918-22 (objecting to "convicted felon" references). Talos raised the issue again in its motion for new trial, which the trial court denied. ROA.9450-56. When, after reviewing the final trial transcript, the pervasiveness of these comments

became apparent, Talos tried to bring them to the trial court's attention through a supplemental memorandum in support of its motion for new trial. ROA.10702-20. But the trial court denied leave to file it. ROA.10722.

### A. Under any standard of review, the inflammatory comments by plaintiffs' counsel require a new trial.

This Court reviews a trial court's denial of new trial under an abuse-of-discretion standard. *Westbrook*, 754 F.2d at 1241. While this standard is deferential, "this deference cannot exceed a due regard for what is right and the interests of justice." *Id*. When a verdict results from prejudicial error, "deference must be abandoned." *Id*.

Even when a party fails to object timely, this Court can still review under the plain-error standard. Under this standard, reversal is appropriate if the error is plain, affects the appellant's substantial rights, and seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 776 (5th Cir. 2009). Even under plain-error review, this Court "must reverse when necessary to preserve substantial justice." *Whitehead*, 163 F.3d at 276.

### B. Counsel's inflammatory comments permeated the trial.

The word limit prevents Talos from quoting all the myriad inflammatory comments. Indeed, it was not merely the incendiary nature of

the comments that inflamed the jury; it was their sheer repetition. (The repetition shows another thing: deliberateness.) For each category, therefore, Talos quotes only a handful of examples, with record citations to additional instances where the same tactic was repeated ad nauseam.

### 1. *Branding Talos as a "convicted felon."*

During the trial, plaintiffs' counsel sought to question a Talos witness about a 2016 conviction of a company later acquired by Talos,[15] related to an incident in 2012. *See* ROA.2649. Talos objected, renewing an objection it had made in a motion in limine. *See* ROA.2289 (motion in limine); ROA.10918-22 (same objection at trial). But the trial court overruled the objection.

Talos's objection should have been sustained. Under Fed. R. Evid. 404(b)(2), "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Yet that is exactly how the trial court let plaintiffs used this prior incident. Emboldened by the trial court's ruling, plaintiffs' counsel used it repeatedly to tar Talos as a convicted felon:

---

[15] Energy Resource Technology GOM, LLC. *See* ROA.2649.

As a Talos corporate representative, do you know that Talos was convicted of a felony as it relates to regulations or knowingly and willfully failing to abide by regulations for hot work? [ROA.10923.]

Do you remember stating in your deposition that you were acquainted with the information about the felony as it relates to hot work permitting prior to conducting your investigation for this event? [ROA.10923.]

I forgot. You're the person they hired because they had a felony conviction, correct? [ROA.10926.]

You were one of the individuals that was hired after a felony conviction. [ROA.10981.]

Sorry. The entity that helped convict you for a felony crime? [ROA.11001.]

Again, the above are only some of plaintiffs' counsel's repeated references to a felony conviction. By Talos's count, this occurred 21 times: the 5 times quoted above plus another 16 times throughout the trial. *See* ROA.10925:10; ROA.10925:16-17; ROA.10982:6; ROA.10983:21; ROA.10984:2; ROA.10984:12; ROA.10984:24; ROA.10985:4; ROA.10999:24; ROA.11001:12-13; ROA.11259:5; ROA.11259:12-13; ROA.11259:18; ROA.11260:11-12; ROA.11269:9, and ROA.12276:22. This could not help but inflame the jury.

## 2. *Condemning Talos for seeking legal counsel.*

No one should be condemned for seeking legal counsel's advice. Yet this is exactly what plaintiffs urged the jury to do. In its post-accident investigation, Talos prudently availed itself of counsel's advice, correctly anticipating litigation. Plaintiffs' counsel repeatedly told the jury to infer something sinister from this:

> Talos did an investigation, put people on the investigation team. Guess who they put on it, lawyers. Does that make sense to anyone else, why do you need a lawyer from Liskow Lewis or Mr. Jurgens' firm to be involved in the investigation. [ROA.10814.]

> The person selected to be on your investigation team to help you with your report was a lawyer with Liskow Lewis, true? [ROA.10864.]

> Did you know that instead of allowing you to be on the investigation team, instead they went and put a lawyer on it from Liskow Lewis? [ROA.11225.]

> Why do you think a lawyer got put on the investigation team? [ROA.12276.]

> Oh, whoops, we have a lawyer on our investigation team. [ROA.12278.]

Again, these are only a handful of examples. Others can be found at ROA.10818:25; ROA.10865:11-14, ROA.10981:12-14, ROA.11225:10-12; ROA.12094:10-13; ROA.12130:10-11; and ROA.12130:24-25.

### 3. *Accusing Talos of witness intimidation.*

Accusing a party of wrongdoing without any evidence is "[a] particularly indefensible tactic ...." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 284 (5th Cir. 1975). Plaintiffs' counsel repeatedly used this tactic, accusing Talos of witness intimidation with no evidence to support the charge:

> You've seen in your industry in areas where there are occasions where companies want the contractor to take the blame, right? Something goes wrong, they say, contractor, we hire you, we provide you work, you better eat this one; that happens, doesn't it? [ROA.11244-45.]

> And the reason why it makes you uncomfortable is because you're afraid of getting blackballed, aren't you? [ROA.11320.]

> And certainly you've heard and seen in the industry that when there is a serious event the first company that gets blamed is the contractor, right? [ROA.11320.]

> And you've even heard of big companies like Talos threatening contractors that says blame them—first they blame them, then they yank their work, right? [ROA.11320.]

> In the offshore world they got a rule: If you're a big oil company and you have the privilege as a contractor to come work for us, something goes wrong, you fall on the sword. [ROA.12253-54.]

