IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ANIKA WARNER, AS GUARDIAN OF MINOR CHILD, Y. J.,
*Plaintiff-Appellee*

v.

TALOS ERT, L.L.C.,
*Defendant-Appellant*

VANTRECE JACKSON,
*Plaintiff-Appellee*

v.

TALOS ERT, L.L.C.,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA,
CIVIL ACTION NO. 2:18-CV-1435

**ORIGINAL BRIEF OF PLAINTIFFS-APPELLEES, ANIKA WARNER ON BEHALF OF Y.J., AND VANTRECE JACKSON, URGING AFFIRMANCE**

Andy Dupre (La. Bar 32437)
Ilijana Todorovic (La. Bar 39052)
THE DUPRE LAW FIRM, LLC
705 Constantinople Street

New Orleans, LA 70115
Telephone: 985-855-2553
Facsimile: 504-814-8156

Appellate counsel to the appellees,
Anika Warner on behalf of Y.J., and
Vantrece Jackson

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ANIKA WARNER, AS GUARDIAN OF MINOR CHILD, Y. J.,
*Plaintiff-Appellee*

v.

TALOS ERT, L.L.C.,
*Defendant-Appellant*

VANTRECE JACKSON,
*Plaintiff-Appellee*

v.

TALOS ERT, L.L.C.,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA,
CIVIL ACTION NO. 2:18-CV-1435

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal:

1.  Anika Warner, Plaintiff-Appellee;

2.  Vantrece Jackson, Plaintiff-Appellee;

3.  Talos ERT, L.L.C., Defendant-Appellant;

4.  Arnold & Itkin, LLP, Law Firm of Record for Appellee Anika Warner;

5.  Cox, Cox, Filo, Camel & Wilson, L.L.C., Law Firm of Record for Appellee Anika Warner;

6.  Zehl & Associates, P.C., Law Firm of Record for Appellee Vantrece Jackson;

7.  The Dupre Law Firm, LLC, Law Firm of Record for Appellees Anika Warner and Vantrece Jackson;

8.  Adams and Reese, L.L.P., Law Firm of Record for Appellant Talos ERT, L.L.C.; and

9.  King & Jurgens, L.L.C., Law Firm of Record for Appellant Talos ERT, L.L.C..

/s/ Andy Dupre
Appellate counsel to the appellees,
Anika Warner on behalf of Y.J., and Vantrece Jackson

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

In this fact-intensive appeal from a jury's verdict and a district court's final judgment, oral argument is unnecessary. The standard of review is deferential, the record is fully developed, and the judgment is backed by a substantial body of evidence. No unique question of law is presented by the appellant. The Court may decide this case on the briefs based on the standard of review and the record. Oral argument would not add to the decision-making process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS…………………………….......iii

STATEMENT REGARDING ORAL ARGUMENT…………………...…....v

TABLE OF CONTENTS……………………………………………...…….vi

TABLE OF AUTHORITIES……………………………...…………………ix

I.      INTRODUCTION………………………………....………………....…1

II.     RESTATEMENT OF THE ISSUES……………………………………...…..3

III.    STATEMENT OF THE CASE…………………………………………...…..4

        A.     Statement of facts…………………………………...…………4

               1.      Talos knows that *its* own neglect of *its* own firewater
                       pipes created a hazardous condition on *its* own platform;
                       yet, Talos doesn't act until ordered to do so……………......4

               2.      Talos demands that its own JSA govern the
                       pipe-removal; but Talos's JSA proves to be woefully
                       inadequate for the job..………………...…………...…….7

                       a.      The (inadequate) JSA approved by Talos
                               allows DLS to use a *rope* to lower the pipes—which
                               contributes to this incident…………………...…….......9

                       b.      The (inadequate) JSA approved by Talos
                               allows the work to proceed without a mandatory
                               hot work permit—which contributes to
                               this incident……………………………………...…...14

   c. The (inadequate) JSA approved by Talos
    does not properly mark/barricade the landing zone,
    directly exposing Mr. Jackson to the pipe-falling
    hazard—causing this incident……………………..…..18

 B. Procedural History…………………………………………………..21

IV. SUMMARY OF THE ARGUMENT……………………........………………………....23

V. LAW AND ARGUMENT……………………………………………………...26

 A. The standard of review on a motion for judgment as a
  matter of law is *de novo*, but it is "especially deferential"
  after a jury trial………………….................………………………....26

 B. Under the "especially deferential" standard, the district
  court did not err in denying Talos's motion for judgment
  as a matter of law…………………….................................................27

  1. An overwhelming body of evidence adduced at trial
   showed that Talos authorized an unsafe work practice………28

  2. The evidence at trial proved Talos's independent
   negligence with ease; Talos's duty arose both from
   contract and from creating the hazard.....................................35

   a. Objective documentary evidence presented to
    the jury showed that Talos assumed a duty of care
    through its contract with DLS…………………….......40

   b. The evidence at trial showed that Talos assumed
    a duty of care by creating the hazardous condition
    that killed Mr. Jackson……………………...................42

 C. The district court did not abuse its discretion in denying
  Talos's motion for a new trial; the jury's allocation of 88% fault
  to Talos is supported by the evidence………………..………………..45

  D.  The district court's rulings on damages do not constitute
     an abuse of discretion …………….…………………………...…..48

     1.  The district court did not abuse its discretion
        regarding the verdict form………..…………...…………...…49

     2.  The district court did not abuse its discretion in
        applying the maximum recovery rule or in otherwise
        calculating the remitted awards………..………...……...…52

        a.  The district court properly applied the maximum
           recovery rule to general damages for Mr. Jackson's
           minor son; there is no abuse of discretion…...……........53

        b.  The district court properly applied the maximum
           recovery rule to general damages for Mr. Jackson's
           widow; there is no abuse of discretion….…..…….......57

  E.  The district court did not abuse its discretion in denying
     Talos's motion for a new trial based on alleged inflammatory
     comments …………….…………………………...…………...…60

VI.  CONCLUSION…………………………………………...…………65

CERTIFICATE OF SERVICE…………………………………………66

CERTIFICATE OF COMPLIANCE …………………………………….67

# TABLE OF AUTHORITIES

## Cases

*Abernathy v. Spie Grp., Inc.,*
1990 WL 62021 (E.D. La. 1990) ……………………………………….....36

*Alford v. Anadarko E&P Onshore LLC,*
2015 WL 471596 (E.D. La. 2015) …………………………………..…....39

*Apache Deepwater, L.L.C. v. W&T Offshore, Inc.,*
930 F.3d 647 (5th Cir. 2019)………………………..……………..……....26

*Augustine v. SAFECO Nat. Ins. Co.,*
2008-1515 (La. App. 3 Cir. 6/10/09), 18 So. 3d 761………………….…....51

*Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.,*
69 F.3d 535 (5th Cir. 1995)……………………………..…....…………....45

*Baisden v. I'm Ready Prods., Inc.,*
693 F.3d 491 (5th Cir. 2012)……………………………..………………....61-62

*Baxter v. Anderson,*
277 F. Supp. 3d 860 (M.D. La. 2017)..……………..……………………....64

*Bowers v. Liuzza,*
00-229 (La. App. 5 Cir. 7/25/00), 769 So. 2d 88………………………....51

*Breaux v. Goodyear Tire & Rubber Co.,*
2021-00811 (La. 10/5/21), 325 So. 3d 363………………………………....50

*Bujol v. Entergy Servs., Inc.,*
922 So.2d 1113 (La. 2004) ……………..…………………....………..37

*Campbell v. Keystone Aerial Survs., Inc.,*
138 F.3d 996 (5th Cir. 1998) ……………………..……………....….39

*Clapper v. Am. Realty Invs., Inc.,*
  2024 WL 995478 (5th Cir. Mar. 8, 2024)……………………………………61

*Colburn v. Bunge Towing, Inc.,*
  883 F.2d 372 (5th Cir. 1989)……………………...…………………...61-62

*Croce v. Bromley Corp.,*
  623 F.2d 1084 (5th Cir. 1980)……………………...…………………...50

*Delahoussaye v. Performance Energy Servs., L.L.C.,*
  734 F.3d 389 (5th Cir. 2013)……………………...…………………45

*Deville v. Conmaco/Rector, L.P.,*
  2011 WL 13213666 (E.D. La. 2011)……………………………………39

*Dixon v. Int'l Harvester Co.,*
  754 F.2d 573 (5th Cir. 1985)……………………...…………………65

*Douglass v. Delta Air Lines, Inc.,*
  897 F.2d 1336 (5th Cir. 1990)……………………...…………………52, 56

*Echeverry v. Jazz Casino Co., L.L.C.,*
  988 F.3d 221 (5th Cir. 2021) …………………………………………36, 48, 52

*Edwards v. Sears, Roebuck and Co.,*
  512 F.2d 276 (5th Cir. 1975)……………………………………….…61

*Estate of Heiser v. Islamic Republican of Iran,*
  466 F.Supp. 2d 229 (D.D.C. 2006). …………………………………56, 60

*Ewell v. Petro Processors of Louisiana, Inc.,*
  364 So. 2d 604 (La. App. 1st Cir. 1978) …………………..………….…29

*Fontenot v. Citgo Petroleum Corp.,*
  2017-924 (La. App. 3 Cir. 5/23/18), 247 So. 3d 837……………………….…51

*Frazier v. Honeywell Int'l, Inc.,*
  518 F. Supp. 2d 831 (E.D. Tex. 2007) …………………………………53

*Gantt v. Seadrill Americas, Inc.,*
    360 F. Supp. 3d 402 (E.D. La. 2018)……………………………………………39

*Graham v. Amoco Oil Co.,*
    455 So. 2d 1364 (La. 1984)……………………………………………………36

*Guillot v. Daimlerchrysler Corp.,*
    2008-1485 (La. App. 4 Cir. 9/24/10), 50 So. 3d 173……………..……………..51

*Harris v. Pizza Hut of Louisiana, Inc.,*
    21 F.3d 643 (5th Cir. 1994)……………………………………………………36

*Heckman v. Gonzalez-Caballero,*
    2023 WL 2923315 (5th Cir. Apr. 13, 2023)…………....………….…….………61-63

*Holt v. Aetna Cas. & Sur. Co.,*
    28,450 (La. App. 2 Cir. 9/3/96), 680 So. 2d 117 …………….…...……....…51

*Janvey v. Romero,*
    817 F.3d 184 (5th Cir. 2016) …………………….…………….…………….26

*Jones v. Buck Kreihs Marine Repair, L.L.C.,*
    2013-0083 (La. App. 4 Cir. 8/21/13), 122 So. 3d 1181 ………………….………39

*Manchack v. Willamette Indus., Inc.,*
    621 So. 2d 649 (La. App. 2 Cir. 1993) ……………...….……………….…...39

*Manning v. Dillard Dep't. Stores, Inc.,*
    99-1179 (La. 12/10/99), 753 So. 2d 163………………………………......…36

*McAdams v. Louisiana Power & Light Co.,*
    95-126 (La. App. 5 Cir. 7/25/95), 659 So. 2d 820, ……………….……….…39

*Mobil Expl. & Producing v. A-Z/Grant Int'l Co.,*
    1996 WL 194931 (E.D. La. 1996)……………………………….…….…..…40

*Newsom v. Wal-Mart Stores, Inc.,*
    58 F.3d 635 (5th Cir. 1995) ……………………………...……………...…45

*Nobles v. Egal,*
    2022 WL 3971048 (W.D. Tex. 2022)……………………..…………………......50

*Parkman v. W&T Offshore, Inc.,*
    673 F. Supp. 3d 811 (M.D. La. 2023)………..…………….……………...27, 29, 36

*Patriot Contracting, LLC v. Star Ins. Co.,*
    2018 WL 10797881 (E.D. La. 2018)………………………………………...39

*Pinsonneault v. Merchants & Farmers Bank & Trust Co.,*
    01-2217 (La. 4/3/02), 816 So. 2d 270…………………..……..……………...36

*Ponds v. Force Corp.,*
    2016 WL 7178483 (E.D. La. 2016)………………………………….…...39-40

*Prestenbach v. Rains,*
    4 F.3d 358 (5th Cir. 1993)……………………………………………...45

*Puga v. RCX Sols., Inc.,*
    922 F.3d 285 (5th Cir. 2019)…………………………...……………...52

*Rachal v. Brouillette,*
    2012-794 (La. App. 3 Cir. 3/13/13), 111 So. 3d 1137……………….50-51, 55, 57

*Renfro v. Burlington N. Santa Fe Ry. Co.,*
    2015-372 (La. App. 3 Cir. 5/11/16), 193 So. 3d 1192…………….………...50

*Richardson v. SEACOR Lifeboats, LLC,*
    2015 WL 2193907 (E.D. La. 2015)……………………………….…...39

*Romero v. v. Mobil Expl. & Producing N. Am., Inc.,*
    939 F.2d 307 (5th Cir. 1991) ……………………………………….…...39

*Ross v. Willard,*
    2007 WL 4374027 (M.D. La. 2007) …………………………….……...39

*Salinas v. O'Neill,*
    286 F.3d 827 (5th Cir. 2002)………………………………..…………...58-59

*Sandbom v. BASF Wyandotte, Corp.,*
   95-0335 (La. App. 1 Cir. 4/30/96), 674 So. 2d 349…………………………...27, 29

*Seidman v. Am. Airlines, Inc.,*
   923 F.2d 1134 (5th Cir. 1991)…………………………………………………...48

*Shell Offshore, Inc. v. Tesla Offshore, L.L.C.,*
   2015 WL 5714622 (E.D. La. 2015)…………………………………………...40

*Smith v. Harrah's New Orleans Mgmt. Co.,*
   213 F. App'x 353 (5th Cir. 2007)…………………………………………...48

*Socorro v. City of New Orleans,*
   579 So. 2d 931 (La. 1991)…………………………………………………...36

*Sonder USA, Inc. v. 635 N. Scott St., L.L.C.,*
   2023 WL 6458851 (5th Cir. Oct. 4, 2023)…………………………………...49

*Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,*
   2016 WL 9414347 (E.D. La. 2016)……………………………………...…40