Again, these are only a handful of examples. Others can be found at ROA.11319:21-24; ROA.11320:1-3; ROA.11320:14-20; ROA.11340:4-8;

ROA.11343:10-11; ROA.11343:16-19; ROA.11585:22-25; ROA.12252:24-

ROA.11253:3; and ROA.12279:16-25.

### *4. Accusing Talos's counsel of misrepresentation.*

It is proper for one side to challenge the other side's interpretation of

evidence. But accusing opposing counsel of misrepresenting the evidence

crosses the line. Plaintiffs' counsel crossed that line—repeatedly:

> [Y]ou know, big oil companies hire lawyers, come down here
> with contracts, try to trick and confuse you. [ROA.11585.]

> And you can understand my frustration in trying to get these
> juries the truth when you have lawyers stand up here and try
> to represent documents mean something totally different
> than what they actually mean. [ROA.11586.]

> We are here because this company believes that it can smoke
> and mirror confusion to try to take the blame away from
> themselves….
> You know, when this case started I never imagined you
> would see the amount of deception and the amount of
> missing information. [ROA.12247.]

> That's what's going on here, information hidden from
> witnesses, information hidden from juries. I mean, the
> conduct is outrageous. [ROA.12252.]

More examples of this improper tactic are found at ROA.11168:23-

ROA.11169:2; ROA.11171:18-20; ROA.11587:11-13, and ROA.11595:16-18.

### 5. *Making conscience-of-the-community arguments.*

This Court has condemned conscience-of-the-community arguments—

"all impassioned and prejudicial pleas intended to evoke a sense of

community loyalty, duty and expectation." *Westbrook*, 754 F.2d at 1238-39.

This trial saw a lot of that tactic, too, from opening statements through closing

arguments:

> There's a lot of people watching this case, a lot of people
> watching what will a jury do with our playbook of deny and
> diminish. [ROA.10814.]

> It's a power to say, Talos, I heard you, I heard what your
> evidence was, and you're wrong…. We're here to ask you to
> use that power, use that power to right this wrong.
> [ROA.12236.]

It got so bad that Talos's counsel had to take the unusual step of

objecting to plaintiffs' closing argument. But the trial court overruled the

objection, ROA.12238-39. Emboldened by this ruling, plaintiffs' counsel

continued in the same vein:

> I'd give anything to sit in your chair right now, to sit in your
> chair and have your power to be able to tell this company
> what you did is wrong, the conduct for the last five years is
> wrong. [ROA.12241.]

> It's an important case because it deals with what happens
> offshore and what's done after. What you decide here, people
> are watching…. [ROA.12259.]

And I'm asking you, begging you, to use that power, use that
power for this boy and use that power for every person that
is like this boy. [ROA.12281.]

So why are we here? We're here because they don't think you
have the courage to do what's right. [ROA.12247:7-8.]

Once again, these are only some of the examples of this improper trial

tactic. *See* ROA.12254:12; ROA.12280:5 – ROA.11281:1; and ROA.12281:3-5.

### C.   The remedy is a new trial on all issues.

It would be hard to find a trial transcript more permeated than this one

with one side's inflammatory comments. As in *Edwards*, this Court need not

decide whether, individually, these remarks created inherent unfairness. 512

F.2d at 285-86. As in *Edwards*, the remarks here "so permeated counsel's

argument, and were so calculated to prejudice the defendants," that the

resulting verdict cannot stand. In *Edwards*, the trial court itself recognized the

prejudice; here, the trial court did not. But the prejudice is the same.

The verdict itself—on both fault allocation and damages—proves the

prejudice. DLS, the party whose negligence directly caused Jackson's death,

and whose representative admitted to at least 50% fault, was allocated only

12% fault. At worst, Talos failed only to supervise DLS; yet it was cast with

88% fault. As for damages, the Court need only view the jury's staggering $20

million award to Y.J. for non-pecuniary damages.

When a jury is improperly inflamed like this, "the better approach is to require a new trial on any issue infected by passion and prejudice …." *Westbrook*, 754 F.2d at 1241. When it appears that the improper trial tactics affected both liability and damages, a new trial on both issues must be ordered. *Edwards*, 512 F.2d at 282-83.

## Conclusion

In its essence, plaintiffs' claims against Talos are for failure to discover, intervene in, and correct its independent contractor's unsafe work practices. Yet under this Court's precedents interpreting Louisiana law, Talos had no duty to do so. For that fundamental reason, this Court should reverse the trial court's judgment. Alternatively, this Court should grant a new trial on all issues or, at least, on damages. If this Court reaches the issue of excessive damages, it should grant remittiturs, conditioned on the plaintiffs' acceptance of remittitur in lieu of a new trial on damages.

*/s/ Raymond P. Ward*

**Adams and Reese LLP**
Martin A. Stern, La. Bar # 17154
Raymond P. Ward, La. Bar # 20404
701 Poydras Street, Suite 4500
New Orleans, LA 70139
(504) 581-3234
(504) 566-0210 fax
martin.stern@arlaw.com
ray.ward@arlaw.com

**King & Jurgens, LLC**
George B. Jurgens III, La. Bar # 7602
Jedd S. Malish, La. Bar # 23846
201 St. Charles Ave., 45th Floor
New Orleans, LA 70170
(504) 582-3800
(504) 582-1233 fax
gjurgens@kingjurgens.com
jmalish@kingjurgens.com

# Certificate of Compliance

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), **as modified by the clerk's order of December 29, 2023 (Doc. 49)**, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1,  this document contains 16,235 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 version 16.0.5426.1000, in 14-point Cambria font.

*/s/ Raymond P. Ward*

Attorney of record for Talos ERT, L.L.C.