*Thomas v. Burlington Res. Oil and Gas Co.,*
   2000 WL 1528082 (E.D. La. 2000)……………………………………...…37, 42

*Ukudi v. McMoran Oil & Gas, L.L.C.,*
   587 F. App'x 119 (5th Cir. 2014) …………………………………………...…36

*U.S. S.E.C. v. Snyder,*
   292 F. App'x 391 (5th Cir. 2008)…………………………………………...…49

*Venezia v. ConocoPhillips Co.,*
   2014 WL 107962 (E.D. La. 2014)……………………………………...…37, 42

*Villaronga v. v. Gelpi P'ship No. 3,*
   536 So. 2d 1307 (La. App 1st Cir. 1988)……………………………………...…29

*Voces v. Energy Res. Tech., G.O.M., L.L.C.,*
   704 F. App'x 349 (5th Cir. 2017)…………………………………………...…27

*Vogler v. Blackmore,*
    352 F.3d 150 (5th Cir. 2003)…………..……………………………………...48

*Wallace v. Mississippi,*
    43 F.4th 482 (5th Cir. 2022)…………………………………………...……..64

*Waters v. Lowe's Home Centers, LLC,*
    2019 WL 5309969 (E.D. La. 2019)…………………………………...……..39

*Williams v. Manitowoc Cranes, L.L.C.,*
    898 F.3d 607 (5th Cir. 2018) ……………………………………...…………26

*Zimko v. v. American Cyanamid,*
    905 So. 2d 465 (La. App. 4th Cir. 2005)…………………………………..58-59

**Statutes**

La. Supreme Court Rule XLIV, Plain Civil Jury Instructions……………………64

Fed. R. Evid. 404………..……………………………………………………………61

324A of the Restatement (Second) of Torts ………………………..……………..37

**Secondary Sources**

18 La. Civ. L. Treatise, Civil Jury Instructions § 18:14 Wrongful death (3d ed.)....50

## ORIGINAL BRIEF OF PLAINTIFFS-APPELLEES, ANIKA WARNER ON BEHALF OF Y.J., AND VANTRECE JACKSON, URGING AFFIRMANCE

The plaintiffs-appellees, Anika Warner on behalf of Y.J., and Vantrece Jackson, urge the Court to affirm the district court's final judgment following a jury trial—a judgment that is faithful to governing law and which rests upon an overwhelming body of evidence.

## I.   INTRODUCTION

This is a wrongful death case. Talos ERT, LLC ("Talos") hired DLS, LLC and its crew—including Mr. Walter Jackson—to remove heavily corroded firewater pipes on its WC 2-15 offshore platform. Mr. Jackson was killed in the process. Despite a host of evidence showing that its negligence caused the incident, Talos denied liability, arguing that it did "nothing wrong." At trial, the jury disagreed with Talos's self-proclaimed role of a passive bystander—finding it 88% at fault, while attributing 12% fault to DLS. Talos has now appealed, raising several challenges.

In its brief, however, Talos covers its eyes to the record evidence and the legal theories that the plaintiffs advocated at trial. As this Court will see, Talos's brief (1) addresses arguments that the plaintiffs have never advanced in this case, and (2) provides an incomplete view of the evidence and key witness testimony on the central points that were presented to the jury. For instance, Talos spends a notable portion of its brief attempting to refute arguments that the plaintiffs never made against it—

1

such as that the pipe removal operation was ultrahazardous or that Talos retained operational control over it. Yet, the question of Talos's failure to issue a hot work permit in violation of federal regulations—which was the focus of trial—remains entirely *unaddressed* by Talos. And for a good reason: Talos simply could not find an excuse that would justify it. This Court should rule that Talos has waived all arguments regarding its liability for failing to issue a hot work permit.

But finding excuses to justify its (in)actions and pointing the finger elsewhere was Talos's entire strategy at trial. In that vein, Talos told the jury that (1) wind miraculously blew its hot work permit into the Gulf of Mexico—whereas Talos actually never even issued it, (2) DLS's crew "shock-loaded" the rope used for lowering the pipes—whereas Talos actually failed to provide the crew with proper tools for the job, (3) Mr. Jackson was not supposed to stand under a suspended load—whereas Talos actually failed to properly mark and barricade a landing zone on its platform, (4) DLS failed to monitor its workers—whereas Talos actually pencil-whipped its approval for the job without physically visiting the platform and conducting a proper hazard analysis. Faced with a mountain of contrary evidence, Talos's excuses did not sit well with the jury. Ultimately, the jury awarded approximately $20 million to Mr. Jackson's minor son and $7 million to his widow—which damages were then considerably remitted by the district court.

But Talos's excuses did not end there. Ignoring the realities of this case, Talos now tries to blame the jury's verdict on allegedly "inflammatory" comments made by the plaintiffs' counsel, and it attacks the district court's already significant remittitur and application of the maximum recovery rule. None of Talos's challenges raised before this Court, however, overcome the respective standards of review. The record of this case speaks for itself. And it counsels that the district court's judgment should stand undisturbed in all respects. This Court should affirm.

## II.  RESTATEMENT OF THE ISSUES

1.  Under Louisiana law, a principal is generally not liable for the negligent acts of its independent contractor. But an exception to this general rule allows imposition of liability to the principal when the principal expressly or impliedly authorizes unsafe work practice. Under the "especially deferential" standard of review, did the district court err in finding that Talos expressly or impliedly authorized DLS's unsafe work practice—warranting denial of Talos's motion for judgment as a matter of law?

2.  Louisiana law holds a principal liable for its own acts of negligence. Holding Talos independently negligent for this incident required a showing of a duty of care. Under the "especially deferential" standard, did the district court err in finding that Talos assumed a duty of care (1) through its contract with DLS, and/or

(2) by creating the hazardous condition at issue—warranting denial of its motion for judgment as a matter of law?

3.    Alternatively, did the district court abuse its discretion in denying Talos's motion for a new trial after the jury attributed 88% fault to Talos for causing this incident?

4.    On damages, did the district court abuse its discretion in (1) without any objection, separating, on the verdict form, loss of love, affection, and companionship from past and future mental anguish, and (2) applying the maximum recovery rule?

5.    While rendering its verdict in the context of this trial, was the jury inflamed and prejudiced by the comments of the plaintiffs' counsel for which Talos claims to be improper (and which, almost uniformly, were un-objected to)?

## III.    STATEMENT OF THE CASE

### A.    Statement of facts.

#### 1.    Talos knows that *its* own neglect of *its* own firewater pipes created a hazardous condition on *its* own platform; yet, Talos doesn't act until ordered to do so.

Talos is the owner and operator of the WC 215-A offshore platform in the Gulf of Mexico where this incident occurred.[1] For years, Talos left its useless, out-of-service firewater piping system on this platform to corrode—knowing very well that

---

[1]    ROA.11765:5-25.

these mammoth-size "heavily corroded" pipes "could break at any time" and kill someone.[2] Talos also knew that the responsibility to eliminate this fatal hazard fell on Talos, alone.[3] But none of this was enough to get Talos to act. In fact, it wasn't until the Bureau of Safety and Environmental Enforcement ("BSEE") visited Talos's platform, found Talos to (again) be in violation of federal safety regulations, and ordered Talos to fix the issue that Talos finally realized the need to do so.[4]

Talos hired Mr. Jackson's employer, DLS, to help remove the heavily corroded piping from its platform. The parties entered into a Master Service Agreement ("MSA"),[5] which required them to execute a separate Bridging Agreement[6]—all with a goal to ensure that DLS complied with (1) *Talos's* Safety and Environmental Management System ("SEMS"), and (2) *Talos's* safe work practices manual.[7] While Talos has claimed throughout this litigation that these documents did not govern the

---

[2]     ROA.12428 (Talos's corrosion mitigation task list); ROA.12611-12614 (transcript of excerpt video deposition of Talos's operations compliance manager Steve Champagne played at trial); ROA.11766:10-13 (parties' stipulation that "included on the 2018 Talos corrosion mitigation task list was out-of-service firewater piping hangers are heavily corroded and could break at any time").

[3]     ROA.12612-12613 and ROA.12615 (transcript of excerpt video deposition of Talos's operations compliance manager Steve Champagne played at trial).

[4]     *Id.* at ROA.12614-12616.

[5]     ROA.13515-13527 (MSA).

[6]     ROA.13521 (MSA, ¶22); ROA.11766:1-9 (stipulations).

[7]     ROA.13521 (MSA, ¶22); ROA.11028:13-11030:3 (Ziegler); ROA.12555 and ROA.12571 (Talos's SEMS plan); ROA.13459 (Bridging Agreement, ¶2.2).

pipe removal job in question, that theory was defeated by *every single witness* who testified on this issue at trial.[8] This is important, because what Talos was trying to tell the jury was that the responsibility for safely executing the pipe-removal operation belonged—not to Talos—but to DLS and its supervisor, Mr. Stephen DeLue.

Yet, these very documents—which Talos (unsuccessfully) claimed to be inapplicable—said otherwise.[9] To be clear, Talos's own policies and procedures as well as its lease agreement with the federal government showed that it was *Talos's* responsibility to ensure safety on its own platform.[10] Even Talos's corporate representative, Mr. Rope Spinks, conceded the point.[11]

This responsibility came with a key requirement: Talos's own person in charge ("PIC") and person with ultimate work authority ("UWA"), Mr. Jeremy Bourque,[12] was to review and approve each and every step of the pipe-removal job

---

[8]   ROA.11324:20-11325:2 (DeLue); ROA.11200:24-11201:4, ROA.11206:7-11207:6, and ROA.11457:21-24 (DLS corporate); ROA.11031:7-11032:4, ROA.11168:10-22, ROA.11111:18-11112:4, ROA.11132:8-11133:17, and ROA.11170:3-11171:13 (Ziegler); ROA.10849:25-10850:5, ROA.12028:2-9, and ROA.12033:3:21 (Talos corporate).

[9]   ROA.12554 (Talos's SEMS plan); ROA.12436 (Talos's manual); *id.* at ROA.12441, ROA.12481, and ROA.12482 (¶5.1.3.).

[10]  ROA.11026:18-11030:15 (Ziegler).

[11]  ROA.10850:14-10851:20 (Talos corporate); ROA.11324:11-19 (DeLue); ROA.11033:22-11035:2 (Ziegler); ROA.11229:22-11230:16 (DLS corporate).

[12]  ROA.10850:6-10852:4 (Talos corporate).

before that job could begin.[13] Put simply, there is absolutely nothing that DLS, its crew, or its supervisor Mr. DeLue did—or did not do—that would have freed Talos and its Mr. Bourque of the requirement to analyze all potential hazards and give his final approval for the job to proceed.[14]

### 2. Talos demands that its own JSA govern the pipe-removal; but Talos's JSA proves to be woefully inadequate for the job.

The parties' Bridging Agreement that applied to the pipe-removal operation[15] required DLS to use *Talos's* Job Safety Analysis ("JSA") form.[16] Conducting a JSA is of no minor significance. Indeed, the purpose of a JSA is to perform a hazard analysis to identify—and then eliminate—any potential hazards involved with a job to be done on Talos's platform.[17]

---

[13]   ROA.10850:14-10851:20, ROA.10871:8-17, and ROA.10934:25-10935:2 (Talos corporate); ROA.11159:20-11160:4 and ROA.11175:8-11176:3 (Ziegler); ROA.11234:22-11235:1 (DLS corporate); ROA.11295:13-19, ROA.11297:20-11298:3, and ROA.11298:20-11299:25 (DeLue).

[14]   ROA.12566 (Talos's SEMS plan) ("The PIC of the facility *must* approve and sign the JSA.") (emphasis added); ROA.11298:20-11299:25 (DeLue).

[15]   ROA.13521 (MSA, ¶22); ROA.13459 (Bridging Agreement, ¶1); ROA.11766:1-9 (stipulations).

[16]   ROA.13461-13462 (Bridging Agreement, ¶5).

[17]   ROA.12514 (Talos's manual, ¶7.1.1.); ROA.11032:15-11033:15 (Ziegler).

The evidence at trial showed that the responsibility to do all of this belonged to Talos and its PIC and UWA, Mr. Bourque.[18] The evidence at trial also showed that Mr. Bourque should *not* have signed off on a JSA if the JSA was inadequate.[19] Unfortunately for Mr. Jackson, Talos's Mr. Bourque did just that. The JSA for the day of the incident was notably deficient,[20] but Mr. Bourque still signed off on it—thus allowing the job to proceed without him properly (1) addressing, and (2) eliminating key hazards.[21] And the evidence presented to the jury showed that it was these exact hazards that ultimately led to Mr. Jackson's untimely demise.[22] Three of these hazards, revealing the sheer deficiency of the JSA improperly authorized by Mr. Bourque, call for discussion below.

---

[18]     ROA.10871:8-10872:1 and ROA.10934:25-10936:1 (Talos corporate); ROA.11032:15-11034:21 (Ziegler).

[19]     ROA.10870:9-15 (Talos corporate) ("Q: Okay. He [Bourque] was the person that was -- that signed off on this JSA, correct? A: Correct. Q: He should never approve it unless it's adequate, correct? A: If it was inadequate, correct, he should not approve it.").

[20]     ROA.11040:14-11043:3 and ROA.11054:8-11057:4 (Ziegler).

[21]     ROA.10871:8-10872:1 and ROA.10934:25-10936:1 (Talos corporate); ROA.11039:5-11040:6 (Ziegler); ROA.12544-12549 (the JSA for the day of the incident).

[22]     ROA.11297:7-11298:12 (DeLue).

a. **The (inadequate) JSA approved by Talos allows DLS to use a *rope* to lower the pipes—which contributes to this incident.**

The evidence presented to the jury showed three things. First, it was *Talos's* responsibility to provide DLS with adequate tools "needed in order for [DLS] to perform their job[] in a healthy and safe manner."[23] Second, it was *Talos's* responsibility not to pencil-whip the JSA and to—even if DLS had suggested to use an improper tool or piece of equipment for the job—ensure that the chosen tool was, in fact, adequate.[24] And third, Talos failed to do so here.

To illustrate, before DLS ever arrived at Talos's platform, Mr. DeLue had met with Talos's facilities engineer Larry Robinson. The two discussed, and Mr. Robinson specifically *approved*, using a rope for lowering the pipes.[25] To be sure, days before the pipe-removal operation was to be performed by DLS, Talos knew that a half-inch manila rope was going to be used to lower pre-cut pipes from the platform's cellar deck to the +10 deck located approximately 40 feet below. Thereafter, while

---

[23]    ROA.12441 (Talos's manual, ¶3.1.3.); ROA.11255:12-11256:13 (DLS corporate); ROA.10977:3-9 (Talos corporate) ("Q: And one of -- part of the PIC's responsibility is making sure that proper tools are being selected for the job, true? A: Within reason, yes. Q: And that would -- that is something that the PIC has to do before the work begins, correct? A: He does."); ROA.11300:17-11301:9 (DeLue).

[24]    ROA.11300:17-11301:9 (DeLue); ROA.11250:14-11254:20 (DLS corporate); ROA.12069:3-22 (Talos corporate).

[25]    ROA.11289:1-17, ROA.11291:11-11293:17, and ROA.11300:23-11301:9 (DeLue); ROA.11251:22-11252:3 (DLS corporate).

conducting the JSA before allowing the pipe-removal job to proceed, Talos's PIC and UWA Mr. Bourque also learned that the pipes would be lowered down with a rope—and also *approved* this method.[26] This means that, had Talos wanted to lower the pipes by using a different method (e.g. push them through the opening) or by using a different tool (e.g. a crane or an air tugger), Talos had more than sufficient time and opportunity to request these alternatives.[27] But these alternatives would have been significantly more costly for Talos—and, knowing that its platform was soon to be decommissioned and removed from the Gulf of Mexico never to be used again, Talos was unwilling to incur that cost.[28]

Ultimately, the half-inch manilla rope approved by Talos for lowering the pipes broke, causing a piece of pipe to fatally strike Mr. Jackson. Attempting, after the fact, to skirt its responsibility for choosing the inadequate method of using rope as the tool to lower the pipes (a rope that broke), Talos presented the jury with quite a theory. It argued then, just like it argues now before this Court, that the rope did not break because it was an inadequate tool for the job—but because DLS crew allegedly "shock-loaded" the rope by pushing or kicking the pipes over the edge off the

---

[26]     ROA.11305:21-11307:7 (DeLue).

[27]     ROA.11251:22-11254:20 (DLS corporate); ROA.11158:22-11160:4 (Ziegler).

[28]     ROA.11158:22-11160:4 (Ziegler); ROA.12070:1-12075:4 (Talos corporate).

scaffold. But the evidence that the jury heard defeated Talos's theory entirely. Three points stand out.

*First*, claimed Talos, Mr. DeLue instructed his DLS crew to cut the pipes into manageable sections of less than 36 inches long—which sections would, thus, weigh about 87 pounds.[29] But the crew, according to Talos, violated Mr. DeLue's instructions because the pipe that they cut—and that struck Mr. Jackson—was approximately 51 inches long and weighed 130 pounds.[30] So, it then only follows, says Talos, that a contributing factor of this incident was not the inadequacy of the rope—but the DLS crew's violations of Mr. DeLue's instructions. Yet the problem with Talos's theory was highlighted through the testimony of its own expert in material failure and materials engineering, Thomas Shelton. According to Mr. Shelton, his testing of an exemplar rope showed that the rope in question here had the breaking strength of *over 2,000 pounds*—and this, again, according to Mr. Shelton—is "plenty of strength" and was "more than sufficient to handle" these allegedly longer and heavier pieces of pipe cut by DLS crew.[31] Said another way, even if DLS crew was arguably cutting

---

[29]    ROA.9426 (Talos's memorandum in support of JMOL).

[30]    ROA.12066:17-21 (Talos corporate); ROA.12126:11-16 (Shelton).

[31]    ROA.12125:8-12127:20 (Shelton).

the pipes in violation of Mr. DeLue's instructions, Talos presented the jury with no evidence whatsoever that these so-called violations caused this incident in any way.

*Second*, instead of "gently lowering the pipe sections,"[32] Talos argued that the crew was pushing or kicking these pipe sections over the edge—thereby "shock-loading" the rope and causing it to break. As this Court can see for itself, Talos relied on the deposition testimony of DLS's welder, John Menser, as the *only* support for the notion that DLS crew was lowering the pipes in such a manner.[33] That is, when deposed, Mr. Menser testified that—when *he* was the one lowering the pipes to the +10 deck—*he* would "push or kick" the pipe to get the slack out of the rope.[34] It is then solely based on this testimony that Talos's expert, Mr. Shelton, opined that this repeated kicking of the pipe "shock loaded" the rope, causing its strand structure to weaken and tear.[35]

The issue here is two-fold. One, Talos presented no evidence to the jury to show how many times Mr. Menser was the one in charge of lowering the pipes down to the +10 deck. In fact, Mr. Menser testified that (1) he was *not* the one who was

---

[32]     Appellant's brief, p. 15.

[33]     *Id.* (citing ROA.11811, ROA.11814-16). To note, despite being subpoenaed to appear at trial, Mr. Menser failed to do so. Thus, his deposition testimony was read into the record. *See* ROA.11664:7-11673:23 (the parties' discussion with the court on Menser).

[34]     ROA.11811:6-11814:25 (Menser).

[35]     ROA.12110:22-12112:5 (Shelton).

lowering the pipes on the day of the incident—it was Byron Davis,[36] and (2) he was in charge of *cutting* the pipes at the time, so he *did not even see* the pipe fall.[37] And two, the testimony of the very first witness at trial—Talos's corporate representative, Mr. Spinks—revealed that evidence had been improperly withheld from the plaintiffs.[38] This evidence, finally produced mid-trial, showed that the manilla rope used on the morning of the incident was "*brand-new out of a box*"[39]—a fact that was (conveniently) not even disclosed to Mr. Shelton.[40] So, Talos presented the jury with absolutely no evidence that (1) Mr. Davis ever, much less repeatedly, pushed or kicked the pipe over the scaffold, and (2) Mr. Davis shock-loaded a brand new rope. In other words, the fact that Mr. Menser may have, for an *unknown* number of times, pushed or kicked a *different* pipe section, being lowered by a *different* rope, on a *different* day is no evidence that Mr. Davis ever shock-loaded the rope at issue here.

And *third*, all of this notwithstanding, the evidence at trial kneecapped Talos's theory for yet another reason. Though he testified that the rope in question failed as

---

[36]    ROA.11853:7-11 (Menser).

[37]    ROA.11857:8-24 and ROA.11867:9-19 (Menser).

[38]    ROA.10872:6-10892:14 (Talos corporate testimony and parties' ensuing discussion with the court).

[39]    ROA.11667:225-11671:2 (bench conference); ROA.11253:12-21 and ROA.11555:19-11556:2 (DLS corporate).

[40]    ROA.12156:20-12157:13 (Shelton).

a result of being "shock-loaded," Talos's expert Mr. Shelton admittedly did *not* even conduct any calculations to determine the magnitude of this alleged shock load.[41] And this is important. Without offering even as much as a guess on the alleged shock load, Talos left the jury to wonder exactly how (1) a brand new rope, (2) with the breaking strength of <u>2,000+</u> pounds, (3) for which there was no evidence of *ever* being "shock-loaded" by *any* DLS crew member, (4) could conceivably break while lowering a mere <u>130</u>-pound piece of pipe.

Based on the above, Talos's theory that it was "shock-loading" of the rope that contributed to this incident was wholly unproven.

> **b.    The (inadequate) JSA approved by Talos allows the work to proceed without a mandatory hot work permit—which contributes to this incident.**

The pipe-removal job involved hot work activities such as welding, burning, and cutting. This meant that a hot work permit, undisputedly, had to be issued before the job could proceed.[42] And this permit-issuing responsibility, also undisputedly, belonged to *Talos*.[43] As the record of this case shows, the hot work permit has been one of the focal points throughout this litigation, including at trial. Yet, in its nearly 80-

---

[41]    ROA.12131:21-12137:4 (Shelton).

[42]    ROA.10856:5-12 (Talos corporate).

[43]    ROA.13461 (Bridging Agreement, ¶4); ROA.10856:13-10857:5 (Talos corporate); ROA.11069:4-18 (Ziegler); ROA.11307:8-25 (DeLue).

page brief, Talos spends *zero* words addressing this issue for the Court. This is likely because the evidence related to the hot work permit—as well as Talos's own conjecture trying to explain this evidence away—is so bad for Talos that it found no conceivable way to spin the issue in its favor before this Court. Three reasons explain why.

*First*, the jury heard evidence showing that Talos's PIC and UWA on the platform, Mr. Bourque, was required to (1) physically visit the location of the pipe-removing job and approve any hot work activities before they can occur, (2) issue a hot work permit, and (3) prohibit any and all hot work activities from proceeding until a permit is issued.[44] The jury also heard evidence that Mr. Bourque did not do any of these things.[45] Still, Talos argued that it did issue a hot work permit on the day of the incident.[46] But when the time came for Talos to show this supposed hot work permit to the jury, Talos was unable to do so.[47]

*Second*, when asked what happened to the hot work permit that Mr. Bourque purportedly issued on the day of the incident, Talos's corporate representative Mr.

---

[44] ROA.10856:5-12 (Talos corporate); ROA.11070:19-11071:15 (Ziegler); ROA.12544 (the JSA for the day of the incident).

[45] ROA.11580:15-25 (DLS corporate); ROA.11054:8-11055:9 (Ziegler); ROA.10867:1-10868:18 and ROA.10942:24-10943:14 (Talos corporate).

[46] ROA.9428 (Talos's memorandum in support of JMOL).

[47] ROA.10902:16-10907:17 (Talos corporate); ROA.11068:10-16 (Ziegler).

Spinks offered an explanation to the jury which—perhaps in his mind, only—seemed plausible. He claimed that the hot work permit in question was somehow miraculously blown overboard by the wind, ending up in the Gulf of Mexico.[48] This explanation, however, was readily defeated by the evidence and by common sense. Indeed, there were at least two copies of every hot work permit issued on Talos's platform: One was attached to the JSA form and kept onsite, while the other one was kept in the office.[49] Talos's explanation to the jury that the wind blew its hot work permit into the Gulf of Mexico completely neglected to explain (1) how the wind could have blown away the hot work permit *attached* to the JSA, but not the JSA itself—which was in evidence,[50] and (2) how the wind could have blown away the copy of the hot work permit that was located *in the office*.

And *third*, Talos's "wind" explanation left several other related mysteries unresolved for the jury. For instance, Talos had no answer as to why its incident report submitted to the federal government made no mention of its hot work permit being blown overboard by the wind.[51] Talos also had no answer as to why Talos had a copy of the hot work permit issued for *every day* preceding Mr. Jackson's death, but

---

[48]    ROA.10902:16-10908:12 (Talos corporate).

[49]    *Id.* at ROA.10908:13-10912:18.

[50]    ROA.12544-12549 (the JSA for the day of the incident).

[51]    ROA.10905:7-10906:1 (Talos corporate).

somehow did not have any copy of the permit issued on the day in question. And while Talos conducted an internal investigation into this incident, not a single minute of this investigation was dedicated to at least asking DLS where the hot work permit was or what happened to it.

But Talos was unbothered. Faced with dim prospects of the jury finding its "wind" explanation believable, Talos came up with an alternative one. It argued that, even if it were true that Mr. Bourque failed to issue a hot work permit on the day of the incident, that failure could not have possibly contributed to Mr. Jackson's demise. This is so, said Talos, because hot work permits are "intended to prevent fire and explosions" and do not "deal with the correct way to lower pipe."[52] But the plaintiffs' expert, Edward Ziegler, explained to the jury that this theory, too, was wrong. Mr. Ziegler testified that, contrary to Talos's argument, a hot work permit deals with much more than just "fire and explosions."[53] Mr. Ziegler also testified that Talos's failure to issue a hot work permit was not, at all, meaningless. Rather, it caused this incident because a properly conducted JSA and a properly issued hot work permit would have recognized and eradicated the need for DLS crew and Mr. Jackson to ever

---

[52]     ROA.9428 (Talos's memorandum in support of JMOL).

[53]     ROA.11066:17-11068:9 (Ziegler).

be positioned under a suspended load where they were directly exposed to the falling hazard.[54]

For completeness, in addition to Mr. Ziegler's testimony, the jury was also presented with the evidence showing that (1) Talos had already been convicted of a felony for violating the same hot work permit requirements that were at issue in this case,[55] and (2) the BSEE found that Talos had a pervasively "unsafe work culture."[56]

      c.    **The (inadequate) JSA approved by Talos does not properly mark/barricade the landing zone, directly exposing Mr. Jackson to the pipe-falling hazard—causing this incident.**

There is yet another reason why Talos failed to conduct a proper JSA: It allowed the pipe-removal to proceed without (1) adequately marking and barricading safe landing zones, and (2) issuing the required cross-barricade permits.

By way of background, through the JSA, Talos's Mr. Bourque was required to properly identify and barricade landing zones where the pre-cut pipe sections could be safely lowered.[57] This requirement existed for a reason. With hot work activity—

---

[54]    *Id.* at ROA.11069:4-11071:15.

[55]    ROA.10926:14-10929:4, ROA.10981:1-18, and ROA.10985:11-16 (Talos corporate); ROA.11260:10-17 (DLS corporate).

[56]    ROA.10858:18-10859:11, ROA.10867:1-15, and ROA.10983:25-10985:16 (Talos corporate); ROA.11260:10-17 and ROA.11222:8-11223:8 (DLS corporate).

[57]    ROA.10943:15-10945:18 (Talos corporate).

*i.e.,* torch-cutting of the pipes—taking place directly above the +10 deck, there was a risk of falling sparks and objects.[58] But Talos did not comply with this requirement, either. In his standard practice of pencil-whipping the JSA form, Mr. Bourque allowed DLS to proceed with the pipe-removal without having first designated or barricaded *any* landing, no-standing, or no-access zones.[59] Talos's own investigation determined that these (in)actions of its PIC and UWA caused this incident.[60]

But the evidence that was presented to the jury on this issue did not end there. That evidence showed that it was *Talos's Mr. Bourque* who decided that DLS should stack and then retrieve the pipes from the +10 deck located directly below the hot work activity.[61] The problem, however, was that—since 2017[62]—there had been an "out-of-service" area on this +10 deck[63] that was marked off with an improperly constructed barricade.[64] Talos not only knew, but it also *required,* DLS crew to cross this improperly constructed barricade at various times during the day to be able to retrieve

---

[58]   ROA.10930:10-22, ROA.10931:24-10932:18, and ROA.10941:2-10942:18 (Talos corporate); ROA.11315:2-13 (DeLue).

[59]   ROA.10943:15-10945:18, ROA.10930:10-17, ROA.10932:21-10933:6, and ROA.12044:7-13 (Talos corporate).

[60]   ROA.10933:2-6 and ROA.10941:24-10942:14 (Talos corporate).

[61]   ROA.11006:4-11008:6 (Talos corporate); ROA.11264:3-10 (DLS corporate).

[62]   ROA.11004:1-11006:3 (Talos corporate); ROA.11076:1-11077:25 (Ziegler).

[63]   ROA.10947:15-10948:4 (Talos corporate).

[64]   ROA.11075:12-25 (Ziegler).

the lowered-down pipes.[65] Talos was, thus, required to issue a cross-barricade permit *each and every time* that a DLS crew member stepped inside the "out-of-service" area to retrieve a piece of pipe.[66]

But Talos never issued such a permit.[67] By (1) requiring DLS crew to repeatedly enter the "out-of-service" area, which the crew was not supposed to enter in the first place, and (2) repeatedly failing to issue the required cross-barricade permits, Talos made DLS's work "dangerous."[68] And it contributed to this incident.[69] This was not merely an argument of the plaintiffs' counsel or an opinion of the plaintiffs' expert. This was the testimony of Talos's own corporate representative, who—in no uncertain terms—told the jury the following:

> Q: Okay, sir. I'm just asking you a simple question. We agreed that the hot work permit or the JSA need to expressly state if certain areas of the lower deck *need to be designated as a no-standing zone*. We've got that. Right?
>
> A: I think it should, yes.
>
> Q: And you found in your investigation that you *thought that the hot work permit or the JSA should have contained that type*

---

[65] ROA.11312:20-11313:2 (DeLue); ROA.11072:17-11073:17 (Ziegler); ROA.11233:11-11235:19 (DLS corporate).

[66] ROA.11071:16-11073:17 and ROA.11075:12-25 (Ziegler); ROA.11312:20-11314:22 (DeLue).

[67] ROA.11072:17-11073:17 (Ziegler).

[68] *Id.* at ROA.11076:24-11077:25.

[69] ROA.11078:1-11081:21 (Ziegler).

*of information for the work being performed on the date, correct?*

A: *Could have prevented the incident, yes.*

Q: Okay. And you found that -- that would mean that *you found that your person in charge signed off on the JSA without -- and allowing the work to go forward without having the standing zones or barricaded areas as you identified, correct?*

A: *That's correct.*

Q: That would mean he *was allowing the work to go forward* and in what your mind is *an unsafe manner*, true?

A: He *did allow it* in the sense that he is responsible for allowing work to go on the platform.[70]

Ultimately, the BSEE conducted its own investigation into this incident. It concluded that Talos failed to conduct a proper JSA and issue the required permits.[71]

## B.   Procedural history.

Prior to trial, the parties engaged in an extensive motion practice which—among others—included Talos's, not one or two, but *three* attempts at summary judgment, asking the district court to dismiss the plaintiffs' claims against it.[72] All

---

[70]   ROA.10941:24-10942:18 (Talos corporate) (emphasis added).

[71]   ROA.10865:24-10868:18 (Talos corporate).

[72]   ROA.741-773 (Talos's first summary judgment motion); ROA.6544-6554 (Talos's motion for reconsideration of the court's denial of its first summary judgment motion); ROA.8123-8149 (Talos's second summary judgment motion).

attempts were rejected by the district court.[73] The matter proceeded to a seven-day jury trial on January 25, 2023. At the conclusion of trial, the jury returned a verdict in favor of the plaintiffs—finding that Talos was 88% at fault, and DLS was 12% at fault, for the incident that caused Mr. Jackson's death.[74] On behalf of her minor son, the jury awarded Anika Warner (1) $40,000 in loss of past financial support, (2) $80,000 in loss of future financial support, (3) $10 million for loss of love, affection, and companionship, (4) $5 million for past mental anguish, and (5) $5 million for future mental anguish.[75] And for Mr. Jackson's widow, Mrs. Vantrece Jackson, the jury awarded (1) $186,407 in loss of past wages, (2) $568,266 in loss of future wages, (3) $233,257 in loss of household services, (4) $4 million for loss of love, affection, and companionship, (4) $1.5 million for past mental anguish, and (5) $1.1 million in future mental anguish.[76] On February 10, 2023, the district court entered a final judgment on the jury's verdict.[77]

---

[73] ROA.6392-6398 (order denying Talos's first summary judgment motion); ROA.6679-6691 (order granting Talos's motion to reconsider but finding that its first summary judgment motion remains denied); ROA.8913-8924 (order denying Talos's second summary judgment motion).

[74] ROA.10752-10755 (jury verdict form).

[75] *Id.* at ROA.10754.

[76] *Id.*

[77] ROA.9361-9362 (final judgment).

Thereafter, Talos filed a slew of post-trial requests seeking judgment as a matter of law, a new trial, or a remittitur of the jury's damages award.[78] The plaintiffs opposed the effort.[79] Talos filed its reply in support,[80] to which the plaintiffs responded in a sur-reply.[81] Following a hearing on June 28, 2023,[82] the district court—in a written order dated September 28, 2023—(1) denied Talos's motion for judgment as a matter of law and a motion for a new trial, and (2) granted in part Talos's motion for remittitur, ordering that the general damages award to Ms. Warner on behalf of her minor child be adjusted from $20 million to $4,360,708.59, and that the general damages award to Mrs. Jackson be adjusted from $6.6 million to $5,104,226.22.[83] Talos appealed.[84]

## IV.  SUMMARY OF THE ARGUMENT

None of Talos's challenges raised in its brief overcome their respective standards of review by this Court.

---

[78]    ROA.9412-9465 (Talos's post-trial motion).

[79]    ROA.9788-9858 (plaintiffs' opposition to Talos's post-trial motion).

[80]    ROA.10525-10552 (Talos's reply in support of its post-trial motion).

[81]    ROA.10723-10728 (plaintiffs' sur-reply to Talos's post-trial motion).

[82]    ROA.12308-12354 (post-trial hearing transcript).

[83]    ROA.10730-10741 (court's ruling on Talos's post-trial motion).

[84]    ROA.10742 (Talos's notice of appeal).

*First*, while a principal is not generally liable for the negligence of its independent contractor, Louisiana law has carved out certain exceptions to this general rule. One of those exceptions argued by the plaintiffs at trial was that Talos expressly or impliedly authorized an unsafe work practice. The principal is vicariously liable under this exception if, instead of taking adequate precautions that would render the work ordinarily safe, it authorizes the particular manner which rendered the work unsafe. The evidence showed that Talos did so in no less than seven different ways. The district court did not err in denying Talos's motion for judgment as a matter of law on this ground.

*Second*, that notwithstanding, Louisiana law holds principal liable for its independent negligence—which necessitates a showing of a duty of care. Among others, the principal can assume a duty of care (1) by contract, and (2) by creating the hazardous condition at issue. The evidence showed that Talos assumed a duty of care toward DLS in both of these ways. The district court did not err in denying Talos's motion for judgment as a matter of law on this ground, either.

*Third*, the jury allocated 88% fault to Talos for causing this incident, while it assigned the remaining 12% fault to DLS. The jury's fault allocation is fully in line with the evidentiary record in this case. So, the district court did not abuse its discretion in denying Talos's motion for a new trial on liability.

*Fourth*, a review of Louisiana jurisprudence shows that loss of love, affection, and companionship is distinct and separate from past and future mental anguish. Louisiana cases also show that district courts enjoy discretion to—and commonly do—list different elements of general damages, both past and future, separately on a verdict form. So, the district court did not abuse its discretion to do so in this case (especially given that Talos failed to object on the issue). Equally, the district court did not abuse its discretion in applying the maximum recovery rule to the plaintiffs' damages. The awards on which the court relied in remitting the plaintiffs' recovery here (1) share sufficient facts with this case, such that its reliance on those rulings is justified, and (2) are not even the highest rewards that the court could consider.

And *fifth*, concerning alleged prejudicial remarks by plaintiffs' counsel, by failing to timely object to the opening statement or closing argument delivered by the plaintiffs' counsel—as well as to his line of questioning of certain witnesses at trial—Talos waived its right to raise that issue before this Court. Nevertheless, plaintiffs' counsel made no inflammatory comments of any kind to the jury. And there is no evidence that the jury was prejudiced in its rendering of the verdict by any comments or line of questioning that Talos complains of here.

This Court should affirm the district court's judgment in full.

## V.    LAW AND ARGUMENT

### A.    The standard of review on a motion for judgment as a matter of law is *de novo*, but it is "especially deferential" after a jury trial.

This Court reviews the denial of a motion for judgment as a matter of law *de novo*, "but our standard of review with respect to a jury verdict is *especially deferential.*"[85] And under that standard, "a litigant cannot obtain judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion."[86] So, the Court "cannot reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings."[87] The Court must review "all of the evidence in the record," crediting the non-moving party's evidence and disregarding all evidence favorable to the moving party that the jury is not required to believe.[88]

---

[85]    *Janvey v. Romero,* 817 F.3d 184, 187 (5th Cir. 2016) (emphasis added); *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.,* 930 F.3d 647, 652–53 (5th Cir. 2019); *Williams v. Manitowoc Cranes, L.L.C.,* 898 F.3d 607, 614 (5th Cir. 2018).

[86]    *Janvey,* 817 F.3d at 187; *Williams,* 898 F.3d at 614.

[87]    *Williams,* 898 F.3d at 614 (internal citation omitted); *Apache Deepwater,* 930 F.3d at 652–53 ("A party is only entitled to judgment as a matter of law on an issue where no reasonable jury would have had a legally sufficient evidentiary basis to find otherwise.").

[88]    *Janvey*, 817 F.3d at 187; *Apache Deepwater,* 930 F.3d at 652–53.

**B.**     **Under the "especially deferential" standard, the district court did not err in denying Talos's motion for judgment as a matter of law.**

To set the stage, the plaintiffs do not dispute—as a general matter—that Louisiana law does not hold a premises owner/principal liable for the negligent acts of its independent contractor acting under a contract.[89] However, Louisiana law provides for certain exceptions to this rule—exceptions which *allow* imposition of liability to the principal for damages caused by its independent contractor's negligence. There are *three* such exceptions: (1) when the injuries at issue result from an ultrahazardous activity, (2) when the principal reserves the right to exercise "operational control" over the independent contractor's actions, or (3) when the principal gives "express or implied authorization" to an unsafe work practice.[90] To be clear, "express or implied authorization" of an unsafe work practice is a *third, separate* exception to the independent contractor defense.[91]

At trial, the plaintiffs sought to establish Talos's liability on two grounds—and two grounds, only: (1) Talos's express or implied authorization of an unsafe work practice, which is the third exception listed above, and (2) Talos's

---

[89]     *Voces v. Energy Res. Tech., G.O.M., L.L.C.,* 704 F. App'x 345, 349 (5th Cir. 2017).

[90]     *Parkman v. W&T Offshore, Inc.,* 673 F. Supp. 3d 811, 822 (M.D. La. 2023).

[91]     *Sandbom v. BASF Wyandotte, Corp.,* 95-0335 (La. App. 1 Cir. 4/30/96), 674 So. 2d 349, 355.

independent negligence.[92] Accordingly, this brief will have the same focus. While Talos argues the other two exceptions to this Court—*i.e.,* the ultrahazardous activity and operational control[93]—the plaintiffs did *not* advocate or rely upon these exceptions in presenting their case to the jury.[94] As such, a notable portion of Talos's brief dedicated to the independent contractor issue and the jurisprudence that does not apply here adds nothing for consideration.

### 1. An overwhelming body of evidence adduced at trial showed that Talos authorized an unsafe work practice.

Talos spends almost ten pages of its brief attempting to pierce a proverbial hole in arguments that the plaintiffs have never even made. By comparison, Talos's position that it did not expressly or impliedly authorize an unsafe work practice by DLS—which was a central issue in this case—consists of mere *three paragraphs.*[95] So it should come as no surprise that Talos's presentation of the record evidence on this important issue is, to put it mildly, meager at best.

---

[92] ROA.12290:20-12291:1 (final jury charge/instructions).

[93] Appellant's brief, pp. 25-28 (discussing the ultrahazardous activity exception) and pp. 28-32 (discussing the operational control exception).

[94] ROA.12290:20-12291:1 (final jury charge/instructions).

[95] Appellant's brief, pp. 33-34.

As noted, Louisiana law holds a principal vicariously liable for the negligent acts of its independent contractor if the principal expressly or impliedly authorized an unsafe work practice.[96] Louisiana law provides:

> Where an available safe method, which *includes the taking of adequate precautions*, will render it at least ordinarily safe, and the work is done in an unsafe manner, the employer will be liable if he has expressly or impliedly authorized the particular manner which will render the work unsafe, and not otherwise.[97]

The evidence presented at trial made it easy for the jury to apply this rule to this case. And that evidence came from the mouth of Talos's own corporate representative, Mr. Spinks. In plain English, Mr. Spinks told the jury that (1) Talos's PIC and UWA, Mr. Bourque, "gave express authorization" for DLS to proceed with the pipe-removal,[98] (2) in doing so, Mr. Bourque allowed the work to proceed in "an unsafe manner,"[99] and (3) there were precautions which, if taken, "[c]ould have

---

[96] *Parkman,* 673 F. Supp. 3d at 822; *Sandbom*, 674 So. 2d at 355; *Villaronga v. Gelpi P'ship No. 3,* 536 So. 2d 1307, 1310 (La. App 1st Cir. 1988).

[97] *Ewell v. Petro Processors of Louisiana, Inc.,* 364 So. 2d 604, 606–07 (La. App. 1st Cir. 1978) (emphasis added).

[98] ROA.10850:14-10851:20 and ROA.10871:8-17 (Talos corporate) ("Q: When you get a JSA the PIC and the ultimate work authority has the responsibility to evaluate the process, each step, the hazards, mitigate those hazards, correct? A: Correct. Q: *Because in order for anything to go forward he has to give express authorization, true? A: That's correct.* Q: *He gave express authorization for the work being performed, correct? A: As he understood it, yes.*"); *id.* at ROA.10934:25-10935:2 ("Q: *The PIC, ultimate work authority, no JSA goes forward unless he gives the okay. We know this. A: That's correct.*") (emphasis added in both).

[99] ROA.10941:24-10942:18 (Talos corporate).

prevented the incident."[100] This testimony, all on its own, doomed any Talos's argument to the contrary.[101]

But there is more. The jury heard the evidence that Talos cold have taken no less than *seven* different precautions for conducting a safer pipe-removal operation, each of which—independently, but especially in tandem—would have prevented Mr. Jackson's death. These precautions, which are explained in greater detail in the fact section *supra*, included Talos:

a.  Conducting a proper JSA to be able to identify and then eliminate potential and existing risks involved with the pipe-removal in question—which Talos was required but failed to do;[102]

b.  Providing DLS with proper tools needed for the pipe-removal, instead of burying its head in the sand and allowing DLS to use a half-inch manila rope to lower heavy metal pipes—which Talos was required but failed to do;[103]

---

[100]   *Id.*

[101]   *Id.;* ROA.10871:8-10872:1 and ROA.11039:11-11040:6 (Ziegler); ROA.11204:4-22, ROA.11220:7-11221:18, ROA.11236:22-11237:9, and ROA.11447:19-11448:18 (DLS corporate); ROA.11297:7-11298:12 and ROA.11307:4-17 (DeLue).

[102]   ROA.12514 (Talos's manual, ¶7.1.1.); ROA.11032:15-11034:21 (Ziegler); ROA.10870:9-15, ROA.10871:8-10872:1, and ROA.10934:25-10936:1 (Talos corporate).

[103]   ROA.12441 (Talos's manual, ¶3.1.3.); ROA.11255:12-11256:13 and ROA.11251:22-11254:20 (DLS corporate); ROA.10977:3-9, ROA.12069:3-22, and ROA.12070:1-12075:4 (Talos corporate); ROA.11300:17-11301:9 (DeLue); ROA.11055:1-19 and ROA.11158:22-11160:4 (Ziegler).

c. Issuing a hot work permit before DLS could even begin removing the pipes—which Talos was required but failed to do;[104]

d. Properly marking or barricading a landing zone where the pipes were being lowered in order to prevent personnel entry into that area—which Talos was required but failed to do;[105]

e. Issuing cross-barricade permits to mitigate the risks that existed as a result of Talos's decision requiring DLS crew to repeatedly enter the out-of-service area on its platform—which Talos was required but failed to do;[106]

f. Halting the pipe removal until it issued all required permits—which Talos was required but failed to do;[107] and

g. Not signing off on the JSA and allowing the pipe removal to proceed without first physically visiting the platform—which Talos was required but failed to do.[108]

---

[104]    ROA.13461 (Bridging Agreement, ¶4); ROA.10856:5-10857:5 and ROA.10858:21-10859:12 (Talos corporate); ROA.11068:10-11069:18 (Ziegler); ROA.11307:8-25 (DeLue).

[105]    ROA.10943:15-10945:18, ROA.10930:10-22, and ROA.10941:24-10942:18 (Talos corporate); ROA.11315:2-13 (DeLue).

[106]    ROA.11071:16-11073:17 and ROA.11075:12-11077:25 (Ziegler); ROA.11312:20-11314:23 (DeLue); ROA.10941:24-10942:18 (Talos corporate).

[107]    ROA.12586 (Talos's SEMS plan).

[108]    ROA.10856:5-12 (Talos corporate); ROA.11070:19-11071:15 (Ziegler); ROA.12544 (the JSA for the day of the incident).

Each of these Talos's (in)actions directly exposed DLS crew to the risk of harm during the pipe-removal operation—making it abundantly clear to the jury that Talos (expressly or impliedly) authorized the very manner that rendered the job unsafe.[109]

But Talos, again, crafted an excuse. Two, to be exact.

*One,* Talos argued to the jury that it did not authorize an unsafe work practice because it never directed DLS crew "to do anything unsafe," such as to (1) simultaneously cut and lower the pipes, (2) push or kick the pre-cut pipe sections off the scaffold, "shock-loading" the rope in the process, or (3) enter the barricaded landing zone while pipes were being lowered.[110] Yet, Talos's argument was at odds with the trial testimony of its own corporate representative—who testified that Mr. Bourque expressly authorized DLS to proceed with the pipe-removal in "an unsafe manner."[111] And the argument also overlooked a small detail: Talos presented *no evidence* to suggest that DLS crew's (1) simultaneous cutting and lowering of the pipes, or (2) pushing or kicking of the pipes over the edge, played any role in causing this incident.

---

[109]    ROA.10850:14-10851:20, ROA.10871:8-17, and ROA.10934:25-10935:2 (Talos corporate); ROA.11175:8-11176:9 (Ziegler); ROA.11234:22-11235:1 (DLS corporate); ROA.11295:13-19 and ROA.11297:20-11299:25 (DeLue); ROA.12566 (Talos's SEMS plan).

[110]    Appellant's brief, pp. 33-34.

[111]    ROA.10850:14-10851:20, ROA.10871:8-17, and ROA.10941:24-10942:18 (Talos corporate).

Just like Talos failed to present to the jury any evidence that the "brand new" rope used on the day of the incident was, in fact, "shock loaded."

To dispel any doubt on the issue, Talos's own expert, Mr. Shelton, testified that—with over 2,000 pounds in breaking strength—the rope had "plenty of strength" and was "more than sufficient" to handle[112] the allegedly longer and heavier sections of pipe cut by DLS crew that weighed only 130 pounds.[113] The record in this case is devoid of any evidence showing either (1) that Mr. Davis—who was lowering the pipes at the time of the incident—had at all, let alone repeatedly, "pushed or kicked" the pipes off the scaffold, or (2) that a "brand new out of a box"[114] rope failed as a result of being "shock-loaded." While he casually floated this notion before the jury, Talos's expert was forced to admit that he did not conduct any calculations to determine the magnitude of the alleged shock load.[115] Viewed together, this means that all that Talos's "shock load" theory achieved at trial was that it left the jury to wonder how a piece of pipe weighing 130 pounds—for which there was no

---

[112]     ROA.12125:8-12127:20 and ROA.12162:3-7 (Shelton).

[113]     ROA.12066:17-21 (Talos corporate); ROA.12126:11-16 (Shelton).

[114]     ROA.11667:225-11671:2 (bench conference); ROA.11253:12-21 and ROA.11555:19-11556:2 (DLS corporate).

[115]     ROA.12131:21-12137:4 (Shelton).

evidence of ever being kicked or pushed over the edge—could have conceivably caused a brand new rope with the bearing capacity of 2,000+ pounds to break.

And *two*, said Talos, this incident occurred because Mr. DeLue at the time was in his office located on the platform (as opposed to on the +10 deck)—and Talos never "expressly or impliedly ordered Mr. DeLue to neglect his supervisory duties."[116] As confirmed by the sheer lack of any credible or expert evidence to support it, the argument fails. There is nothing that Mr. DeLue did or did not do in performing his supervisory duties that could have relieved Talos of *its own* duty to comply with *its own* requirements (imposed by *its own* policies and procedures), such as that (1) Talos's PIC and UWA physically visit the jobsite before signing off on the JSA,[117] (2) Talos conduct a proper JSA and analyze all potential hazards before giving its approval for the job to proceed,[118] (3) Talos provide DLS with adequate tools needed for the job,[119] (4) Talos mark or barricade a landing zone where the pipes were being

---

[116]    Appellant's brief, p. 34.

[117]    ROA.10856:5-12 (Talos corporate); ROA.11070:19-11071:15 (Ziegler); ROA.12544 (the JSA for the day of the incident).

[118]    ROA.12566 (Talos's SEMS plan); ROA.11298:20-11299:25 (DeLue); ROA.12514 (Talos's manual, ¶7.1.1.); ROA.11032:15-11034:21 (Ziegler); ROA.10870:9-15, ROA.10871:8-10872:1, and ROA.10934:25-10936:1 (Talos corporate).

[119]    ROA.12441 (Talos's manual, ¶3.1.3.); ROA.11255:12-11256:13 and ROA.11251:22-11254:20 (DLS corporate); ROA.10977:3-9, ROA.12069:3-22, and ROA.12070:1-12075:4 (Talos corporate); ROA.11300:17-11301:9 (DeLue); ROA.11055:1-19 and ROA.11158:22-11160:4 (Ziegler).

lowered,[120] (5) Talos issue all required permits[121] without which the pipe-removal was not allowed to proceed in the first place,[122] and so on. Talos's failures on all these accounts did not only make DLS's work more dangerous[123]—but they *admittedly* caused this incident.[124]

The net sum of the above is simple: Talos authorized an unsafe work practice that contributed to this incident. Talos's own corporate representative told this to the jury. And so did every other witness at trial who testified on the point. In light of the record evidence, which is decidedly stacked against Talos, the district court did not err in denying Talos's motion for judgment as a matter of law.

> ### 2. The evidence at trial proved Talos's independent negligence with ease; Talos's duty arose both from contract and from creating the hazard.

Regardless of whether any of the exceptions to the independent contractor defense apply, a principal—under Louisiana law—remains liable for its own

---

[120]     ROA.10943:15-10945:18, ROA.10930:10-22, and ROA.10941:24-10942:18 (Talos corporate); ROA.11315:2-13 (DeLue).

[121]     ROA.13461 (Bridging Agreement, ¶4); ROA.10856:5-10857:5 and ROA.10858:21-10859:12 and ROA.10941:24-10942:18 (Talos corporate); ROA.11068:10-11069:18, ROA.11071:16-11073:17, and ROA.11075:12-11077:25 (Ziegler); ROA.11307:8-25 and ROA.11312:20-11314:23 (DeLue).

[122]     ROA.12586 (Talos's SEMS plan).

[123]     ROA.11076:24-11077:25 (Ziegler).

[124]     ROA.10941:24-10942:18 (Talos corporate).

negligence.[125] It is well-cemented that a negligence claim in Louisiana has five elements, but duty is the first one.[126] In its brief, Talos's argument on the issue of its independent negligence is limited to the existence of duty.[127] The plaintiffs respond accordingly.

The governing law is largely undisputed: Duty is a question of law.[128] And "the particular facts and circumstances of each individual case determines the extent of the duty and the resulting degree of care necessary to fulfill the duty."[129] By virtue of being the owner of the platform, Louisiana law imposed on Talos a duty to provide DLS crew with reasonably safe premises for work.[130] And, as federal courts have recognized, the duty of a platform-owner to ensure the safety of the premises is implicated when the principal (1) *assumes such a duty by contract*,[131] or (2) *creates the*

---

[125] *Graham v. Amoco Oil Co.,* 21 F.3d 643, 645 (5th Cir. 1994); *Echeverry v. Jazz Casino Co., L.L.C.,* 988 F.3d 221, 228 (5th Cir. 2021); *Parkman,* 673 F. Supp. 3d at, 823.

[126] *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La. 4/3/02), 816 So. 2d 270, 275-76.

[127] Appellant's brief, pp. 34-44.

[128] *Harris v. Pizza Hut of Louisiana, Inc.,* 455 So. 2d 1364, 1371 (La. 1984).

[129] *Socorro v. City of New Orleans,* 579 So. 2d 931, 938 (La. 1991).

[130] *Abernathy v. Spie Grp., Inc.,* 1990 WL 62021, at *5 (E.D. La. 1990) ("The owner or operator of a facility also has a duty to provide persons on its premises with a safe place to work."); *Manning v. Dillard Dep't. Stores, Inc.*, 99-1179 (La. 12/10/99), 753 So. 2d 163, 165.

[131] *Ukudi v. McMoran Oil & Gas, L.L.C.*, 587 F. App'x 119, 122 (5th Cir. 2014) (per curiam).

*hazardous condition* at issue.[132] The evidence adduced at trial shows that both of these scenarios were met in this case.

Before diving into that evidence, however, two points are worth noting at the onset.

*First*, that the plaintiffs were arguing for the existence of Talos's duty (only) on the two aforementioned grounds—assumption by contract and creation of the hazard—should have been clear to Talos since the parties' early pre-trial motion practice.[133] Yet, Talos did not address *either* of these two grounds in its brief. Instead, Talos cites for this Court the law regarding the assumption of duty (1) under Section 324A of the Restatement (Second) of Torts—which does not apply in this case,[134] and (2) which was, for that same reason, never argued by the plaintiffs. To avoid deepening confusion on the issue, the plaintiffs will not analyze this inapplicable law for the Court.

---

[132]    *Venezia v. ConocoPhillips Co.,* 2014 WL 107962, at *6 (E.D. La. 2014); *Thomas v. Burlington Res. Oil and Gas Co.*, 2000 WL 1528082 at *2 (E.D. La. 2000).

[133]    ROA.5631-5636 (plaintiffs' opposition to Talos's first summary judgment motion).

[134]    Appellant's brief, p. 42 (citing *Bujol v. Entergy Servs., Inc.*, 922 So.2d 1113, 1129 (La. 2004)) (quoting Section 324A of the Restatement (Second) of Torts for the assumption of duty).

"The plain language of the introductory portion of § 324A establishes that an assumption of duty arises when the defendant (1) undertakes to render services, (2) *to another,* (3) which the defendant should recognize as necessary for the protection *of a third person*." *See Bujol,* 922 So. 2d at 1129 (emphasis added). Here, Talos did not undertake to render any services to DLS (it was vice versa), and Talos's liability in this case concerns the harm done to DLS's Mr. Jackson (not a third party).

And *second*, inapposite law notwithstanding, Talos's only argument that it owed no duty to Mr. Jackson is rooted in its attack on Mr. Ziegler's testimony.[135] According to Talos, Mr. Zieler opined on Talos's existence of a duty in this case by impermissibly drawing it from the BSEE regulations in violation of "this Court's precedents."[136] Not so. Talos had already tried its hand at this argument in its motion to exclude Mr. Ziegler,[137] but the district court rejected the effort.[138] As the plaintiffs explained in their opposition to the motion,[139] Mr. Ziegler did not—at all—opine on whether Talos owed any legal duty to Mr. Jackson. And the snippet of Mr. Ziegler's testimony, which Talos block-quoted in its brief, only confirms it.[140] Rather, what Mr. Ziegler did opine on was Talos's (non)compliance with federal safety regulations and applicable industry standards. And as this Court knows, Mr. Ziegler was perfectly within his rights to do so.

---

[135] Appellant's brief, pp. 36-41.

[136] *Id.* at p. 38.

[137] ROA.2170-2184 (Talos's motion to exclude Ziegler's testimony).

[138] ROA.6407-6416 (order denying Talos's motion to exclude Ziegler's testimony).

[139] ROA.4283-4303 (plaintiffs' opposition to Talos's motion to exclude Ziegler's testimony).

[140] Appellant's brief, pp. 37-38. Notably, there is nothing in this quoted testimony that even touches upon the existence of a duty. Besides, it is undisputed that (1) federal regulations applied to Talos as the owner of the platform, and (2) Talos's own documents required DLS to follow Talos's safe work practices and use Talos's JSA form. So, the exact reason why Talos decided to quote this part of Mr. Ziegler's testimony for the Court eludes the plaintiffs.

Federal safety regulations are relevant evidence in weighing a defendant's culpability.[141] And so is an expert's opinion on compliance with those regulations.[142] This is so because "a regulation provides evidence of the general standard of care" in the industry.[143] And expert witnesses are routinely allowed to testify as to industry standards and whether a defendant complied with them.[144] Without such objective standards, "there is no reliable foundation for [the] expert opinion."[145] Expert testimony analyzing a party's conduct with respect to applicable rules and regulations is

---

[141] *Romero v. Mobil Expl. & Producing N. Am., Inc.,* 939 F.2d 307, 311 (5th Cir. 1991); *McAdams v. Louisiana Power & Light Co.,* 95-126 (La. App. 5 Cir. 7/25/95), 659 So. 2d 820, 824 ("[A] plaintiff may offer a statute or regulation as evidence of a defendant's negligence even when that statute or regulation cannot be used to establish negligence per se."); *Manchack v. Willamette Indus., Inc.,* 621 So. 2d 649, 653 (La. App. 2 Cir. 1993) ("Violations of the regulations are intuitively relevant as evidence that premises are unreasonably dangerous, though they cannot be used as conclusive proof."); *Gantt v. Seadrill Americas, Inc.,* 360 F. Supp. 3d 402, 408, n. 30 (E.D. La. 2018).

[142] *Id.*; *Ponds v. Force Corp.,* 2016 WL 7178483, at *4–5 (E.D. La. 2016); *Waters v. Lowe's Home Centers, LLC,* 2019 WL 5309969, at *3 (E.D. La. 2019).

[143] *Alford v. Anadarko E&P Onshore LLC,* 2015 WL 471596, at *12 (E.D. La. 2015) (emphasis omitted); *Campbell v. Keystone Aerial Survs., Inc.,* 138 F.3d 996, 1003 (5th Cir. 1998) ("Even if a violation of a regulation does not constitute negligence per se, failure to comply with a regulation may still provide evidence that the defendant deviated from the applicable standard of care."); *Jones v. Buck Kreihs Marine Repair, L.L.C.,* 2013-0083 (La. App. 4 Cir. 8/21/13), 122 So. 3d 1181, 1187 ("Louisiana law is clear that '[w]hile statutory violations are not in and of themselves definitive of civil liability, they may be guidelines for the court in determining standards of negligence by which civil liability is determined.'").

[144] *Deville v. Conmaco/Rector, L.P.,* 2011 WL 13213666, at *3 (E.D. La. 2011); *Richardson v. SEACOR Lifeboats, LLC,* 2015 WL 2193907, at *3 (E.D. La. 2015); *Patriot Contracting, LLC v. Star Ins. Co.,* 2018 WL 10797881, at *5 (E.D. La. 2018).

[145] *Ross v. Willard*, 2007 WL 4374027, at *1 (M.D. La. 2007) ("Without 'industry standards' to rely upon, [the expert] seems to base his conclusions on his own authority. Because 'knowledge connotes more than subjective belief or unsupported speculation,' there is no reliable foundation for [the] expert opinion.").

even helpful to the trier of fact.[146] Expert witnesses, thus, "may and in fact *must* cite certain objective standards, including federal regulations, in coming to [their] conclusions."[147]

Therefore, even without any further input from the plaintiffs, Talos gives this Court no reason—much less a persuasive one—to find that the district court erred in denying its motion for judgment as a matter of law on the issue of its independent negligence.

> ### a. Objective documentary evidence presented to the jury showed that Talos assumed a duty of care through its contract with DLS.

As the plaintiffs have maintained all along, Talos assumed a duty of care in this case through its contract with DLS.

Specifically, the parties stipulated that their MSA and a separate Bridging Agreement governed the pipe-removal operation.[148] Beyond any credible dispute, this Bridging Agreement obligated DLS to adhere to Talos's SEMS program[149] and

---

146    *Ponds v. Force Corp.,* 2016 WL 7178483, at *4–5 (E.D. La. 2016); *Shell Offshore, Inc. v. Tesla Offshore, L.L.C.,* 2015 WL 5714622, at *6 (E.D. La. 2015); *Mobil Expl. & Producing v. A-Z/Grant Int'l Co.*, 1996 WL 194931, at *3 (E.D. La. 1996).

147    *E.g., Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,* 2016 WL 9414347, at *12 (E.D. La. 2016) (emphasis added); *Ross*, 2007 WL 4374027, at *1.

148    ROA.13521 (MSA, ¶22); ROA.11766:1-9 (stipulations).

149    ROA.13459 (Bridging Agreement, ¶2.2).

Talos's safe work practices manual.[150] By their very text, these documents show that Talos assumed the duty to (1) provide DLS with adequate tools "needed in order for [DLS] to perform their job[] in a healthy and safe manner,[151] and (2) approve for use only those tools that a properly conducted JSA confirmed to be adequate for the job.[152] At trial, however, the jury heard the evidence that Talos did neither of these things.

That evidence shows that, before DLS and Mr. Jackson ever stepped foot on Talos's platform, Talos (1) knew that a half-inch manila rope would be used to lower the pipes to the +10 deck,[153] (2) approved this rope to be used,[154] and (3) had every chance in the world to, as the party most familiar with its platform, request that a different method or tool be used for the pipe-removal.[155] But Talos settled on the cheapest option that would bring it in compliance with the BSEE orders. Why?

---

[150]    *Id.*; ROA.11324:20-11325:2 (DeLue); ROA.11200:24-11201:4, ROA.11206:7-11207:6, and ROA.11457:21-24 (DLS corporate); ROA.11031:7-11032:4, ROA.11168:10-22, ROA.11111:18-11112:4, ROA.11132:8-11133:17, and ROA.11170:3-11171:13 (Ziegler); ROA.10849:25-10850:5, ROA.12028:2-9, and ROA.12033:3:21 (Talos corporate).

[151]    ROA.12441 (Talos's manual, ¶3.1.3.); ROA.11255:12-11256:13 (DLS corporate); ROA.10977:3-9 (Talos corporate); ROA.11300:17-11301:9 (DeLue).

[152]    ROA.11300:17-11301:9 (DeLue); ROA.11215:22-11254:20 (DLS corporate); ROA.12069:3-22 (Talos corporate).

[153]    ROA.11289:1-17, ROA.11291:11-11293:17, and ROA.11300:23-11301:9 (DeLue); ROA.11251:22-11252:3 (DLS corporate).

[154]    *Id.*; ROA.11305:21-11307:7 (DeLue).

[155]    ROA.11251:22-11254:20 (DLS corporate); ROA.11158:22-11160:4 (Ziegler).

Because Talos knew that its platform would soon be decommissioned and cease to be a source of revenue.[156] So, Mr. Jackson fell victim to Talos's financial decisions motivated by its bottom line.

In sum, this evidence affirmatively showed that Talos was independently negligent in this case because it first, by contract, assumed certain duties toward DLS and then callously breached them—causing this incident.

> **b. The evidence at trial showed that Talos assumed a duty of care by creating the hazardous condition that killed Mr. Jackson.**

Under Louisiana law, a principal owes a duty to an independent contractor employee to ensure the safety of its premises if the principal creates the hazardous condition at issue.[157] That is exactly what happened here.

Indeed, the evidence adduced at trial showed that Talos created the pipe-falling hazard that contributed to this incident. The evidence also showed that Talos did so in, at least, seven different ways. One, despite being required to do so, Talos did not conduct a proper JSA to address and eliminate the risks involved with the pipe removal operation.[158] Two, despite being required to do so, Talos did not provide

---

[156]   ROA.11158:22-11160:4 (Ziegler); ROA.12070:1-12075:4 (Talos corporate).

[157]   *Venezia,* 2014 WL 107962, at *6; *Thomas*, 2000 WL 1528082 at *2.

[158]   ROA.12514 (Talos's manual, ¶7.1.1.); ROA.11032:15-11034:21 (Ziegler); ROA.10870:9-15, ROA.10871:8-10872:1, and ROA.10934:25-10936:1 (Talos corporate).

DLS with adequate tools for the job.[159] Three, despite being required to do so, Talos did not issue a hot work permit on the day of the incident—the permit without which the pipe removal should not have been allowed to proceed in the first place.[160] Four, despite being required to do so, Talos did not properly mark or barricade a landing zone or a no access area to prevent personnel entry into the space where the pipes were being lowered and where there was a risk of being directly exposed to the falling hazard.[161] Five, despite being required to do so, Talos did not issue cross-barricade permits for each and every time that DLS crew had to access the out-of-service area to retrieve the lowered pipes.[162] Six, despite being required to do so, Talos did not prevent DLS from proceeding with the pipe removal—which was warranted because Talos had failed to issue all required permits for the pipe removal to go forward.[163] And seven, despite being required to do so, Talos did not first physically visit its own

---

[159]     ROA.12441 (Talos's manual, ¶3.1.3.); ROA.11255:12-11256:13 and ROA.11251:22-11254:20 (DLS corporate); ROA.10977:3-9, ROA.12069:3-22, and ROA.12070:1-12075:4 (Talos corporate); ROA.11300:17-11301:9 (DeLue); ROA.11055:1-19 and ROA.11158:22-11160:4 (Ziegler).

[160]     ROA.13461 (Bridging Agreement, ¶4); ROA.10856:5-10857:5 and ROA.10858:21-10859:12 (Talos corporate); ROA.11068:10-11069:18 (Ziegler); ROA.11307:8-25 (DeLue).

[161]     ROA.10943:15-10945:18, ROA.10930:10-22, and ROA.10941:24-10942:18 (Talos corporate); ROA.11315:2-13 (DeLue).

[162]     ROA.11071:16-11073:17 and ROA.11075:12-11077:25 (Ziegler); ROA.11312:20-11314:23 (DeLue); ROA.10941:24-10942:18 (Talos corporate).

[163]     ROA.12586 (Talos's SEMS plan).

platform before pencil-whipping the JSA and allowing the pipe removal to proceed without conducting a proper hazard analysis.[164]

All of these failures are fully corroborated by, among others, Talos's own documents as well as by the fatal testimony of its own corporate representative. By comparison, Talos presented the jury with *no evidence* whatsoever to show that (1) Talos was not required to do *any* of these things—much less all of them, (2) Talos did not fail in *any* of these regards—much less in all of them, or (3) these Talos's failures, in their own right but especially in combination, did not play a role in causing this incident. And that vacuum of evidence speaks volumes.

The record in this case thus confirms that Talos created the hazardous condition that led to this incident. In doing so, Talos assumed a duty of care under Louisiana law. Thus, the district court did not err in finding that Talos was independently negligent in this case and in denying its motion for judgment as a matter of law on the issue.

---

[164] ROA.10856:5-12 (Talos corporate); ROA.11070:19-11071:15 (Ziegler); ROA.12544 (the JSA for the day of the incident).

### C. The district court did not abuse its discretion in denying Talos's motion for a new trial; the jury's allocation of 88% fault to Talos is supported by the evidence.

Perhaps aware of the weakness of its position on negligence, Talos offers this Court an alternative argument. It claims that, even if its (in)actions did cause this incident, the jury's allocation of 88% fault to it was "unreasonable."[165] So, says Talos, the district court should have, at least, granted it a new trial on liability.[166] The district court correctly declined this invitation.

As a preliminary matter, this Court defers heavily to the wisdom of the jury verdict.[167] And a district court's denial of a motion for new trial is reviewed "for an abuse of discretion, that is, for clear error."[168] There is no abuse of discretion in denying a motion for new trial "unless there is a *complete absence* of evidence to support the verdict."[169]

---

[165]   Appellant's brief, pp. 44-45.

[166]   *Id.* at p. 44.

[167]   *Prestenbach v. Rains,* 4 F.3d 358, 361 (5th Cir. 1993).

[168]   *Newsom v. Wal-Mart Stores, Inc.,* 58 F.3d 635 (5th Cir. 1995); *Delahoussaye v. Performance Energy Servs., L.L.C.,* 734 F.3d 389, 392 (5th Cir. 2013); *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.,* 69 F.3d 535 (5th Cir. 1995) ("The allocation of fault is a finding of fact subject to the clearly erroneous standard of review.").

[169]   *Newsom,* 58 F.3d at 635 (emphasis added) (internal citation omitted).

In its brief, "Talos acknowledges the daunting standard of review."[170] Still, Talos attempts to meet it by claiming that the jury's fault allocation "resulted from something other than a rational view of the evidence."[171] This is so, says Talos, because the jury should not have assigned it 88% fault when DLS's corporate representative, Mr. Joseph Tortomase, admitted that DLS was at least 50% at fault.[172] Not only does Talos's argument fall woefully short of meeting the exacting standard of review that applies here, but it is also yet another example of Talos's scant presentation of the evidence to this Court.

It is true that Mr. Tortomase was *initially* under the impression that DLS shared a great deal of responsibility for this incident with Talos. But what Talos so conveniently fails to mention to the Court is that this opinion *changed* in the course of this litigation as Mr. Tortomase was, for the first time, learning new information— the information which Talos had kept away from DLS. For instance, Talos (1) denied DLS's requests to join Talos's investigation into the incident,[173] (2) denied DLS's requests to inspect the parted manila rope,[174] and (3) refused to provide DLS with

---

[170]   Appellant's brief, p. 45.

[171]   *Id.* at p. 46.

[172]   *Id.* at pp. 45-46.

[173]   ROA.11223:9-12 and ROA.11224:14-11225:9 (DLS corporate).

[174]   *Id.* at ROA.11253:17-11254:20.

the requested information.[175] As a result, when DLS tried to conduct its own investigation into the incident—leading to the creation of a "Lessons Learned" document[176] in which he stated his initial impressions concerning DLS's fault—Mr. Tortomase didn't know that Talos had "as much responsibility as the documentation has proven to me."[177] In other words, at the time, Mr. Tortomase didn't know that (1) Talos's Mr. Bourque was required to physically visit the site and review each step included in the JSA,[178] (2) Mr. Bourque was required to "expressly sign off" on the way that the pipe removal was conducted,[179] (3) Talos didn't issue a hot work permit on the day of the incident,[180] (4) Talos was required, but failed, to designate the landing zones and issue cross-barricade permits,[181] and so on.[182] Most importantly, Mr. Tortomase told the jury that this lack of information rendered DLS's investigation (that occurred shortly after the incident)—and the ensuing Lessons

---

[175]    ROA.11254:25-11255:3 and ROA.11257:9-22 (DLS corporate).

[176]    *Id.* at ROA.11210:20-23 and ROA.11241:6-14.

[177]    *Id.* at ROA.11261:2-17.

[178]    *Id.* at ROA.11242:7-15 and ROA.11462:8-17.

[179]    *Id.* at ROA.11448:7-18.

[180]    *Id.* at ROA.11469:1-4.

[181]    *Id.* at ROA.11469:5-9.

[182]    *Id.* at ROA.11242:16-11243:14.

Learned document containing his initial opinion regarding DLS's fault for this incident—essentially useless.[183]

As such, Talos's reliance on Mr. Tortomase's initial (and since retracted) opinion on DLS's role in causing this incident—as the *only* support for its challenge of the jury's fault allocation—is entirely misplaced. The district court's denial of Talos's motion for a new trial was not clearly erroneous. And Talos gives this Court no reason to disturb the jury's sound verdict.

### D. The district court's rulings on damages do not constitute an abuse of discretion.

Contrary to Talos's argument, this Court's standard of review on the district court's damages-related rulings is not *de novo*.[184] It is for an abuse of discretion.[185] And this standard is "strict," especially when—as here—a trial court has already ordered a remittitur.[186]

---

[183]    *Id.* at ROA.11243:10-11244:8.

[184]    Appellant's brief, pp. 46-48.

[185]    *Echeverry*, 988 F.3d at 236; *Vogler v. Blackmore,* 352 F.3d 150, 154 (5th Cir. 2003); *Smith v. Harrah's New Orleans Mgmt. Co.,* 213 F. App'x 353, 357–58 (5th Cir. 2007).

[186]    *Seidman v. Am. Airlines, Inc.,* 923 F.2d 1134, 1140 (5th Cir. 1991).

### 1. The district court did not abuse its discretion regarding the verdict form.

Talos first claims that the district court violated this Court's precedent and invited the jury to duplicate the general damage awards by using a "verdict form with separate blanks for loss of love, affection, and companionship; past mental anguish; and future mental anguish."[187] According to Talos, this error was "amplified by the trial court's erroneously instructing the jury to consider mental anguish and loss of love and affection as separate elements of recovery."[188] But Talos's argument is meritless. Three reasons explain why.

*First*, Talos *admittedly* did not object to the district court's instruction to the jury regarding mental anguish.[189] "[A] party's failure to adequately object to a jury instruction means that the party has waived that objection on appeal."[190] As such, the Court should hold that the issue is not preserved and address it no further. But even if Talos had not forfeited its objection, the district court did not abuse its

---

[187]  Appellant's brief, p. 48.

[188]  *Id.* at p. 52.

[189]  *Id.* at n. 9.

[190]  *Sonder USA, Inc. v. 635 N. Scott St., L.L.C.,* 2023 WL 6458851, at *6, n.7 (5th Cir. Oct. 4, 2023); *U.S. S.E.C. v. Snyder,* 292 F. App'x 391, 408 (5th Cir. 2008).

discretion here because the subject jury instruction is fully in compliance with Louisiana law.[191]

*Second*, relying on *Croce v. Bromley Corp.,*[192] Talos claims that the verdict form should have included a single blank for loss of love, affection, and companionship—which subsumed the plaintiffs' mental anguish. But there is a problem. *Croce* was decided almost *50 years ago* when there was no "clear expression from Louisiana courts favoring separate monetary awards for distinct elements of nonpecuniary damages."[193] While Talos refuses to recognize this reality, that has since changed. As recent Louisiana jurisprudence has made it clear, "[m]ental anguish, grief, and anxiety, on one hand, and loss of love and affection, on the other hand, are *independent concepts*" and *"distinct and separate injuries."*[194] While "[m]ental anguish and grief refers to the 'pain, discomfort, inconvenience, anguish, and emotional trauma'

---

[191]     18 La. Civ. L. Treatise, Civil Jury Instructions § 18:14 Wrongful death (3d ed.).

[192]     623 F.2d 1084 (5th Cir. 1980).

[193]     *Id.*

[194]     *Rachal v. Brouillette,* 2012-794 (La. App. 3 Cir. 3/13/13), 111 So. 3d 1137, 1142 (emphasis added); *Breaux v. Goodyear Tire & Rubber Co.,* 2021-00811 (La. 10/5/21), 325 So. 3d 363 ("Plaintiffs are allowed to recover general damages for both 'loss of love and affection' as well as 'mental anguish, grief, and anxiety' as recognized by the courts below.") (internal citations omitted); *Renfro v. Burlington N. Santa Fe Ry. Co.,* 2015-372 (La. App. 3 Cir. 5/11/16), 193 So. 3d 1192, 1213; *Nobles v. Egal,* 2022 WL 3971048, at *13 (W.D. Tex. 2022) ("In wrongful death cases, mental anguish damages and loss of companionship and society damages both compensate for noneconomic losses. ... However, these two elements of damages are separate and do not overlap.").

that accompany the injury," "[l]oss of love and affection . . . goes beyond the initial grief and emotional trauma."[195] That is, while "grief is the presence of an emotion as a result of a loved one's death," loss of love and affection "is the absence of an experience; specifically, the absence of a love previously bestowed."[196]

And *third*, "[c]ourts commonly list different elements of general damages, including mental anguish and physical pain and suffering, *both* past and future, *separately*."[197] Louisiana courts routinely allow this practice as evident from the jury's separate awards for past and future mental anguish, respectively.[198]

Therefore, the district court did not abuse its discretion in separating these two completely different categories of general damages in the verdict form. The denial of Talos's motion for a new trial raised on this ground was proper and should be left undisturbed.

---

[195]    *Rachal,* 111 So. 3d at 1142.

[196]    *Id.*

[197]    *Guillot v. Daimlerchrysler Corp.,* 2008-1485 (La. App. 4 Cir. 9/24/10), 50 So. 3d 173, 193 (internal citations omitted) (emphasis added); *Fontenot v. Citgo Petroleum Corp.,* 2017-924 (La. App. 3 Cir. 5/23/18), 247 So. 3d 837, 842.

[198]    *E.g., Bowers v. Liuzza,* 00-229 (La. App. 5 Cir. 7/25/00), 769 So. 2d 88, 94; *Holt v. Aetna Cas. & Sur. Co.,* 28,450 (La. App. 2 Cir. 9/3/96), 680 So. 2d 117, 131; *Augustine v. SAFECO Nat. Ins. Co.,* 2008-1515 (La. App. 3 Cir. 6/10/09), 18 So. 3d 761, 765.

### 2. The district court did not abuse its discretion in applying the maximum recovery rule or in otherwise calculating the remitted awards.

Though the district court partly granted Talos's remittitur request, substantially reducing the jury's general damages award to the plaintiffs,[199] Talos is still displeased. It claims that the district court, in applying the maximum recovery rule, failed to consider cases that are factually similar to this one. That is incorrect.

This Court employs the "maximum recovery" rule in determining whether damages are excessive and setting remittitur.[200] The rule "permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision."[201] Notably, while the assessment must be guided in all respects by "the highest" prior awards that exist, not the lowest,[202] the rule "does not necessarily limit an award to the highest amount previously recognized in the state."[203]

---

[199]   ROA.10730-10741 (court's ruling on Talos's post-trial motion).

[200]   *Echeverry,* 988 F.3d at 236; *Puga v. RCX Sols., Inc.,* 922 F.3d 285, 297 (5th Cir. 2019).

[201]   *Echeverry,* 988 F.3d at 236.

[202]   *Id.* at 236-37.

[203]   *Douglass v. Delta Air Lines, Inc.,* 897 F.2d 1336, 1344, n.14 (5th Cir. 1990).

### a. The district court properly applied the maximum recover rule to general damages for Mr. Jackson's minor son; there was no abuse of discretion.

For Mr. Jackson's minor child, Talos argues that the district court improperly adjusted the jury's award from $20 million to $4,360,708.59 because it did not consult cases that, by Talos's standards, are sufficiently similar to the facts of this case. But no case, including the ones referenced by Talos, is wholly similar to this one. Splitting hairs in the way suggested by Talos to find factually identical cases would render the maximum recovery rule obsolete.[204]

Mr. Jackson's son was only 8 years old when he lost his father.[205] But, though they lived apart, he still felt like his dad was "a piece of [him]."[206] This is so because Mr. Jackson played a huge and very important role in his son's upbringing.[207] Though he worked offshore away from home, Mr. Jackson vowed to Ms. Warner that they would invest their best efforts in raising their child.[208] And he stayed true to his promise. When his son was born prematurely, Mr. Jackson rushed to New

---

[204] *Frazier v. Honeywell Int'l, Inc.,* 518 F. Supp. 2d 831, 842 (E.D. Tex. 2007) ("No reported case is wholly similar to the facts of this case, thus the maximum recovery rule is not mandated here.").

[205] ROA.11647:11-16 (Warner).

[206] ROA.11760:4-7 (Y.J.).

[207] ROA.11621:7-21 (Warner).

[208] *Id.* at ROA.11618:21-11619:11.

York and was the first one to hold him upon his release from NICU.[209] Mr. Jackson was always supportive of his son such that Ms. Warner never felt like a single parent.[210] In addition to financially providing for him,[211] Mr. Jackson would also buy his son school supplies and various gifts to make his son feel special.[212] Mr. Jackson was a "loving father"[213] who would talk to his son in the morning before school and at night to say prayers before bed.[214] He provided his son with guidance, advice, and comfort.[215] He encouraged and supported his son's talent and love for football—something that they both shared.[216] As an undefeated football champion, Mr. Jackson's son wears a spat on his cleats that says "Love you dad."[217] He has been seeing a therapist to cope with the loss of his father.[218]

The jury and the district court witnessed Mr. Jackson's longing and suffering for his father first-hand, and they were (respectively) in the best position both to

---

[209]    *Id.* at ROA.11620:10-11621:6.

[210]    *Id.* at ROA.11631:6-8 and ROA.11645:20-11646:14.

[211]    *Id.* at ROA.11624:5-20.

[212]    *Id.* at ROA.11623:10-11624:4.

[213]    *Id.* at ROA.11625:3-14.

[214]    ROA.11622:7-11623:9 and ROA.11630:8-15 (Warner); ROA.11760:4-11761:3 (Y.J.).

[215]    ROA.11762:9-25 (Y.J.).

[216]    ROA.11626:10-25 (Warner); ROA.11759:17-18 and ROA.11760:13-23 (Y.J.).

[217]    ROA.11632:6-19 (Warner).

[218]    ROA.11629:15-11630:7 (Warner); ROA.11761:15-24 (Y.J.).

award damages at the outset and to determine an appropriate remittitur thereafter. And a review of relevant cases shows that the remittitur granted in Talos's favor is in line with the evidence and the governing law.

In applying the maximum recovery rule to the evidence, the district court properly relied upon *Rachal v. Brouillette*, wherein a minor child lost his mother in a vehicular collision.[219] There, the jury awarded the minor $2.5 million in wrongful death damages, which the appellate court affirmed.[220] As the district court noted, with inflation, this award is worth $3,303,567.11 today, and, when increased by 50%, comes to $4,955,350.67.[221] After a reduction for fault, it comes down to $4,360.708.59.[222] *Rachal* is analogous to this one and the district court's remittitur is properly based upon it and properly applies the maximum recovery rule to it.[223]

---

[219]    111 So. 3d 1137 (La. App. 3d Cir. 2013).

[220]    *Id.* at 1143-44.

[221]    ROA.10739.

[222]    *Id.*

[223]    The appellant also argues that the district court erred in using the date of entry of judgment in *Rachal* instead of the appellate court's affirmance date. Appellant's brief, p. 58. This theory, which is worth only $95,729 in the grand scheme of the judgment, is not supported by any citation in the appellant's brief. Even so, the theory was never raised below by the appellant and should be deemed waived. To the extent that the issue is preserved, however, there is no reason why the date of an appellate court's affirmance of a district court judgment should control over the date of the district court judgment itself for maximum recovery purposes. And to that extent, the theory should be rejected.

Also supportive of the award is *Estate of Heiser v. Islamic Republican of Iran*, which is a decision in which a federal court applied Louisiana law. [224] In applying the maximum recovery rule, this Court has considered "those federal cases governed by [the State]'s substantive law." [225] *Heiser* is one such case and, contrary to Talos's argument, it should be considered here. [226] It involved the bombing of Khobar Towers in Saudi Arabia killed various U.S. servicemen. Their families (and estates) filed suit against various foreign entities involved, and the matter proceeded to a default hearing. One of the sons was only four years old when his father died. [227] The court awarded him $5 million for the loss. [228] The other son was only two months old when his father died. He, too, was awarded $5 million. [229] If maximum recovery is applied to this reported December 2006 decision, it would have been worth $7,626,090.19 at the time when the district court entered remittitur and, after a 150% increase, $11,439,135.28. A reduction for fault would then bring it to $10,066.439.05. [230] Although the district court did not rely upon *Heiser* in ruling, that case confirms that

---

[224]    466 F.Supp. 2d 229 (D.D.C. 2006).

[225]    *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990).

[226]    *Id.*

[227]    *Heiser,* 466 F.Supp. 2d at 323.

[228]    *Id*.

[229]    *Id*. at 324.

[230]    Available at https://www.bls.gov/data/inflation_calculator.htm (last visited on March 18, 2024).

the district court's decision for choosing a more conservative holding of *Rachal* on which to base its remittitur, if anything, was generous to Talos and not erroneous. The Court should decline to disturb the district court's remittitur.

> **b. The district court properly calculated the maximum recover rule on general damages for Mr. Jackson's widow; there was no abuse of discretion.**

The district court adjusted the jury's general damages award to Mrs. Jackson from $6.6 million to $5,104,226.22.[231] Talos argues that this, too, was done in error because Talos does not approve of the level of factual similarity between this case and the one relied on by the court.

At the time of the incident, Mrs. Jackson had been married to Mr. Jackson for 3 years.[232] A loving husband and her best friend, Mr. Jackson always made her feel safe, happy, and provided for.[233] When together, they loved to travel, go to church and movies, and host cookouts for their family.[234] When his work took him offshore, Mr. Jackson would call his wife 3 times a day—every single day.[235] He promised to

---

[231]   ROA.10730-10741 (court's ruling on Talos's post-trial motion).

[232]   ROA.11687:20-24 (Mrs. Jackson).

[233]   *Id.* at ROA.11690:11-11691:4, ROA.11706:2-19, and ROA.11688:4-14.

[234]   *Id.* at ROA.11685:3-22 and ROA.11687:2-13.

[235]   *Id.* at ROA.11706:20-11707:8.

grow old with her,[236] but his untimely passing caused by this incident prevented him from keeping that promise.

The district court's remittitur properly relied upon *Zimko v. v. American Cyanamid*, a case in which a worker died from mesothelioma and his wife filed suit.[237] After a trial, she was awarded $2.5 million for the loss of her husband.[238] Applying maximum recovery to this decision brought it to $3,866,838.05 and, when increased by 150%, up to $5,800,257.07. Once adjusted for Talos's fault, that reduced it to $5,104,226.22, which is the exact calculation that the district court made. *Zimko* is extraordinarily similar to this case, and the district court properly used it as its benchmark for applying the maximum recovery rule.

Talos claims otherwise, arguing that *Zimko*'s failure to discuss the damages in detail makes it inappropriate for consideration.[239] That theory is incorrect. For this argument, Talos cites *Salinas v. O'Neill*, which is a case where this Court, in a footnote, declined to rely on a prior federal decision that had not broken down a district court's remittitur in full, so it was unclear what damages in the remitted award were

---

[236]    *Id.* at ROA.11691:1-4 (post-trial hearing transcript).

[237]    905 So. 2d 465 (La. App. 4th Cir. 2005).

[238]    *Id.* at 474.

[239]    Appellant's brief, pp. 55-56.

for what.[240] Because that is the actual holding Talos is relying upon, the best argument that Talos can muster—made in a footnote only—is that *Zimko*'s $2.5 million award also included "medical expenses" which are not delineated in the appellate court's judgment.[241] Yet *Zimko*'s medical expenses are readily ascertainable from the parties to that appeal's publicly available briefs: The medical expenses were $179,935.75.[242] This relatively low number explains why Talos relegates the argument to a footnote. Even more tellingly, Talos is *aware* that this information is publicly available in the briefs because the appellees here pointed it out in open court at the post-trial motions hearing.[243] Yet Talos does not address that fact in its brief, nor does Talos raise, as an error, that the district court should have calculated *Zimko*'s general damages as worth the difference of $2,320,064.25. The Court should deem this to be a waiver of such an argument. Regardless, *Zimko* dwarfs the quantum jurisprudence that Talos presents this Court. And, especially given the deference owed to the district court after it issues a remittitur, this modest difference does not diminish the correctness and the force of the district court's reliance upon *Zimko*.

---

[240]    *Salinas v. O'Neill*, 286 F.3d 827, 832 at n.7 (5th Cir. 2002).

[241]    Talos's brief, p. 55, n.10.

[242]    Appellee's brief in *Zimko*, 2003 WL 25975138 at *22 ("Ken[] Zimko's medical expenses total $179,935.75 . . . and those figures are without dispute.").

[243]    ROA.12343:9-18.

To reiterate, it is the highest—not the lowest—prior award that this Court has instructed must guide the excessiveness determination. And again, *Heiser* provides useful confirmation of the district court's reasoning. There, the U.S. serviceman's wife was also awarded wrongful death damages under Louisiana law for the loss of her husband. After examining their close relationship, the court awarded her $8 million in wrongful death damages.[244] Applying inflation to the date of the district court's remittitur would increase this award to $12,201,744.30, and when adding 150% on, would take it to $18,302,616.45. After reduction for Talos's 88% fault, it would be over $16 million. This is far above what Mrs. Jackson received in this case and, all on its own, confirms that her remitted award is not abusive.

These decisions strongly counsel that no further remittitur of Mrs. Jackson's award is warranted. The district court's remitted award should be left undisturbed.

### E.  The district court did not abuse its discretion in denying Talos's motion for a new trial based on alleged inflammatory comments.

The record evidence in this case was so decidedly unfavorable to Talos that, in its eyes, mere questioning of witnesses by the plaintiffs' counsel on the evidence was "inflammatory." After reviewing the trial transcript, the district court—which is "generally better able than an appellate court to evaluate the prejudice flowing

---

[244]    466 F.Supp. 2d 229, 322-23 (D.D.C. 2006).

from improper jury arguments"[245]—found that "nothing inappropriate was said."[246] Examining the complained of statements collectively, and in the specific context of the trial,[247] this Court will be hard-pressed not to reach the same conclusion. Each Talos's "category" of allegedly incendiary comments will be discussed below.

*First*, it is undisputed that—prior to this incident—Talos had already been convicted of a felony for violating the same hot work permit requirements that were at issue in this case.[248] Contrary to Talos's argument, this evidence of prior bad act was admissible on several grounds—not in the least to show absence of a mistake or lack of accident.[249] That was especially relevant here considering that Talos attempted to cover up its failure to issue a hot work permit on the day of the incident by blaming the wind for blowing it into the Gulf of Mexico. Each of the 21 record cites referenced by Talos,[250] except for one that references the closing argument,[251]

---

[245] *Baisden v. I'm Ready Prods., Inc.,* 693 F.3d 491, 509 (5th Cir. 2012).

[246] ROA.10735 (court's ruling on Talos's post-trial motion).

[247] *Clapper v. Am. Realty Invs., Inc.,* 2024 WL 995478, at *3 (5th Cir. Mar. 8, 2024); *Colburn v. Bunge Towing, Inc.,* 883 F.2d 372, 375 (5th Cir. 1989); *Heckman v. Gonzalez-Caballero,* 2023 WL 2923315, at *2 (5th Cir. Apr. 13, 2023).

[248] ROA.10926:14-10929:4, ROA.10981:1-18, and ROA.10985:11-16 (Talos corporate); ROA.11260:10-17 (DLS corporate).

[249] Fed. R. Evid. 404(b)(2).

[250] Appellant's brief, p. 71.

[251] That is ROA.12276:22.

shows the plaintiffs' counsel questioning Talos's corporate representative on the issue. And, in the specific context of this trial, this was entirely proper. Besides, a cursory review of *each* of these 21 record cites shows that Talos failed to lodge a *single* objection. Not only is this "a telling indication that [Talos] did not think at the time the references were so prejudicial that they warrant an objection,"[252] but—as this Court knows—that also constitutes a *waiver*.[253] The Court should follow its normal practice and deem these un-raised objections to be waived.

*Second*, while it is true that the plaintiffs' counsel questioned witnesses at trial regarding the members that comprised Talos's team responsible for investigating this incident, such questioning did not—by any stretch of imagination—"condemn Talos for seeking legal counsel."[254] Instead, its purpose was to explore bias in Talos's investigation efforts—the same investigation efforts that led Talos to declare itself almost entirely free of fault for causing this incident. The plaintiffs were, thus, perfectly within their rights to explore the issue. Besides, again, Talos *never once objected* to the plaintiffs' comments or the line of questioning on the point—thereby waiving the right to now complain about it before this Court.

---

[252]  *Heckman v. Gonzalez-Caballero,* 2023 WL 2923315, at *3 (5th Cir. Apr. 13, 2023).

[253]  *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 283 (5th Cir. 1975); *Baisden*, 693 F.3d at 509; *Colburn*, 883 F.2d at 376.

[254]  Appellant's brief, p. 72.

*Third,* Talos boldly claims that the plaintiffs at trial "accused it of witness intimidation." But, as confirmed by Talos's own cites, this is simply false. It is no secret that blackballing is common in the offshore industry. There is nothing prohibiting the plaintiffs from questioning the witnesses about this practice—particularly in light of DLS's (initial) willingness to admit a considerable share of fault for this incident. No conceivable prejudice could have befallen Talos because the witnesses were free to admit or deny it. In any event, due to Talos's failure to lodge any objections on this ground, the issue is waived, anyway.

*Fourth,* that Talos is a sore loser is further revealed by its next spin of events—*i.e.,* that the plaintiffs allegedly accused Talos's counsel of misrepresentation.[255] The argument is baseless and hypocritical. As the Court can glean from Talos's quotes, which refer to the information "being hidden" or "missing,"[256] Talos withheld highly relevant evidence from the plaintiffs until *the middle of this trial*.[257] So, the fact that the jury had to be informed that Talos hid probative evidence from the plaintiffs was a consequence of Talos's own making.[258] And it was not Talos, but the plaintiffs,

---

[255]    Appellant's brief, p. 74.

[256]    *Id.*

[257]    ROA.10872:2-10892:14 (discussions among parties, Talos's corporate representative, and the court on missing evidence).

[258]    *Heckman,* 2023 WL 2923315, at *3 (holding that reversal or remittitur is appropriate only when, in closing arguments, counsel's assertions are either false or without basis in record).

who were severely prejudiced by this development at trial. That Talos, indeed, suffered no prejudice is also confirmed by its failure to object—which, again, amounts to a waiver, making it unnecessary for the Court to even address the point.

And finally, *fifth*, Talos argues that the plaintiffs' counsel appealed to the jury to act as the "conscience of the community" in rendering its verdict. Not so. As a threshold matter, conscience-of-the-community arguments are not per se improper.[259] They may become improper when the "parties' relative popular appeal, identities, or geographical locations are invoked to prejudice the viewpoint of the jurors.[260] Talos did not, and cannot, present this Court with a shred of evidence that such invocation was made here. After all, Talos also did not cite for this Court a single case where any court ordered a new trial based on the comments that Talos complains of here. That is telling. And for completeness, in this substantive Louisiana law-based case, the Louisiana Supreme Court's prescribed general civil jury instructions *do* incorporate aspects of community decision-making: "Above all, the community wants you to achieve justice."[261] This simply confirms that such arguments are not, per se, improper.

---

[259]   *Baxter v. Anderson,* 277 F. Supp. 3d 860, 865 (M.D. La. 2017).

[260]   *Id.* (internal citation omitted).

[261]   La. Supreme Court Rule XLIV, Plain Civil Jury Instructions, Closing Instructions (available at: https://www.lasc.org/Supreme_Court_Rules?p=RuleXLIV ).

To conclude, Talos concedes—due to its failures to object— that the standard of review is for plain error.[262] But, as shown above, Talos doesn't come close to meeting that standard here. While Talos claims that a new trial is warranted because "[i]t would be hard to find a trial transcript more permeated than this one with one side's inflammatory comments,"[263] the truth is simpler: It would be hard to find a case where the record—combined with a defendant's far-fetched excuses and withholding of evidence—was more fatal to the appellant than this one. And that presents no ground for a new trial.

## VI.   CONCLUSION

The district court's judgment should stand in all respects. The Court should affirm.

---

[262]   Appellant's brief, p. 69; *Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 586 (5th Cir. 1985); *Wallace v. Mississippi,* 43 F.4th 482, 496 (5th Cir. 2022) ("Under the plain-error standard, Wallace must show for reversible plain error: (1) a forfeited error; (2) that was plain (clear or obvious error, rather than one subject to reasonable dispute); and (3) that affected his substantial rights.").

[263]   Appellant's brief, p. 76.

Respectfully submitted,

/s/ Andy Dupre
Andy Dupre (La. Bar 32437)
Ilijana Todorovic (La. Bar 39052)
THE DUPRE LAW FIRM, LLC
705 Constantinople Street
New Orleans, LA 70115
Telephone: 985-855-2553
Facsimile: 504-814-8156

Appellate counsel to the appellees,
Anika Warner on behalf of Y.J., and
Vantrece Jackson

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2024, I electronically filed this Original Brief of Plaintiffs-Appellees Anika Warner and Vantrece Jackson, Urging Affirmance, with the Clerk of Court of the U.S. Court of Appeals for the Fifth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Andy Dupre
Appellate counsel to the appellees,
Anika Warner on behalf of Y.J., and
Vantrece Jackson

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's order granting an extension of the word limit because this brief contains 14,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 with 14 point, Equity Text A font.

/s/ Andy Dupre
Appellate counsel to the appellees,
Anika Warner on behalf of Y.J., and
Vantrece Jackson